FILED
MAY 21 2007
U.S. COURT OF
FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BILTMORE FOREST BROADCASTING FM, INC.** | ) | |
| | ) | |
| **v.** | ) | **No.** 07-316 C |
| | ) | |
| **THE UNITED STATES** | ) | |

## COMPLAINT

Donald J. Evans
Raymond J. Quianzon
Fletcher, Heald & Hildreth, PLC
1300 North 17th Street - 11th Floor
Arlington, Virginia 22209
Telephone: 703-812-0400
Facsimile: 703-812-0486

May 21, 2007

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BILTMORE FOREST BROADCASTING FM, INC.** | ) | |
| | ) | |
| **v.** | ) | **No. ______** |
| | ) | |
| **THE UNITED STATES** | ) | |

## COMPLAINT

Donald J. Evans
Raymond J. Quianzon
Fletcher, Heald & Hildreth, PLC
1300 North 17th Street - 11th Floor
Arlington, Virginia 22209
Telephone: 703-812-0400
Facsimile: 703-812-0486

May 21, 2007

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BILTMORE FOREST BROADCASTING FM, INC.** | ) | |
| | ) | |
| **v.** | ) | **No. ______** |
| | ) | |
| **THE UNITED STATES** | ) | |

## COMPLAINT

*Jurisdiction*

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 2071(a), (c); 2503(b); and 2521(1). The statute that mandates the payment of money for acts or omissions alleged herein is 28 U.S.C. § 1491(a)(1).

Plaintiff acknowledges that this court has ruled in *Folden v. United States*, 56 Fed. Cl. 43 (2003), *aff'd*, 379 F. 3d 1344 (Fed. Cir. 2004), *cert. den.* 545 U.S. 1127, 125 S. Ct. 2935, 162 L. Ed. 2d 865 (2005), that certain claims in connection with licenses issued by the Federal Communications Commission ("FCC") are not subject to the jurisdiction of this court but are instead subject to the exclusive jurisdiction of the United States Court of Appeals for the District of Columbia Circuit. Plaintiff duly pursued an appeal of the FCC's licensing decision with respect to the license at issue with the D.C. Circuit and later the Supreme Court. *Biltmore Forest Broadcasting FM, Inc. v. FCC*, 321 F. 3d 155 (DC Cir. 2003), *cert. den.* 540 U.S. 981, 124 S. Ct. 463, 157 L. Ed. 2d 371 (2003). Those proceedings are now final and Plaintiff could not and does not seek an award from this Court of the license at issue there. Plaintiff's complaint before this Court is limited to the FCC's breach of its contract with Plaintiff and the attendant monetary damages, a matter over which the D.C. Circuit has no jurisdiction, for which the D.C. Circuit could afford no remedy, and for which the standard of review is entirely different. Because the

D.C. Circuit Court could not consider a contract claim or award monetary damages, there is no other court but this one to which Plaintiff can turn for relief. Thus, either *Folden* is distinguishable from the instant case on its facts, or Plaintiff will respectfully seek *en banc* review of *Folden* by the United States Court of Appeals for the Federal Circuit. The alternative would be to leave a jurisdictional vacuum where a federal agency can enter into and breach contracts involving licenses with no judicial recourse or remedy by the injured party.

*Facts*

1. Biltmore Forest Broadcasting FM, Inc. ("BFBFM"), a North Carolina corporation, was an applicant before the Federal Communications Commission ("FCC" or "Commission") for a license to own and operate an FM broadcast radio station in Biltmore Forest, NC. Its application was mutually exclusive with several other applicants.

2. The FCC decided during the pendency of the applications that it would issue the Biltmore Forest license by a process of "competitive bidding" or auction. This method of issuing broadcast licenses when there are multiple applicants had been authorized by Congress in 1997.

3. The FCC conducts license auctions pursuant to a hierarchy of rules that go from general rules applicable to all auctions to specific rules applicable to individual auctions. The general rules that apply to all auctions are found in 47 C.F.R. § 2101, *et seq*., with rules specific to particular radio services found in the rules for those services. The FCC's broadcast auction rules (pertinent here) are set forth in 47 C.F.R. § 73.5001, *et seq*. In addition to those rules, the FCC issues public notices prior to each auction which set out the specific requirements for participation in that particular auction (*e.g.*, the amount of upfront payments, bidding rules, the deadline for filing applications, permissible amendments to the applications, and the elements

which must be included in applications.) The rule applicable to broadcast auctions expressly makes compliance with the requirements set forth in such pre-auction public notices mandatory:

> To participate in broadcast service or ITFS auctions, all applicants *must* timely submit short-form applications (FCC Form 175) along with all required certifications, information and exhibits pursuant to the provisions of Section 1.2105(a) and any Commission public notices.

47 CFR 73.5002(b).

Accordingly, the terms establishing eligibility to participate in this auction were, by operation of the FCC's regulations, found in the *Public Notice* which the FCC issued for this auction.

4. In that *Public Notice* the FCC specified the essential information, exhibits and certifications which were required in order to participate in the auction at issue here. (*See* Attachment A to this Complaint). The FCC regulations (47 C.F.R. § 1.2105(a)(2)(B)) required applicants to supply seven different certifications which were automatically included in the electronically printed form submitted by prospective auction bidders.

5. In addition, for this auction only, the FCC required the submission of a special certification which was designed to verify whether prospective bidders were in compliance with the FCC's policy attributing to applicants the media interests held by family members under certain circumstances.

6. The *Public Notice* stated in boldfaced type:

> Accordingly, **whether or not a New Entrant Bidding Credit is being sought, all applicants must provide the information set forth in this section.** The following information is required:
>
> *Bidders or attributable interest holders in bidders must certify under penalty of perjury that the bidder complies with the Commission's policies relating to media interests of immediate family members.* See Policy Statement, *Clarification of the Commission's Policies Regarding Spousal Attribution*, 7 F.C.C. Rcd. 1920 (1992).

(Bold face and italics in original.)

7. This requirement was reiterated elsewhere in the *Public Notice*: "Bidders must certify in (in Exhibit A) compliance with the Commission's policies relating to media interests of immediate family members." *Id.* p.10. The *Public Notice* thus explicitly made the submission of this family media certification mandatory.

8. The *Public Notice* also established the consequence of failure to supply this required information by the specified deadline:

> **Failure to submit required information by the resubmission date will result in dismissal of the application and inability to participate in the auction.**

(Emph. in original.) *Id.* at p. 2.

9. When a government agency issues rights by auction, the terms are binding alike upon the United States and the bidders. The stated terms set out in the Public Notice and the pertinent rules established an express or implied-in-fact contract between the bidders and the FCC governing the acquisition of the license.

10. BFBFM submitted the requisite upfront payment and all certifications necessary to participate in the auction.

11. One of the other prospective auction participants, Liberty Productions, L.P. ("Liberty"), failed to submit the required family media certification. The original deadline for filing applications was August 20, 1999, and the "resubmission date" – the deadline for filing any corrective amendments – was September 14, 1999. Liberty did not submit the certification by that date or any date until long after the auction was over.

12. The FCC's rules precluded any pre-auction challenges to other applications, so no other bidder could raise this issue prior to the conclusion of the auction. The FCC appeared to be unaware that the requisite certification had not been supplied.

13. Despite its failure to submit the qualifying certification, Liberty proceeded to participate in the auction, which was conducted electronically. By the last stages of the auction, the two remaining bidders were BFBFM and Liberty. Because BFBFM had recognized that Liberty was ineligible to participate under the stated terms of the auction, it stopped bidding at that point. By continuing to bid against Liberty, BFBFM would have been bidding up the price against a competing bidder who was ineligible to participate.

14. Liberty placed the highest bid and was tentatively declared the winner on the basis of its last high bid.

15. Within the prescribed time permitted by the FCC, BFBFM and the other losing bidders challenged Liberty's qualifications on various grounds, including the failure to submit the required certification and therefore Liberty either should not have been permitted to participate in the auction at all or should have been determined to be a disqualified bidder.

16. After considering the challenges, the FCC ruled on May 25, 2001, that the requirements set forth in the auction terms were not requirements but "general admonishments." The FCC permitted Liberty to amend its Form 175 post auction and confirmed Liberty as the auction winner. (Attachment B to this Complaint.)

17. Since BFBFM was the highest bidder eligible to participate under the terms of the auction contract, the FCC was obligated to issue BFBFM the license (assuming it was otherwise qualified). The FCC's failure to comply with the stated terms of the auction was a breach of the auction contract, be it express or implied-in-fact. This unfounded position resulted in the plaintiff being wrongly denied a valuable license despite following the procedures scrupulously.

18. BFBFM recognizes the FCC's right as a regulatory authority to issue the license to another party despite its breach of the contract with the other bidders. BFBFM does not seek

to have the license rescinded or reissued or amended in any way but instead elects to pursue its remedy for damages caused by the FCC's breach.

*Remedy Requested*

WHEREFORE, Plaintiff, prays this Court to find the FCC breached its contract with BFBFM and as a result, BFBFM has suffered monetary damages equal to Eight Million Dollars ($8,000,000) (the difference between the current value of the license and the price BFBFM would have paid as the high bidder against all other qualified bidders) or such other amount as the evidence may show, and for such other relief as the Court may deem appropriate.

Respectfully submitted,

Donald J. Evans
Raymond J. Quianzon
Fletcher, Heald & Hildreth, PLC
1300 North 17th Street - 11th Floor
Arlington, Virginia 22209
Telephone: 703-812-0400
Facsimile: 703-812-0486

May 21, 2007

# ATTACHMENT A

# PUBLIC NOTICE

FEDERAL COMMUNICATIONS COMMISSION
445 12th Street, SW
WASHINGTON, DC 20554

News Media Information: (202) 418-0500
333Fax-On-Demand: (202) 418-2830
Internet: http://www.fcc.gov
ftp.fcc.gov

DA 99-1346
July 9, 1999

## CLOSED BROADCAST AUCTION

## Notice and Filing Requirements for Auction of AM, FM, TV, LPTV, and FM and TV Translator Construction Permits Scheduled for September 28, 1999

### Minimum Opening Bids and Other Procedural Issues

Report No. AUC-99-25-A (Auction No. 25)

### 1. INTRODUCTION

This Public Notice announces the procedures and minimum opening bids for the upcoming Closed Broadcast Auction. On May 17, 1999, the Mass Media Bureau ("MMB") and the Wireless Telecommunications Bureau ("WTB") (collectively, "Bureaus") released a Public Notice,[1] seeking comment on the establishment of reserve prices or minimum opening bids for the auction of AM, FM, TV, LPTV, and FM and TV Translator Construction Permits (Auction No. 25), in accordance with the Balanced Budget Act of 1997.[2] In addition, the Bureaus sought comment on a number of procedures to be used in Auction No. 25. The Bureaus received 39 comments and 7 reply comments in response to the *Closed Broadcast Auction Public Notice*.

---

1 *See* Closed Broadcast Auctions Scheduled For September 28, 1999; Comment Sought on Minimum Opening Bids and Other Auction Procedures, *Public Notice*, DA 99-940 (released May 17, 1999) ("*Closed Broadcast Auction Public Notice*").

2 Section 3002(a), Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 251 (1997) ("Budget Act"); 47 U.S.C. § 309(j)(4)(F). The Commission's authority to establish a reserve price or minimum opening bid is set forth in 47 C.F.R. § 1.2104(c) and (d).

C0109

***Construction Permits to Be Auctioned:*** Pursuant to the *Broadcast First Report and Order*,[3] participation in this auction is limited to those applicants identified in the *Closed Broadcast Auction Public Notice*, as modified herein. Applicants will be potentially eligible to bid only on those construction permits for which they have filed an appropriate long form application (FCC Forms 301, 346 or 349).[4] A list of each MX Group in Auction No. 25, along with its upfront payment and minimum opening bid, is included as Attachment A. The listing contained in Attachment A reflects changes made by the Bureaus as a result of comments received on the *Closed Broadcast Auction Public Notice* and from other actions announced herein.

***Auction Date:*** The auction will begin on September 28, 1999. The initial schedule for bidding will be announced by public notice at least one week before the start of the auction. Unless otherwise announced, bidding will be conducted each business day and will continue until bidding has stopped on all licenses.

***Auction Title:*** Auction No. 25 (Closed Broadcast Auction).

***Bidding Methodology:*** Simultaneous multiple round bidding. Bidding will be permitted only from remote locations, either electronically (by computer) or telephonically.

***Pre-Auction Deadlines:***

- Free Auction Seminar ........................ August 3, 1999
- Short Form Application (FCC Form 175) ........ August 20, 1999; 5:30 p.m. ET
- Orders for Remote Bidding Software ............ August 20, 1999
- Upfront Payments (via wire transfer)............ September 13, 1999; 6:00 p.m. ET
- Mock Auction September 24, 1999

---

3 *See* Implementation of Section 309(j) of the Communications Act -- Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Service Licenses, *First Report and Order*, MM Docket No. 97-234, GC Docket No. 92-52 and GEN Docket No. 90-264, 13 FCC Rcd 15920 (1998) ("*Broadcast First Report and Order*") and *Memorandum Opinion and Order*, FCC 99-234, rel. April 20, 1999 ("*Memorandum Opinion and Order on Reconsideration*"). In these items, the Commission adopted service and competitive bidding rules for mass media services, including standard broadcast (AM), frequency modulation (FM) and full service commercial television (TV). Also adopted were rules for the secondary services of low power television (LPTV), FM translator and television translator.

4 *See Broadcast First Report and Order*, 13 FCC Rcd at 15950, 15958-15960, ¶¶ 81, 105-109. *See also Closed Broadcast Auction Public Notice* at 2.

***Telephone Contacts:***

- FCC National Call Center (888) CALL-FCC ((888) 225-5322) or (717) 338-2888 (direct dial)

  *For general auction information and seminar registration, press option #2 at the prompt. Hours of service: 8 a.m. - 5:30 p.m. ET, Monday - Friday.*

- FCC Technical Support Hotline .......... (202) 414-1250 (voice), (202) 414-1255 (text telephone (TTY))

  *Hours of service: 8 a.m. - 6 p.m. ET, Monday - Friday.*

***List of Attachments:***

| | |
|---|---|
| Attachment A: | Summary of Construction Permits to be Auctioned, Upfront Payments, and Minimum Opening Bids |
| Attachment B: | Guidelines for Completion of FCC Form 175 and Exhibits |
| Attachment C: | Auction-Specific Instructions for FCC Remittance Advice (FCC Form 159) |
| Attachment D: | Electronic Filing and Review of FCC Form 175 |
| Attachment E: | Accessing the FCC Network Using Windows 95/98 |
| Attachment F: | FCC Remote Bidding Software Order Form |
| Attachment G: | Summary Listing of Documents from the Commission and the Wireless Telecommunications Bureau Addressing the Application of the Anti-Collusion Rules |
| Attachment H: | Auction Seminar Registration Form |

***Background:*** All spectrum to be auctioned is the subject of pending, mutually exclusive applications for construction permits for the AM, FM, TV, LPTV, and FM and television translator services, for which the Commission has not approved a settlement agreement that obviates the need for an auction. This includes mutually exclusive applications for full service FM, AM and television stations that were subject to the comparative freeze,[5] instituted after the decision of the U.S. Court of Appeals for the District of Columbia in *Bechtel v. FCC*.[6] The auction will also include pending mutually exclusive applications for LPTV, FM translator and television translator, as well as certain mutually exclusive LPTV and television translator DTV displacement relief applications.[7] Pursuant to the *Broadcast First Report and Order*,

---

5 Public Notice, *FCC Freezes Comparative Hearings*, 9 FCC Rcd 1055 (1994), *modified*, 9 FCC Rcd 6680 (1994), *further modified*, 10 FCC Rcd 12182 (1995).

6 *Bechtel v. FCC*, 10 F.3d 875 (D.C. Cir. 1993).

7 *See* Public Notice, *Low Power Television and Television Translators: Mutually Exclusive Displacement Applications*, Mimeo No. 85299 (rel. Sept. 2, 1998); *see also* Public Notice, *Commission Postpones Initial Date for Filing TV Translator and Low Power TV Applications for Displacement Channels*, Mimeo No. 82914 (rel. April 16, 1998).

C0111

participation in the auction will be limited to those applicants identified in this Public Notice and applicants will be potentially eligible to bid on only those construction permits for which they filed an appropriate long-form application (FCC Forms 301, 346 or 349).[8] Also pursuant to the *Broadcast First Report and Order*, **the Bureaus will dismiss the previously-filed long-form application of any pending applicant failing to timely file a short-form application to participate in the Closed Broadcast Auction.**[9]

*Due Diligence:* Potential bidders are solely responsible for investigating and evaluating all technical and marketplace factors that may have a bearing on the value of the facilities on which they intend to bid. **The FCC makes no representations or warranties about the use of this spectrum for particular services. Applicants should be aware that an FCC auction represents an opportunity to become a FCC permittee in these services, subject to certain conditions and regulations. An FCC auction does not constitute an endorsement by the FCC of any particular services, technologies or products, nor does an FCC construction permit or license constitute a guarantee of business success.** Applicants should perform their individual due diligence before proceeding as they would with any new business venture.

*Participation:* Those wishing to participate in the auction must:

- Submit a short form application (FCC Form 175) by 5:30 p.m. Eastern Time, August 20, 1999.
- Submit a sufficient upfront payment and an FCC Remittance Advice Form (FCC Form 159) by 6:00 p.m. Eastern Time, September 13, 1999.
- Comply with all provisions outlined in this Public Notice and applicable rules of the Commission.

*Prohibition of Collusion:* To ensure the competitiveness and integrity of the auction process, the Commission's Rules prohibit competing applicants from communicating with each other during the auction about bids, bidding strategies, or settlements. In Auction No. 25, for example, the rule applies to all applicants within a MX Group. This prohibition becomes effective at the short-form application deadline, and ends on the post-auction down payment due date. Bidders competing for the same construction permit(s) are encouraged not to use the same individual as an authorized bidder. A violation of the anti-collusion rule could occur if an individual acts as the authorized bidder for two or more competing applicants, and conveys information concerning the substance of bids or bidding strategies between the bidders he or she is authorized to represent in the auction. Also, if the authorized bidders are different individuals employed by the same organization (*e.g.*, law firm or technical consulting firm), a violation could similarly occur. At a minimum, in such a case, applicants should certify that precautionary steps have been taken to prevent communication between authorized bidders and that applicants and their bidding agents will comply with the anti-collusion rule.[10] The Bureaus, however, caution that merely

---

8 *See Broadcast First Report and Order at* 15950; 15958-15960, ¶¶ 81, 105-109.

9 *Id.* at 15950 ¶ 82.

10 *See, e.g.*, "Wireless Telecommunications Bureau Responds to Questions About the Local Multipoint Distribution Service Auction," *Public Notice*, 13 FCC Rcd 341 (1998); Application of Nevada Wireless for a

C0112

filing a certifying statement as part of an application will not outweigh specific evidence that collusive behavior has occurred nor will it preclude the initiation of an investigation when warranted.[11] However, applicants may enter into bidding agreements *before* filing their FCC Form 175 short-form applications, as long as they disclose the existence of the agreement(s) in their Form 175 short-form applications.[12] By electronically submitting their FCC Form 175 short-form applications, applicants are certifying their compliance with Sections 1.2105(c) and 73.5002. In addition, Section 1.65 of the Commission's Rules requires an applicant to maintain the accuracy and completeness of information furnished in its pending application and to notify the Commission, as promptly as possible and in any event within 30 days, of any substantial change that may be of decisional significance to that application.[13] Thus, Section 1.65 requires an auction applicant to notify the Commission of any violation of the anti-collusion rules upon learning of such violation. Bidders are therefore required to make such notification to the Commission immediately upon discovery.

***Bidder Information Package:*** Given the closed nature of Auction No. 25 and the fact that the pool of potential bidders is limited to those that had previously filed long-form applications, no Bidder Information Package will be provided. All information necessary to participate in the Closed Broadcast Auction is contained in this Public Notice, the *Closed Broadcast Auction Public Notice*, the *Broadcast First Report and Order*, the *Memorandum Opinion and Order on Reconsideration* and the Commission's rules. Further, since the notice and comment rulemaking proceeding looking toward implementation of this auction was initiated nearly two years ago and since the applicants themselves have had their long-form applications on file for an extensive period of time, there is no need for a Bidder Information Package. Applicants may access updated information about Auction No. 25 at the following address on WTB's web site:

http://www.fcc.gov/wtb/auctions/auc25/auc25.html

Applicants are strongly encouraged to check this site regularly for updated complete information regarding Auction No. 25.

***Future Releases:*** Further information regarding sequencing and length of bidding rounds and other procedural issues will be released in a future public notice.

***Relevant Authority:*** Prospective bidders must familiarize themselves thoroughly with the Commission's Rules relating to broadcast auctions, contained in Title 47, Part 73 of the Code of Federal Regulations. Prospective bidders must also be thoroughly familiar with the procedures,

---

License to Provide 800 MHz Specialized Mobile Radio Service in the Farmington, NM-CO Economic Area (EA-155) Frequency Band A, *Memorandum Opinion and Order*, 13 FCC Rcd 11973, 11977 ¶ 11 (1998) ("*Nevada Wireless*").

[11] *See Nevada Wireless, supra* note 9 at 11978, ¶ 13.

[12] *See* 47 C.F.R. § 1.2105(c).

[13] *See Id.* § 1.65.

C0113

terms and conditions contained in this Public Notice, the *Closed Broadcast Auction Public Notice*, the *Broadcast First Report and Order* and the *Memorandum Opinion and Order on Reconsideration*. Potential bidders must also familiarize themselves with Part 1, Subpart Q of the Commission's Rules concerning Competitive Bidding Proceedings.[14]

The terms contained in the Commission's Rules, relevant orders and public notices are not negotiable. The Commission may amend or supplement the information contained in its public notices at any time, and will issue public notices to convey any new or supplemental information to bidders. It is the responsibility of all prospective bidders to remain current with all Commission Rules and with all public notices pertaining to this auction. Copies of most Commission documents, including public notices, can be retrieved from the FCC Internet node via anonymous ftp @ftp.fcc.gov or the FCC World Wide Web site at http://www.fcc.gov/wtb/auctions. Additionally, documents may be obtained for a fee by calling the Commission's copy contractor, International Transcription Service, Inc. (ITS), at (202) 314-3070. When ordering documents from ITS, please provide the appropriate FCC number (*e.g.*, FCC 98-194 for the *Broadcast First Report and Order* and FCC 99-74 for the *Memorandum Opinion and Order on Reconsideration*).

*Bidder Alerts:* All applicants must certify on their FCC Form 175 applications under penalty of perjury that they are legally, technically, financially and otherwise qualified to hold a license, and not in default on any payment for Commission construction permits or licenses (including down payments) or delinquent on any non-tax debt owed to any Federal agency. **Applicants should be aware that by filing their FCC Form 175 applications, they are certifying that they have long-form applications on file and that there has been no change of control of their long-form applications that would render them ineligible to participate in the auction under 47 U.S.C. §309(l) or any applicable Commission rule.**[15] Prospective bidders are reminded that submission of a false certification to the Commission is a serious matter that may result in severe penalties, including monetary forfeitures, construction permit or license revocations, exclusion from participation in future auctions, and/or criminal prosecution.

Although applicants have had an extensive opportunity to conduct due diligence due to the length of time ensuing since the filing of their long-form applications, the following reminder is provided: As is the case with many business investment opportunities, some unscrupulous entrepreneurs may attempt to use the broadcast spectrum to deceive and defraud unsuspecting investors. Common warning signals of fraud include the following:

- The first contact is a "cold call" from a telemarketer, or is made in response to an inquiry prompted by a radio or television infomercial.

---

[14] *See* Part 1, Subpart Q of Title 47 of the Code of Federal Regulations.

[15] *See Broadcast First Report and Order* at 15942 ¶ 57.

- The offering materials used to invest in the venture appear to be targeted at IRA funds, for example by including all documents and papers needed for the transfer of funds maintained in IRA accounts.

- The amount of the minimum investment is less than $25,000.

- The sales representative makes verbal representations that: (a) the Internal Revenue Service ("IRS"), Federal Trade Commission ("FTC"), Securities and Exchange Commission ("SEC"), FCC, or other government agency has approved the investment; (b) the investment is not subject to state or federal securities laws; or (c) the investment will yield unrealistically high short-term profits. In addition, the offering materials often include copies of actual FCC releases, or quotes from FCC personnel, giving the appearance of FCC knowledge or approval of the solicitation.

Information about deceptive telemarketing investment schemes is available from the FTC at (202) 326-2222 and from the SEC at (202) 942-7040. Complaints about specific deceptive telemarketing investment schemes should be directed to the FTC, the SEC, or the National Fraud Information Center at (800) 876-7060. Consumers who have concerns about specific proposals may also call the FCC National Call Center at (888) CALL-FCC ((888) 225-5322).

## NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS

Licensees must comply with the Commission's rules regarding the National Environmental Policy Act (NEPA). The construction of a broadcast antenna facility is a federal action and licensees must comply with the Commission's NEPA rules for each such facility. See 47 C.F.R. §§ 1.1305-1.1319. The Commission's NEPA rules require that, among other things, licensees consult with expert agencies having NEPA responsibilities, including the U.S. Fish and Wildlife Service, the State Historic Preservation Office, the Army Corp of Engineers and the Federal Emergency Management Agency (through the local authority with jurisdiction over floodplains). Licensees must prepare environmental assessments for broadcast facilities that may have a significant impact in or on wilderness areas, wildlife preserves, threatened or endangered species or designated critical habitats, historical or archaeologic sites, Indian religious sites, floodplains, and surface features. Licensees must also prepare environmental assessments for broadcast facilities that include high intensity white lights in residential neighborhoods or excessive radiofrequency emission.

C0115

## 2. ELIGIBILITY FOR NEW ENTRANT BIDDING CREDIT

### A. General Eligibility Criteria

For the Closed Broadcast Auction the Commission adopted the New Entrant Bidding Credit to promote and facilitate the diversification of ownership in the mass media.

#### (1) Determination of Eligibility for Bidding Credit

The interests of the bidder, and of any individuals or entities with an attributable interest in the bidder in other media of mass communications shall be considered when determining a bidder's eligibility for the New Entrant Bidding Credit. **The bidder's attributable interests shall be determined as of the short form (FCC Form 175) filing deadline - August 20, 1999. Bidders intending to divest a media interest or make any other ownership changes, such as resignation of positional interests, in order to avoid attribution for purposes of qualifying for the New Entrant Bidding Credit must have consummated such divestment transactions or have completed such ownership changes by no later than the short-form filing deadline - August 20, 1999.**[16]

For purposes of determining which entities qualify for a New Entrant Bidding Credit, the following information should be considered: the interests of the bidder, and of any individuals or entities with an attributable interest in the bidder, in other media of mass communications at the time of the short-form application filing deadline. These interest should be considered to the extent that they are considered attributable under the broadcast multiple ownership rules. Further, any bidder asserting new entrant status must have *de facto* as well as *de jure* control of the entity claiming the bidding credit. Typically, *de jure* control is evidenced by ownership of at least 50.1 percent of an entity's voting stock or equivalent level of interest in cases where the bidder is not a corporate entity. *De facto* control is determined on a case-by-case basis.[17]

Under traditional broadcast attribution rules, those entities or individuals with an attributable interest in a bidder include: all officers and directors of a corporate bidder; any owner of 5% or more of the voting stock of a corporate bidder; all partners and limited partners of a

---

[16] The fact that, on August 20, 1999, a bidder has a pending or granted application to assign or transfer control of a media interest shall not be sufficient to avoid attribution. Bidders must have consummated the transaction by August 20, 1999, to avoid attribution.

[17] For further guidance on the issue of control, see the Commission's affiliation rule at 47 C.F.R. § 1.2110(b)(4). *See also Ellis Thompson Corp.*, 76 Rad. Reg. 2d (P & F) 1125, 1127-28 (1994), in which the Commission identified the following factors used to determine control of a business: (1) use of facilities and equipment; (2) control of day-to-day operations; (3) control of policy decisions; (4) personnel responsibilities; (5) control of financial obligations; and (6) receipt of monies and profits; *Intermountain Microwave*, 24 Rad. Reg. (P & F) 983 (1963), and Application of Baker Creek Communications, LP, For Authority to Construct and Operate Local Multipoint Distribution Services In Multiple Basic Trading Areas, *Memorandum Opinion and Order*, DA 98-1921 (released September 23, 1998).

partnership bidder, unless the limited partners are sufficiently insulated from exercising management and control of the partnership; and all members of a limited liability company, unless sufficiently insulated.[18] In cases where a bidder is an individual and his or her spouse or other close family member holds interests in other media, such interests are not automatically attributable to the bidder, however bidders are reminded that the Commission decides attribution issues in this context based on certain factors that it has traditionally considered to be relevant.[19] **Bidders are also reminded that, in the *Memorandum Opinion and Order on Reconsideration*, the Commission determined to consider, in a further order, whether to attribute the mass media interests of any individual or entity who holds a significant equity and/or debt interest in a broadcast auction bidder claiming New Entrant status, even if such an interest is nonvoting.[20] Specifically, the *Memorandum Opinion and Order on Reconsideration* stated that this further order would consider the appropriateness of attributing the mass media interests (if any) held by substantial investors in a bidder claiming a credit as a New Entrant and the threshold at which a nonvoting equity and/or debt interest in a New Entrant should be attributable.[21] While the Commission has not yet released its further order resolving these issues, it stated in the *Memorandum Opinion and Order on Reconsideration* that the further order would be released "expeditiously" and its release would not delay the commencement of broadcast service auctions.[22] Therefore, bidders should be aware of these outstanding issues when considering their qualifications for the New Entrant Bidding Credit.** The eligibility standards will be governed by the rule in effect on the short-form filing for the for the New Entrant Bidding Credit.

**(2) Consortia and Joint Bidding Arrangements**

A party holding a non-controlling, attributable interest in one applicant will be permitted to acquire an ownership interest, form a consortium with, or enter into a joint bidding arrangement with other applicants for construction permits in the same MX Group provided that 1) the attributable interest holder certify that it has not and will not communicate with any party concerning the bids or bidding strategies of more than one of the applicants in which it holds an attributable interest, has formed a consortium, or has entered into a joint bidding arrangement; and 2) the arrangements do not result in a change in control of any of the applicants.[23] While the anti-collusion rule doesn't prohibit non-auction related business negotiations among auction applicants, bidders are reminded that certain discussions or exchanges could broach on impermissible subject matters because they may convey pricing information and bidding strategies. Such subject areas include, but are not limited to, issues such as management, sales, local marketing agreements, rebroadcast agreements and other transactional arrangements.[24]

---

18 *See* 47 C.F.R. § 73.3555 Note 2.

19 *See Clarification of Commission Policies Regarding Spousal Attribution*, 7 FCC Rcd 1920 (1992).

20 *Memorandum Opinion and Order on Reconsideration* at ¶ 74.

21 *Id.*

22 *Id.*

23 *See* 47 C.F.R. § 1.2105(c)(4)(i) & (ii). *See also Broadcast First Report and Order* at 15982 ¶ 158.

24 *Id.* at 159.

**(3) Application Showing**

Applicants should note that they will be required to file supporting documentation as Exhibits A and C to their FCC Form 175 short-form applications to establish that they satisfy the eligibility requirements to qualify for a New Entrant Bidding Credit.[25] Ownership information must also be provided in the Closed Broadcast Auction in order for us to verify eligibility to participate in the auction. Accordingly, **whether or not a New Entrant Bidding Credit is being sought, all applicants must provide the information set forth in this section.** Specifically, for the Closed Broadcast Auction, applicants (or consortia of such applicants) will be required to file (in Exhibit A to their FCC Form 175 short-form application), a full and complete statement of the ownership of the bidding entity, to include all attributable interest holders. **The information must comply, in all material respects, with the ownership information appearing on the applicant's previously filed long-form application.** If the information reflects that there has been a change of control, the related long-form application will be dismissed and the applicant will be ineligible to participate in the auction.[26] The applicant must provide the ownership information for itself and its attributable interest-holders, as defined by Section 73.3555 and Note 2 of that section, including: all officers and directors of a corporate bidder; any owner of 5% or more of the voting stock of a corporate bidder; all partners and limited partners of a partnership bidder, unless the limited partners are sufficiently insulated from the management or operation of the partnership; and all members of a limited liability company, except those sufficiently insulated from its management or operation. Bidders must certify (in Exhibit A) compliance with the Commission's policies relating to media interests of immediate family members. **In addition, in those cases where a New Entrant Bidding Credit is being sought, a certification under penalty of perjury must be set forth in Exhibit C attesting to the eligibility of the bidder for the level of Credit claimed.** If the applicant is applying to bid as a consortium of applicants eligible for the New Entrant Bidding Credit, this information must be provided for each consortium member. In cases where a joint bidding arrangement is contemplated, an Exhibit B must be filed. Applicants owned by minorities or women, as defined in 47 C.F.R. § 1.2110(b)(2) may attach an exhibit (Exhibit D) regarding this status. This information assists the Commission in monitoring the participation of "designated entities" in its auctions. Applicants wishing to submit additional information may do so in Exhibit E (Miscellaneous Information).

---

25 *See* 47 C.F.R. § 1.2105.

26 *Broadcast First Report and Order*, 13 FCC Rcd at 15942 ¶ 57.

C0118

### B. Bidding Credits

Applicants that qualify for the New Entrant Bidding Credit, as set forth in 47 C.F.R. § 73.5007,[27] are eligible for a bidding credit that represents the amount by which a bidder's winning bids are discounted. The size of a New Entrant Bidding Credit depends on the

number of ownership interests in other media of mass communications that are attributable to the bidder-entity and its attributable interest-holders:

- A 35 percent bidding credit will be given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder has no attributable interest in any other media of mass communications, as defined in 47 C.F.R. § 73.5008; and,

- A 25 percent bidding credit will be given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder has an attributable interests in no more than three media of mass communications, as defined in 47 C.F.R. § 73.5008; and,

- No bidding credit will be given if any of the commonly owned mass media facilities would serve the same area as the proposed broadcast or secondary broadcast station, as defined in 47 C.F.R. § 73.5007, or if the winning bidder, and/or any individual or entity with an attributable interest in the winning bidder, have attributable interests in more than three mass media facilities.

Attributable interests held by a winning bidder in existing low power television, television translator or FM translator facilities will not be counted among the bidders' other mass media facilities.

Bidding credits are not cumulative: qualifying applicants receive either the 25 percent or the 35 percent bidding credit, but not both. Attributable interests are defined in 47 C.F.R. § 73.3555 and Note 2 of that section.

Closed Broadcast Auction bidders should note that unjust enrichment provisions apply to winning bidders that use bidding credits and subsequently assign or transfer control of their licenses to an entity not qualifying for the same level of bidding credit.[28] Finally, Closed Broadcast Auction bidders should also note that there are no installment payment plans in the Closed Broadcast Auction.

---

27 § 73.5007 was most recently revised pursuant to the *Memorandum Opinion and Order on Reconsideration*. The revised version of the rule, applicable to the Closed Broadcast Auction, became effective on July 6, 1999.

28 *See* 47 C.F.R. § 73.5007(c), *as revised*.

## 3. PRE-AUCTION PROCEDURES

### A. Short-Form Application (FCC Form 175) -- Due August 20, 1999, 5:30 p.m. ET

In order to be eligible to bid in this auction, applicants must first electronically submit an FCC Form 175 application. **This application must be received at the Commission by 5:30 p.m. ET on August 20, 1999.** Late applications will not be accepted.

There is no application fee required when electronically filing an FCC Form 175. However, to purchase bidding eligibility, an applicant must submit an upfront payment. See Section 3.C, *infra.*

#### (1) Electronic Filing

As of January 1, 1999, applications to participate in FCC auctions must be filed electronically, unless it is not operationally feasible.[29] Applicants will be permitted to file their FCC Form 175 applications in paper form only in the event the FCC experiences technical difficulties with its electronic systems.[30] In such an event, the FCC will announce the procedure for submitting paper applications.

For Auction No. 25, applicants may file applications electronically beginning August 3, 1999. The system will generally be open for filing on a 24-hour basis. The Form 175 filing window will remain open until 5:30 p.m. ET on August 20, 1999. Applicants are strongly encouraged to file early, and applicants are responsible for allowing adequate time for filing their applications. Applicants may update or amend their electronic applications multiple times until the filing deadline on August 20, 1999. Information about the electronic filing of the FCC Form 175 application is included as Attachment D to this Public Notice. Technical support is available at (202) 414-1250 (voice) or (202) 414-1255 (text telephone (TTY)); the hours of service are 8 a.m. - 6 p.m. ET, Monday - Friday.

#### (2) Completion of the FCC Form 175

Applicants should carefully review 47 C.F.R. §§ 1.2105 and 73.5002 and must complete all items on the FCC Form 175. Instructions for completing the FCC Form 175 are in Attachment B of this Public Notice. Applicants should not consider their form submitted to the FCC until they press the "Submit Form 175" button on the "Submit" page and receive confirmation from the filing system that the form has been received by the Commission.

---

[29] *See Part 1 Third Report and Order*, 13 FCC Rcd at 410-11, ¶¶ 59-62; 47 C.F.R. § 1.2105(a).
[30] *Id.* at 412, ¶ 62.

### (3) Electronic Review of FCC Form 175

The FCC Form 175 review software may be used to review and print applicants' FCC Form 175 applications. Applicants may review their own completed FCC Form 175. Applicants may also view other applicants' completed FCC Form 175s after the filing deadline has passed and the FCC has issued a public notice explaining the status of the applications. **For this reason, it is important that applicants do not include their Taxpayer Identification Numbers (TINs) on any Exhibits to their FCC Form 175 applications.** There are no fees for accessing this system or for submitting an FCC Form 175.

## B. Application Processing and Minor Corrections

After the deadline for filing the FCC Form 175 applications has passed, the FCC will process all timely submitted short-form applications to determine which are mutually exclusive and which are acceptable for filing, and will subsequently issue a public notice identifying: (1) those short-form applications which are mutually exclusive and are acceptable for filing (including FCC file numbers and the construction permits for which they applied); (2) those applications rejected; and (3) those short-form applications that have minor defects that may be corrected, and the deadline for filing such corrected applications. Where no mutually exclusive Form 175 applications are filed by August 20, 1999, the related long-form application (FCC Forms 301, 346 and 349) will be removed from the auction and processed, and, if acceptable, will be granted.

As described more fully in the Commission's Rules, after the August 20, 1999, short-form filing deadline, applicants may make only minor non-technical corrections to their FCC Form 175 applications. Applicants will not be permitted to make major modifications to their applications (*e.g.*, change their construction permit selections or proposed service areas, change the certifying official or change control of the applicant or change bidding credits). *See* 47 C.F.R. § 1.2105.

C. Upfront Payments – Due September 13, 1999

In order to be eligible to bid in the auction, applicants must submit an upfront payment accompanied by an FCC Remittance Advice Form (FCC Form 159). **Applicants will have access to filling out an electronic version of the FCC Form 159 (August 1998 version) after completing the electronic FCC Form 175; however, the FCC Remittance Advice Form (FCC Form 159) is to be submitted by facsimile transmission to Mellon Bank in accordance with the instructions below. Earlier versions of this form will not be accepted.** All upfront payments must be received at Mellon Bank in Pittsburgh, Pennsylvania, by 6:00 p.m. ET on September 13, 1999.

Please note that:

- **All payments must be made in U.S. dollars.**
- **All payments must be made by wire transfer.**
- **Upfront payments for Auction No. 25 go to a lockbox number different from the ones used in previous FCC auctions, and different from the lockbox number to be used for post-auction payments.**
- **Failure to deliver the upfront payment by the September 13, 1999 deadline will result in no bidding eligibility being accorded the applicant.**

(1) Making Auction Payments by Wire Transfer

Wire transfer payments must be received **by 6:00 p.m. ET on September 13, 1999.** To avoid untimely payments, applicants should discuss arrangements (including bank closing schedules) with their banker several days before they plan to make the wire transfer, and allow sufficient time for the transfer to be initiated and completed before the deadline. Applicants will need the following information:

ABA Routing Number: 043000261
Receiving Bank: Mellon Pittsburgh
BNF: FCC/ 910-0171
OBI Field: (Skip one space between each information item)
"AUCTIONPAY"
TAXPAYER IDENTIFICATION NO. (same as FCC Form 159, block 26)
PAYMENT TYPE CODE (enter "A25U")
FCC CODE 1 (same as FCC Form 159, block 23A: "25")
PAYER NAME (same as FCC Form 159, block 2)
LOCKBOX NO. 358430

**NOTE: The BNF and Lockbox number are specific to the upfront payments for this auction; do not use BNF or Lockbox numbers from previous auctions.**

Applicants must fax a completed FCC Form 159 to Mellon Bank at (412) 236-5702 at least one hour before placing the order for the wire transfer (but on the same business day). On the cover sheet of the fax, write "Wire Transfer - Auction Payment for Auction Event No. 25." Bidders may confirm receipt of their upfront payment at Mellon Bank by contacting their sending financial institution.

**(2) FCC Form 159**

Each upfront payment must be accompanied by a completed FCC Remittance Advice Form (FCC Form 159). Proper completion of FCC Form 159 is critical to ensuring correct credit of upfront payments. Detailed instructions for completion of FCC Form 159 are included in this Public Notice as Attachment C.

**(3) Amount of Upfront Payment**

In the *Broadcast First Report and Order* the Commission delegated to the Bureaus the authority and discretion to determine an appropriate upfront payment for each construction permit being auctioned.[31] In the *Closed Broadcast Auction Public Notice*, the Bureaus proposed certain upfront payments that were set forth in Attachment A to that Notice.

We received comments on this proposal from a number of parties, including the National Translator Association ("NTA") and George W. Kimble ("Kimble"). NTA states that any organization which is exempt from annual regulatory fees should be exempted from the requirement of filing upfront payments.[32] However, Section 73.5003 of the Commission's rules requires that in order to be eligible to bid, every bidder in every broadcast service shall submit an upfront payment prior to the commencement of bidding. Further, the Commission's rules have mandated this for every prior auction as a means of increasing auction efficiency and discouraging insincere bidders.[33] Therefore, we shall not adopt NTA's suggestion and all bidders will be required to submit an upfront payment.

Kimble states that he believes the following four corollaries are correct statements of auction procedures and asks that we clarify this to be the case: 1) that an applicant that submits an upfront payment is entitled to a refund if it subsequently does not bid at the auction; 2) that

---

31 *See* Amendment of Part 1 of the Commission's Rules -- Competitive Bidding Proceeding, WT Docket No. 97-82, *Order, Memorandum Opinion and Order and Notice of Proposed Rule Making*, 12 FCC Rcd. 5686, 5697-5698, ¶ 16 (1997). *See also Broadcast First Report and Order* at 15967, ¶¶ 127-128.

32 Comments of NTA at 3.

33 47 C.F.R. § 1.2106

C0123

the application of a party that does not submit an upfront payment will automatically be dismissed; 3) that if only one party submits an upfront payment, it would be treated as a "singleton" applicant and would not be required to bid at the auction (and such an applicant would be entitled to a refund of his upfront payment); and 4) that if more than one party submits an upfront payment but no party bids at the auction, the parties are entitled to a refund. Kimble does not state in his hypothetical cases, whether the application he is referring to in each case is a long-form or a short-form application.[34]

The Commission requires the submission of short-form applications by pending applicants and will dismiss the previously-filed long-form application of any pending applicant that fails to timely file a short-form application to participate in the auction.[35] With this in mind, we consider the hypotheticals assuming that Kimble's references are to a short-form application. If the Commission were to receive only one short-form application and thus no mutual exclusivity were to exist for auction purposes, the auction for any such construction permit would cancel.[36] However, should two or more short-forms be tendered within an MX Group, mutual exclusivity would exist for auction purposes. Accordingly, in Hypothetical 1, whether or not there is more than one short-form application filed in an MX Group, an applicant that does not bid or have other outstanding obligations to the Commission such as winning bids or withdrawal payments due in other markets, would be entitled to a refund of its upfront payment. As to Hypothetical 2, if an applicant were to submit a short-form application but fail to timely tender an upfront payment, it would retain its place in the MX Group but, having purchased no bidding eligibility, would not be eligible to bid. As to Hypothetical 3, assuming that two or more parties file short-form applications in their MX Group, but only one submits an upfront payment, mutual exclusivity would exist for auction purposes (since multiple short-form applications are tendered) and, in such case, the party making its upfront payment is not entitled to both a refund and the grant of a construction permit. In Hypothetical 3, while the sole applicant tendering the upfront payment is not required to bid, should it choose not to do so, its upfront payment would be returned but no construction permit would issue. Once mutual exclusivity exists for auction purposes (which occurs when more than one short-form application is filed) the Budget Act mandates that mutually exclusive construction permits be granted only by means of competitive bidding. As to Hypothetical 4, involving the multiple submission of upfront payments, but with no subsequent bidding activity, all parties are entitled to refunds unless withdrawal payment(s) or other collateral obligation(s) are owed to the Commission from other bidding activities.

We therefore adopt our proposed upfront payment amounts for Auction No. 25, subject to reductions being made for certain MX Groups. *See* Section 4.B.(2), *infra*. In such cases, the minimum opening bids of those applicants are also being reduced. This will make the relationship of upfront payments to minimum opening bids commensurate with all other applicants. (In the Closed Broadcast Auction, minimum opening bids are set at the same level as

---

34 Comments of Kimble at 1 - 2.

35 *See Broadcast First Report and Order* at 15950 ¶ 82.

36 *Id.*



C0124

upfront payments, in all cases.) The upfront payment amount for each construction permit is listed in Attachment A.

Applicants potentially eligible to participate in competitive bidding in more than one MX Group should note that upfront payments are not attributed to specific construction permits, but instead will be translated to bidding units to define a bidder's maximum bidding eligibility. For Auction No. 25, the amount of the upfront payment will be translated into bidding units on a one-to-one basis, *e.g.*, a $25,000 upfront payment provides the bidder with 25,000 bidding units. The total upfront payment defines the maximum amount of bidding units on which the applicant will be permitted to bid (including standing high bids) in any single round of bidding. Thus, an applicant does not have to make an upfront payment to cover all construction permits which the applicant has selected on FCC Form 175, but rather to cover the maximum number of bidding units that are associated with construction permits on which the bidder wishes to place bids and hold high bids on at any given time. In this regard, bidders are reminded that **failure to submit an upfront payment of sufficient size to provide bidding eligibility for every MX Group in which an applicant has a pending long-form application will limit the bidding eligibility of that applicant.**

To be able to place a bid on a construction permit, in addition to having specified that permit on the FCC Form 175, a bidder must have an eligibility level that meets or exceeds the number of bidding units assigned to that license. At a minimum, an applicant's total upfront payment must be enough to establish eligibility to bid on at least one of the construction permits applied for on the FCC Form 175, or else the applicant will not be eligible to participate in the auction.

In calculating the upfront payment amount, an applicant should determine the maximum number of bidding units it may wish to bid on in any single round, and submit an upfront payment covering that number of bidding units. **Bidders should check their calculations carefully as there is no provision for increasing a bidder's maximum eligibility after the upfront payment deadline.**

> **NOTE: An applicant potentially eligible to bid in more than one MX Group may, on its FCC Form 175, indicate an intent to bid on every construction permit for which an underlying long-form has been filed, but its actual bidding in any round will be limited by the bidding units reflected in its upfront payment.**

**(4) Applicant's Wire Transfer Information for Purposes of Refunds**

Because experience with prior auctions has shown that in most cases wire transfers provide quicker and more efficient refunds than paper checks, the Commission will use wire transfers for all Auction No. 25 refunds. To avoid delays in processing refunds, applicants should include wire transfer instructions with any refund request they file; they may also

provide this information in advance by faxing it to the FCC Billings and Collections Branch, ATTN:Michelle Bennett or Gail Glasser at (202) 418-2843. **Please include the following information:**

Name of Bank
ABA Number
Account Number to Credit
Correspondent Bank (if applicable)
ABA Number
Account Number
Contact and Phone Number

(Applicants should also note that implementation of the Debt Collection Improvement Act of 1996 requires the FCC to obtain an applicant's Taxpayer Identification Number (TIN) before it can disburse refunds.) Eligibility for refunds is discussed in Section 5.C., *infra.*

**D. Auction Registration**

Approximately ten days before the auction, the FCC will issue a public notice announcing all qualified bidders for Auction No. 25. Qualified bidders are those applicants whose FCC Form 175 applications have been accepted for filing and that have timely submitted upfront payments sufficient to make them eligible to bid on at least one of the construction permits for which a long-form application was previously accepted.

All qualified bidders are automatically registered for the auction. Registration materials will be distributed prior to the auction by two separate overnight mailings, each containing part of the confidential identification codes required to place bids. **These mailings will be sent only to the contact person at the applicant address listed in the FCC Form 175.**

Applicants that do not receive both registration mailings will not be able to submit bids. Therefore, any qualified applicant that has not received both mailings by **noon on September 23, 1999** should contact the FCC National Call Center at (888) CALL-FCC ((888) 225-5322, press option #2 at the prompt). **Receipt of both registration mailings is critical to participating in the auction and each applicant is responsible for ensuring it has received all of the registration material.**

**Qualified bidders should note that lost login codes, passwords or bidder identification numbers can be replaced only by appearing in person at the FCC Auction Headquarters located at 445 - 12th Street, S.W., Washington, DC 20554. Only an authorized representative or certifying official, as designated on an applicant's FCC Form 175, may appear in person with two forms of identification (one of which must be**

**a photo identification) in order to receive replacement codes. Bidders needing replacement codes must call technical support at 202-414-1250 prior to arriving at the FCC.**

## E. Remote Electronic Bidding Software

Qualified bidders that file or amend the FCC Form 175 electronically are strongly encouraged to bid electronically. Due to the fact that each of the potential bidders has already paid substantial fees to the Commission in connection with the filing of their long-form applications, **the software packages required to participate in remote electronic bidding will be provided on request at no charge to the bidders in the Closed Broadcast Auction.** These software packages must be ordered by **August 20, 1999**. (Auction software is tailored to a specific auction, so software from prior auctions will not work for Auction No. 25). A software order form is included in this Public Notice in Attachment F.

## F. Auction Seminar

On August 3, 1999, the FCC will sponsor a free, informational seminar for the Closed Broadcast Auction at the Main Meeting Room on the first floor of the Headquarters Building of the Federal Communications Commission located at 445 - 12th Street, S.W., Washington, DC 20554. The seminar will provide attendees with information about pre-auction procedures, conduct of the auction, FCC remote bidding software, and the Closed Broadcast Auction service and auction rules.

To register, refer to the registration materials included as Attachment H to this Public Notice. The registration form includes details about the time and location of the seminar. Registrations are accepted on a first-come, first-served basis.

## G. Mock Auction

All qualified bidders will be eligible to participate in a mock auction on **September 24, 1999**. The mock auction will enable applicants to become familiar with the electronic software prior to the auction. Free demonstration software will be available for use in the mock auction. Participation by all bidders is strongly recommended. Details will be announced by Public Notice.

## 4. AUCTION EVENT

The first round of the auction will begin on September 28, 1999. The initial round schedule will be announced in a Public Notice listing the qualified bidders, to be released approximately 10 days before the start of the auction.

### A. Auction Structure

#### (1) Simultaneous Multiple Round Auction

In the *Closed Broadcast Auction Public Notice*, we proposed to award the construction permits in a single, simultaneous multiple round auction.[37] On this proposal, Community Broadcasters Association ("CBA") responds that auctions for LPTV displacement applications should be set up to run *seriatim*.[38] CBA stresses the importance of the auction for displaced LPTV licensees and notes that this category of bidder consists of small operators who can't afford the time or staff to stay on-line indefinitely. However, contrary to CBA's expressed concerns, bidders in the Closed Broadcast Auction are not compelled by our procedures to stay online indefinitely. It normally takes no more than a few minutes for a typical bidder to place a bid electronically. Round results are then posted to the Internet at approximate set times following the close of each round. Additionally, round results will be made available by telephone. There is no need to stay on-line for extensive periods of time. Thus, only a periodic presence will be required during each round of the auction; first to place a bid; then later to check round results.

We therefore conclude that the construction permits in the Closed Broadcast Auction will be awarded through a single, simultaneous multiple round auction. Unless otherwise announced, bids will be accepted on all construction permits in each round of the auction. This approach, we believe, allows for a more efficient auction process and, in cases where bidders are eligible to participate in multiple markets, allows them to take advantage of any synergies that exist among construction permits. Due to the large number of potential bidders in this auction, we may decide to partition the bidding period to allow bidding to occur on different groups of construction permits during different time intervals on some or all of the days that the auction is underway. This would alleviate any delays bidders might experience while trying to place bids. In this regard, we note that electronic bidding provides for a substantially enhanced simultaneous bidding capacity than does telephonic bidding, where the number of callers during peak bidding times may result in the formation of queues. For that reason, bidders are encouraged to utilize the electronic filing resources of the Commission to place their bids.

---

37 *Closed Broadcast Auction Public Notice* at 4 - 5.

38 Comments of CBA at 2.

### (2) Maximum Eligibility and Activity Rules

In the *Closed Broadcast Auction Public Notice*, we proposed that the amount of the upfront payment submitted by a bidder would determine the initial maximum eligibility (as measured in bidding units) for each bidder.[39] We received comments from Fant Broadcasting Company ("Fant") on our proposed eligibility rule. Fant believes that the 100% eligibility rule is too high for a multiple market bidder and that this will force such bidders to either exercise a waiver or to bid.[40] This will produce artificially low bid amounts for markets with smaller bidding units as bidders will shy away from them to maintain more eligibility. Fant states that we should require only 50% eligibility in stage one of the auction.[41]

First, we note that in the Closed Broadcast Auction, only a very small percentage of bidders are potentially eligible to bid on more than one market. For that reason, even if valid, we do not see the factors stated by Fant as having a significant impact on the conduct of the Closed Broadcast Auction. Further, no other commenter raises similar concerns and none of the reply comments express support for this position. Accordingly, we can see no reason to reduce our proposed activity requirement designed to increase efficiency. As to the 50% eligibility proposal, we note that there shall be no multiple stages in the Closed Broadcast Auction. Rather, a single stage auction is proposed.[42]

We adopt the maximum eligibility and activity rule proposal for the Closed Broadcast Auction. The amount of the upfront payment submitted by a bidder determines the initial maximum eligibility (in bidding units) for each bidder. Note again that upfront payments are not attributed to specific construction permits, but instead will be translated into bidding units to define a bidder's initial maximum eligibility. The total upfront payment defines the maximum number of bidding units on which the applicant will initially be permitted to bid.

To ensure that the auction closes within a reasonable period of time, an activity rule requires bidders to bid actively throughout the auction, rather than wait until the end before participating. Bidders are required to be active on 100 percent of their maximum eligibility during each round of the auction.

A bidder is considered active on a construction permit in the current round if it is either the high bidder at the end of the previous bidding round and does not withdraw the high bid in the current round, or if it submits an acceptable bid in the current round (see "Minimum Accepted Bids" in Section 4.B.(3), *infra*). A bidder's activity level in a round is the sum of the bidding units associated with construction permits on which the bidder is active. Required

---

39 *Closed Broadcast Auction Public Notice* at 6.

40 Comments of Fant at 2 - 3.

41 *Id.* at 3.

42 *See Closed Broadcast Auction Public Notice* at 6. *See also* Supplement and Erratum to Public Notice DA 99-940 Announcing Closed Broadcast Auctions Scheduled for September 28, 1999, *Public Notice*, DA 99-940 (released May 26, 1999).

minimum activity levels ensure that an auction will proceed expeditiously and efficiently. Because such procedures have proven successful in maintaining the pace of previous auctions, we adopt them for the Closed Broadcast Auction.

### (3) Activity Rule Waivers, Reducing Eligibility and Stopping Rules

In the *Closed Broadcast Auction Public Notice*, we proposed that each bidder in the auction would be provided five activity rule waivers that may be used in any round during the course of the auction.[43] We also proposed to employ a simultaneous stopping rule in Auction No. 25,[44] meaning that all construction permits would remain open until the first round in which no new acceptable bids, proactive waivers or withdrawals were received. We sought comment on a modified version of this rule, in which the auction would close for all construction permits after the first round in which no bidder submits a proactive waiver, a withdrawal, or a new bid on any construction permit on which it is not the standing high bidder.[45] We further proposed to retain the discretion to keep the auction open, even if no new acceptable bids or proactive waivers are submitted and no previous high bids are withdrawn.[46] Finally, we proposed to reserve the right to declare that the auction will end after a specified number of additional rounds ("special stopping rule"),[47] meaning that the Bureaus would accept bids in the final round(s) only for construction permits on which the high bid increased in at least one of the preceding specified number of rounds. We proposed to exercise this option only in circumstances such as where the auction is proceeding very slowly, where there is minimal overall bidding activity, or where it appears likely that the auction will not close within a reasonable period of time.[48]

We received comments on our proposals regarding activity rule waivers, eligibility reduction and the stopping rules from Nobco, Inc. ("Nobco"), Pappas Telecasting of the Midlands, Inc. ("Pappas") Biltmore Forest Broadcasting FM, Inc. ("Biltmore Forest"), Guam Radio Services, Inc. ("Guam") and NTA. Reply comments were filed by Snyder Hill Broadcasting, Inc. ("Snyder Hill") and KM Communications, Inc. ("KM"). Nobco wants no activity rule waivers as they believe it will slow down the process of the auction too much.[49] However, activity rule waivers are designed to cover exigent circumstances over which a bidder may have no control, for example, technical problems with a computer, telephone disruptions, etc. They are not intended for strategic use and there is no evidence of their abuse in the auctions conducted to date.

---

43 *Closed Broadcast Auction Public Notice* at 8.
44 *Id.* at 9.
45 *Id.*
46 *Id.*
47 *Id.* at 10.
48 *Id.*
49 Comments of Nobco at 1 - 2.

Pappas thinks it inadvisable for the Commission to provide for any reduction in eligibility for failure to maintain a 100 percent activity level.[50] It sees this as favoring a small percentage of multiple market bidders and believes that multiple market applicants should be required to maintain their eligibility in each market in every round.[51] Snyder Hill replies in agreement that any multiple market applicant in the Closed Broadcast Auction should be required to maintain activity in every round in every market.[52] Pappas thinks that if they do not have this requirement, multiple market applicants will enjoy an advantage over the vast majority of applicants that are only potentially eligible to bid in a single market.[53] KM asserts that competitive bidding in each MX Group should close only when all bidders have exhausted their eligibility. It disagrees with the position that multiple market bidders should be held to a 100 percent activity level in all markets.[54] After consideration, we believe that the 100 percent activity requirement will not favor the multiple market bidder. It is important to the overall function of the auction process that all bidders retain the flexibility to voluntarily reduce their eligibility once they are no longer interested in a given market.

Biltmore Forest argues that simultaneously auctioning all of the MX Groups delays the end of the auction for all applicants. It asserts that the close of the auction for one market should not depend on the market interest or activity in another market. Biltmore Forest suggests that a market (MX Group) should close out as activity ceases in that market. By way of reply, Snyder Hill agrees that the close of one market should not be dependent on another, seeing such a practice as affording unfair advantage to multiple market applicants.[55] In this regard, we note that once all applicants in a MX Group (except, of course, the standing high bidder) have lost their eligibility following the automatic application of any remaining activity waivers, no other bidders in that MX Group will be able to bid. This effectively closes the bidding in that market while the rest of the auction continues. NTA believes that the proposed use of five activity waivers is "entirely sufficient."[56] We agree.

Guam thinks that the Commission should be able to stop a competitive bidding contest if the only bids placed in a given round are those made by one or more standing high bidders that are merely topping their own pre-existing high bids, thereby artificially extending bidding activity.[57] We view this comment as one supportive of our proposed modified stopping rule and we note that we already have the authority to take such action, should it become necessary to prevent any potential abuse of the auction process.

---

50 Comments of Pappas at 4 - 5.
51 *Id.* at 5.
52 Reply Comments of Snyder Hill at 3.
53 Comments of Pappas at 5.
54 Reply Comments of KM at 5.
55 Reply Comments of Snyder Hill at 3.
56 Comments of NTA at 3.
57 Comments of Guam at 8 - 9.

C0131

Based upon our experience in previous auctions, we adopt our proposals and each bidder will be provided five activity rule waivers that may be used in any round during the course of the auction. Use of an activity rule waiver preserves the bidder's current bidding eligibility despite the bidder's activity in the current round being below the required minimum level. An activity rule waiver applies to an entire round of bidding and not to a particular construction permit.

The FCC auction system assumes that bidders with insufficient activity would prefer to use an activity rule waiver (if available) rather than lose bidding eligibility. Therefore, the system will automatically apply a waiver (known as an "automatic waiver") at the end of any round where a bidder's activity level is below the minimum required unless: (1) there are no activity rule waivers available; or (2) the bidder overrides the automatic application of a waiver by reducing eligibility, thereby meeting the minimum requirements.

A bidder with insufficient activity that wants to reduce its bidding eligibility rather than use an activity rule waiver must affirmatively override the automatic waiver mechanism during the round by using the "reduce eligibility" function in the software. In this case, the bidder's eligibility is permanently reduced to bring the bidder into compliance with the activity rules. Once eligibility has been reduced, a bidder will not be permitted to regain its lost bidding eligibility.

A bidder may proactively use an activity rule waiver as a means to keep the auction open without placing a bid. If a bidder submits a proactive waiver (using the proactive waiver function in the bidding software) during a round in which no bids are submitted, the auction will remain open and the bidder's eligibility will be preserved. An automatic waiver invoked in a round in which there are no new valid bids or withdrawals will not keep the auction open.

Barring extraordinary circumstances, bidding will remain open on all construction permits until bidding stops on every construction permit. Thus, the auction will close for all construction permits when one round passes during which no bidder submits a new acceptable bid on any construction permit, applies a proactive waiver, or withdraws a previous high bid. In addition, however, the Bureaus retain the discretion to close the auction for all construction permits after the first round in which no bidder submits a proactive waiver, a withdrawal, or a new bid on any license on which it is not the standing high bidder. Thus, absent any other bidding activity, a bidder placing a new bid on a construction permit for which it is the standing high bidder would not keep the auction open under this modified stopping rule.

The Bureaus retain the discretion, however, to keep an auction open even if no new acceptable bids or proactive waivers are submitted, and no previous high bids are withdrawn. In this event, the effect will be the same as if a bidder had submitted a proactive waiver. Thus, the activity rule will apply as usual, and a bidder with insufficient activity will either lose bidding eligibility or use an activity rule waiver (if it has any left).

C0132

Further, in their discretion, the Bureaus reserve the right to declare that the auction will end after a specified number of additional rounds ("special stopping rule"). If the FCC invokes this special stopping rule, it will accept bids in the final round(s) only for construction permits on which the high bid increased in at least one of the preceding specified number of rounds. The FCC intends to exercise this option only in extreme circumstances, such as where the auction is proceeding very slowly, where there is minimal overall bidding activity, or where it appears likely that the auction will not close within a reasonable period of time. Before exercising this option, the FCC is likely to attempt to increase the pace of the auction by, for example, increasing the number of bidding rounds per day, and/or increasing the amount of the minimum bid increments for the limited number of construction permits where there is still a high level of bidding activity.

### (5) Auction Delay, Suspension, or Cancellation

In the *Closed Broadcast Auction Public Notice*, we proposed that, by public notice or by announcement during the auction, the Bureaus may delay, suspend, or cancel the auction in the event of natural disaster, technical obstacle, evidence of an auction security breach, unlawful bidding activity, administrative or weather necessity, or for any other reason that affects the fair and competitive conduct of competitive bidding.[58] We received no comments on this proposal.

Because this approach has proven effective in resolving exigent circumstances in previous auctions, we will adopt our proposed auction cancellation rules. By public notice or by announcement during the auction, the Bureaus may delay, suspend or cancel the auction in the event of natural disaster, technical obstacle, evidence of an auction security breach, unlawful bidding activity, administrative or weather necessity, or for any other reason that affects the fair and competitive conduct of competitive bidding. In such cases, the Bureaus, in their sole discretion, may elect to: resume the auction starting from the beginning of the current round; resume the auction starting from some previous round; or cancel the auction in its entirety. Network interruption may cause the Bureaus to delay or suspend the auction. We emphasize that exercise of this authority is solely within the discretion of the Bureaus, and its use is not intended to be a substitute for situations in which bidders may wish to apply their activity rule waivers.

## B. Bidding Procedures

### (1) Round Structure

The initial bidding schedule will be announced by public notice at least one week before the start of the auction, and will be included in the registration mailings. The round structure for each bidding round contains a single bidding round followed by the release of the round results. Also, as noted in Section 4.A.(1) above, we may partition the bidding rounds to allow bidding to occur on different groupings of MX Groups during different time periods within a given round.

---

58 *Id.* at 9.

C0133

In the event that we institute such a procedure, a publicly released bidding schedule will clearly indicate when bids will be accepted for each group of construction permits during a round

The FCC has discretion to change the bidding schedule in order to foster an auction pace that reasonably balances speed with the bidders' need to study round results and adjust their bidding strategies. The FCC may increase or decrease the amount of time for the bidding rounds and review periods, or the number of rounds per day, depending upon the bidding activity level and other factors.

### (2) Reserve Price or Minimum Opening Bid

Generally, the Budget Act calls upon the Commission to prescribe methods by which a reasonable reserve price will be required or a minimum opening bid established when FCC licenses are subject to auction (*i.e.*, because they are mutually exclusive), unless the Commission determines that a reserve price or minimum opening bid is not in the public interest.[59] Consistent with this mandate, the Commission has directed the Bureaus to seek comment on the use of a minimum opening bid and/or reserve price prior to the start of each auction.[60] The Bureaus were directed to seek comment on the methodology to be employed in establishing each of these mechanisms. Among other factors, the Bureaus may consider the type of service that will be offered, the amount of spectrum being auctioned, the degree of competition from incumbent providers, the size of the geographic service areas, potential advertising revenue, physical phenomena, equipment design limitations and interference with other spectrum bands.[61] The Commission concluded that the Bureaus should have the discretion to employ either or both of these mechanisms for future auctions.[62]

In the *Closed Broadcast Auction Public Notice*, the Bureaus proposed to establish minimum opening bids and to retain discretion to lower the minimum opening bids.[63] In the alternative, the Bureaus sought comment on whether, consistent with the Budget Act, the public interest would be served by having no minimum opening bid or reserve price.[64] Numerous comments addressed the issue of minimum opening bids and reserve prices.

A number of commenters requested that certain minimum opening bids be lowered for specific primary service television markets. Fant, Lamco Communications, Inc. (Lamco), KOB-TV, LLC (KOB), Meridian Communications of Montana, Inc. (Meridian), Sunbelt Broadcasting Company(Sunbelt)/Falls Broadcasting Company/Sierra Radio Company (collectively - Sunbelt/Falls/Sierra), Ramar Communications II, Ltd. (Ramar) and Uhlmann/Latshaw Broadcasting, LLC (Uhlmann/Latshaw) point out what they believe are disproportionate

---

59 Budget Act, *see supra* note 2.
60 *See Part I Third Report and Order*, 13 FCC Rcd. at 455-456, ¶ 141.
61 *See Broadcast First Report and Order* at 15971 ¶ 134.
62 *Id.*
63 *Closed Broadcast Auction Public Notice* at 4.
64 *Id.* at 4 - 5.

C0134

differences in the sizes of certain primary service television markets in terms of both households and revenues and the minimum opening bids for those markets.[65] As indicative of this apparent disparity, these commenters specifically point to the minimum opening bids for: International Falls, Minnesota; Ironwood, Michigan; Logan, Utah, Manteo, North Carolina; Rapid City, South Dakota, Roswell, New Mexico; Silver City, New Mexico; and Sun Valley, Idaho. We find merit in these commenters' arguments and, with the exception of Rapid City, South Dakota, we have revised the minimum opening bids for each of these markets and for Coos Bay, Oregon, for similar reasons. The revised minimum opening bids are contained in Attachment A. As for Rapid City, South Dakota, we believe the minimum opening bid is appropriate for UHF spectrum in a market of that size and, for the reasons set forth below, we do not adopt Sunbelt's alternative bid proposal for that market.

Meridian and Sunbelt/Falls/Sierra suggest that the minimum opening bids for television be based upon the number of households in the proposed market and calculated at $1.00 per household.[66] For undefined television markets (those with less than 25,000 households), Sunbelt/Falls/Sierra suggest that a minimum bid of $25,000 be required.[67] Sunbelt/Falls/Sierra also suggest that radio markets be based on the population within the station's predicted 1 mV/m contour and calculated at $0.20 per person or with a minimum bid of $10,000 per applicant.[68] None of these commenters provide any documentation or evidence to support any of their proposed minimum opening bids. It is not clear why the $1.00 and $0.20 figures were chosen. Therefore, since there is no method to determine the accuracy of these alternative proposals, we shall not adopt them.

Kimble and Hudson Communications, Inc. (Hudson), applicants for a new FM radio station in Oro Valley, Arizona, request that the minimum opening bid for that market be lowered from $250,000, to $50,000.[69] Kimble argues that the population within the 1.0mV/m contour of his proposed facility is only 27,706 and that the only way to justify a minimum opening bid of $250,000 is to assume that the new Oro Valley station would be able to serve the Tucson radio market.[70] Hudson and Kimble conclude that their proposed facilities cannot serve Tucson.[71]

The fact that neither Kimble nor Hudson have proposed a station that would provide service to Tucson, Arizona, does not support lowering of the minimum opening bid for the FM spectrum at Oro Valley, Arizona. The minimum opening bid was based upon a maximum class facility operating at the Commission's allotment reference coordinates and not individual

---

65 Comments of Fant at 1-3; Comments of KOB at 1-5 and Reply Comments of KOB at 1-3; Comments at Lamco at 1; Comments of Meridian at 1-8; Comments of Ramar at 1; Comments of Sunbelt/Falls/Sierra at 1-8 and 10-11; Comments of Uhlmann/Latshaw at 1-4.

66 Comments of Meridian at 7; Comments of Sunbelt/Falls/Sierra at 10-11.

67 Comments of Sunbelt/Falls/Sierra at 10-11.

68 *Id.*

69 Comments of Kimble at 1-3; Comments of Hudson at 1-2.

70 *Id.*

71 *Id.*

C0135

applicants' proposals. Furthermore, neither Kimble nor Hudson have demonstrated why the minimum opening bid should be reduced to $50,000.

Guam maintains that the minimum opening bid for the FM spectrum on Channel 275C at Agana, Guam ($160,000) is too high.[72] Guam argues that the class of the facility is irrelevant on the island of Guam because any class station will cover the entire island population.[73] Guam also believes that the population to be served by the proposed station is also not an accurate indicator of the proposed station's value.[74] Guam contends that traditionally, a station's value assumes that a significant portion of a station's overall value is contributed by the listeners in automobiles traveling into the station's service area from other areas. According to Guam, no such listeners exist on the island of Guam.[75] Furthermore, Guam notes that the residents of Guam are in the middle of a deep economic depression.[76] Finally, Guam notes that there are already four network television stations, nine FM stations and three AM stations serving the island and that the new FM station would have to compete with a small pool of potential advertisers.[77] Given these factors, Guam estimates that the minimum opening bid for the new FM station on Channel 275C at Agana, Guam, should be 10% of what would be appropriate for Class C FM spectrum on the mainland of the United States or $16,000.[78]

Guam does not suggest that the minimum opening bid for Channel 275C at Agana, Guam, is greater than what the actual station is worth. Furthermore, Guam has not specifically demonstrated why the minimum opening bid should be reduced by 90% to $16,000. Therefore, we shall not reduce the minimum opening bid for that market.

Three Angels Broadcasting Network, Inc. (Three Angels), an applicant in sixteen of the secondary television markets, notes that its minimum opening bids average more than $65,000 per market.[79] Three Angels maintains that this figure is "ridiculously high" and asks that the Commission set minimum opening bids for SST markets at $5,000 per market.[80] Three Angels provides the "purchase prices" it paid for the stations it owns and Three Angels calculates that the average price for such stations was $5,000.[81] Three Angels states that this is a more realistic level for such stations and that the current minimum opening bids are much higher than warranted.[82] CBA argues that the minimum opening bids for some secondary television are beyond the means of LPTV applicants. Because the inability to obtain a grant of a displacement

---

72 Comments of Guam at 1.
73 *Id.* at 2.
74 *Id.* at 3.
75 *Id.* at 3.
76 *Id.* at 3-4.
77 *Id.*
78 *Id.* at 6.
79 Comments of Three Angels at 1.
80 *Id.* at 1.
81 *Id.* at 2 & Exhibit 1.
82 *Id.*

C0133

application could mean the "death" of an LPTV station, CBA urges that the Commission lower the minimum opening bids if no minimum opening bids are received for SST markets. NTA requests that the minimum opening bids for the secondary television services be adjusted downward to a "fraction of the amounts shown."[83] CTI specifically complains that the minimum opening bid for the low power channel 28 at Hartford, Connecticut ($120,000) is too high.[84] Finally, Dove Broadcasting, Inc. (Dove), complains that the minimum opening bid for its secondary television market (SST-80 - $30,000) is too high.[85] Dove notes that three of the four applicants in that market are for low power television stations in Augusta, Georgia, and its application is for a television translator station at Johnston, South Carolina.[86] Dove argues that, while a $30,000 minimum opening bid for the Augusta applications may be keeping with the Commission's formula, only an infinitesimal fraction of that amount would fit into any reasonable formula for the Johnston application.[87] Without further explanation, Dove requests that it be released from any minimum opening bid or up front payment for its Johnston application.[88]

Apart from Three Angels providing anecdotal evidence of what it claims it paid for its stations, none of these commenters provide methodologies or documentation for what they believe the minimum opening bid should be in their markets. It is not clear whether the "purchase prices" that Three Angels paid for its stations is an accurate reflection of the value of LPTV or television translator stations. Therefore, we are not persuaded that any change of the minimum opening bids is appropriate in any of the markets cited by these commenters.

NTA, Channel 13 Television, Inc. (CTI) and KARE Network Management, Inc. (KARE) request that there be no minimum opening bids for secondary services. NTA argues that extending the length of competitive bidding is a preferable alternative to the setting of minimum opening bids.[89] NTA, CTI and KARE believe that the public interest would best be served by having no minimum opening bids associated with television secondary services.[90] CTI argues that there should be no minimum opening bid for secondary television service markets because these applications are for facilities that may be displaced at any time by full service television facilities.[91] The Commission has previously considered the matter of special relief for secondary service applicants in the context of the competitive bidding process.[92] Special exceptions to the anti-collusion rule were adopted by the Commission allowing for certain kinds of settlement discussions to occur between mutually exclusive applicants after the deadline for filing short-

---

83 *Id.*
84 Comments of CTI at 2.
85 Comments of Dove at 1.
86 *Id.*
87 *Id.* at 2.
88 *Id.*
89 Comments of NTA at 2.
90 Comments of CTI at 1-3; Comments of NTA at 2-3; Comments of KARE at 1-2.
91 Comments of CTI at 2.
92 *See Memorandum Opinion and Order on Reconsideration* at ¶¶ 46, *et seq.*

form applications. While the Commission had the opportunity to grant further forms of relief for secondary services, including relief from minimum opening bids, it chose not to do so. We see no reason now to deviate from our customary practice of setting minimum opening bids for LPTV and other secondary service applicants in the same manner as we have dealt with other services. Further, efficiency factors militate toward the use of minimum opening bids and our prior experience in conducting auctions has demonstrated the importance of minimum opening bids as tools to ensure their expeditious execution. CBA asserts that the Commission should exercise discretion to lower minimum opening bids to below the level of upfront payments in cases where no opening bid is made. While we already have such discretion, we feel it is important that bidders not attempt to "game" the auction in this regard. Waiting out a round in anticipation of a reduction in the minimum opening bid amount would be inadvisable in that a loss of activity rule waivers would automatically occur. This, in turn, reduces the flexibility that a bidder might have in progressing through the competitive bidding process. Further, it is important for bidders to take note of the fact that the Commission has not opted to reduce minimum opening bids in previous auctions.

We note that many commenters chose to address the topic of minimum opening bids, generically. Roy E. Henderson (Henderson) and Guam do not believe it is in the public interest to have any minimum opening bids in this auction.[93] Riverbanks Restaurants, Inc. (Riverbanks), while not an applicant in this auction, urges the Commission to not adopt minimum opening bids for television markets 150 and below.[94]

Unlike most of the recently auctioned wireless services, Henderson maintains that broadcasting is a mature service and the most valuable spectrum in the major markets has long been allocated.[95] The remaining spectrum to be auctioned, Henderson believes, represents the interests of small market broadcast entrepreneurs seeking to bring radio service to underserved communities in largely rural environments.[96] However, even if it were to be assumed that the most valuable spectrum has previously been licensed by the Commission, this does not mean that the spectrum about to be auctioned is without value. The large number of long-form applications on file belie this fact. Guam argues that many applicants applied for their facilities without budgeting for an auction.[97] Unlike other services, Henderson notes that many of the applicants in this auction have already expended resources prior to the upfront payment.[98] Orion Communications Limited (Orion), one of the applicants for a new FM station at Biltmore Forest, North Carolina, notes that, in five of the FM radio markets, applicants have already gone through a comparative hearing and expended large sums to prosecute their applications.[99] Orion requests that applicants in markets where applications have already gone through a comparative hearing

---

93 Comments of Henderson at 1-7 and Reply Comments of Henderson at 1-3; Comments of Guam at 7.

94 Comments of Riverbanks at 1-7.

95 Comments of Henderson at 2.

96 *Id.* at 3.

97 Comments of Guam at 7.

98 *Id.*

99 Comments of Orion at 2.

C0138

be exempted from a minimum opening bid or that the minimum opening bid be *de minimis*.[100]

We disagree with these commenters that setting a minimum opening bid for broadcast markets is not in the public interest. Based on our experience in using minimum opening bids in prior auctions, we believe that minimum opening bids speed the course of the auction and ensure that valuable public assets are not sold for nominal prices, without unduly interfering with the efficient assignment of construction permits or licenses.[101] None of the commenters have indicated that the minimum opening bid in their market is higher than the actual value of their proposed station. They simply believe that the bidders should be able to start the bidding at a level they deem appropriate. However, we have found that allowing such flexibility invariably delays the auction process as bids take an inordinate amount of time to reach their final levels. Setting a minimum opening bid will mean that only those bidders that are sincerely interested in a facility will be participating in the auction and that the bidding will be resolved more rapidly. While some applicants in this auction may already have expended funds to prosecute their applications, we do not see that this fact supports the proposition that no minimum opening bids be adopted. All applicants in the Closed Broadcast Auction will have underwritten varying levels of cost associated with their prospective business ventures. While it is true that hearing case applicants have encountered very significant costs to date, this does not change that fact that our rules and past practices uniformly have required that bidders purchase their bidding eligibility. Providing such eligibility at no charge or at a reduced rate to a single class of bidders would raise questions of whether we are conducting the auction in an even-handed manner. Once again, no commenter suggests that the minimum opening bid in their market is actually higher than the fair market value of the station and we anticipate that applicants will factor their existing expenses into how much they decide to bid for their station, as has been the case in past auctions.

We adopt the minimum opening bids proposed for each of the construction permits in the Closed Broadcast Auction, as modified on Attachment A, and which are reducible at the discretion of the Bureaus. This will allow the Bureaus flexibility to adjust the minimum opening bids if circumstances warrant. We emphasize, however, that such discretion will be exercised, if at all, sparingly and early in the auction, *i.e.*, before bidders lose all waivers and

begin to lose substantial eligibility. During the course of the auction, the Bureaus will not entertain any bidder requests to reduce the minimum opening bid on specific construction permits.

---

100 Comments of Orion at 3.

101 47 U.S.C. 309(j)(3)(C).

C0139

**(3) Minimum Accepted Bids and Bid Increments**

In the *Closed Broadcast Auction Public Notice*, we proposed a minimum bid increment of 10 percent.[102] KOB is of the view that since exponential smoothing is not proposed for the Closed Broadcast Auction, participants will not be given the opportunity to attain marginally optimal pricing for their markets.[103] Our use of exponential smoothing in recent auctions has involved varying the minimum bidding between 10 percent and 20 percent. The effect of choosing a simplified "flat" increment will be to allow greater flexibility to bidders early in the competitive bidding process. It will still allow bidders the same opportunity to attain optimal prices. We therefore see the 10 percent minimum bid increment as an appropriate tool to use in this auction and can see no detriment to potential bidders.

Biltmore Forest comments that 10 percent bidding increments are too high to maintain in the later stages of an auction, since the 10 percent figure results in the setting of larger and larger increments in raw dollar terms.[104] This actually causes less revenue to the Treasury since some that might be willing to make a 4 or 5 percent incremental increase against a standing high bid would not place a bid that would be required to have to be 10 percent higher.[105] In reply, KM states that the 10 percent bidding increment is acceptable, but suggests a cap in raw dollars during the later stages of the auction.[106] Our past experience however, has shown us that a 10 percent bid increment is not excessive and will not significantly affect the amounts of prospective bids or the rate at which bidding occurs. Additionally, we do have discretion to lower the bid increment during the progress of an auction, if we deem that circumstances so dictate.

We adopt the proposal contained in the *Closed Broadcast Auction Public Notice*. The Bureaus retain the discretion to change the minimum bid increment if they determine that circumstances so dictate. For example, the Bureaus may raise the minimum bid increment toward the end of the auction to speed the pace at which bids reach their final values. The Bureaus will do so by announcement in the Automated Auction System. In addition, the Bureaus retain the discretion to implement a dollar floor for the bid increment to further facilitate a timely close of the auction.

Once there is a standing high bid on a construction permit, there will be a bid increment associated with that bid indicating the minimum amount by which the bid on that license can be raised. For the Closed Broadcast Auction, we will use a flat, across-the-board increment of 10

---

102 *Closed Broadcast Auction Public Notice* at 6.
103 Comments of KOB at 5.
104 Comments of Biltmore Forest at 3.
105 *Id.* at 3.
106 Reply Comments of KM at 6.

C0140

percent to calculate minimum bid increments. The Bureaus retain the discretion to compute the minimum bid increment through other methodologies if it determines that circumstance so dictate.

Please note that all bidding will take place either through the automated bidding software or by telephonic bidding. (Telephonic bid assistants are required to use a script when handling bids placed by telephone. Telephonic bidders are therefore reminded to allow sufficient time to bid, by placing their calls well in advance of the close of a round, because four to five minutes are necessary to complete a bid submission. Electronic bidding avoids potential difficulties that might be experienced in attempting to place a telephonic bid toward the end of a round when heavy traffic may result in delays.) There will be no on-site bidding during Auction No. 25.

A bidder's ability to bid on specific construction permits in the first round of the auction is determined by two factors: (1) the construction permits applied for on FCC Form 175; and (2) the upfront payment amount deposited. The bid submission screens will be tailored for each bidder to include only those construction permits for which the bidder applied on its FCC Form 175.

The bidding software requires each bidder to login to the FCC auction system during the bidding round using the FCC account number, bidder identification number, and the confidential security codes provided in the registration materials. Bidders are strongly encouraged to download and print bid confirmations after they submit their bids.

The bid entry screen of the Automated Auction System software for the Closed Broadcast Auction allows bidders to place multiple increment bids which will let bidders increase high bids from one to nine bid increments. A single bid increment is defined as the difference between the standing high bid and the minimum acceptable bid for a construction permit.

To place a bid on a construction permit, the bidder must enter a whole number between 1 and 9 in the bid increment multiplier (Bid Mult) field. This value will determine the amount of the bid (Amount Bid) by multiplying the bid increment multiplier by the bid increment and adding the result to the high bid amount according to the following formula:

**Amount Bid = High Bid + (Bid Mult * Bid Increment)**

Thus, bidders may place a bid that exceeds the standing high bid by between one and nine times the bid increment. For example, to bid the minimum acceptable bid, which is equal to one bid increment, a bidder will enter "1" in the bid increment multiplier column and press submit.

For any construction permit on which the FCC is designated as the high bidder (*i.e.*, a construction permit that has not yet received a bid in the auction or where the high bid was withdrawn and a new bid has not yet been placed), bidders will be limited to bidding only the minimum acceptable bid. In both of these cases no increment exists for the construction permit.

and bidders should enter "1" in the Bid Mult field. Note that in this case, any whole number between 1 and 9 entered in the multiplier column will result in a bid value at the minimum acceptable bid amount. Finally, bidders are cautioned in entering numbers in the Bid Mult field because, as explained in the following section, a high bidder that withdraws its standing high bid from a previous round, even if mistakenly or erroneously made, is subject to bid withdrawal payments.

**(6) Bid Removal and Bid Withdrawal**

In the *Closed Broadcast Auction Public Notice*, we proposed bid removal and bid withdrawal rules.[1] With respect to bid withdrawals, we proposed limiting each bidder to withdrawals in no more than two rounds during the course of the auction. The two rounds in which withdrawals are utilized, we proposed, would be at the bidder's discretion. Nobco asks that we not allow entities to withdraw bids once they are submitted since it will cause confusion for a bid to be posted and later withdrawn. Historically, we have allowed bidders some degree of flexibility to withdraw bids for the purpose of pursuing backup strategies and to maintain a dynamic and vigorous bidding environment. However, we clarify here that the Commission reserves the right to review the bid withdrawal behavior of all auction participants for patterns of insincere bidding which threatens the integrity of the auction process. Any abuse of the Commission's bid withdrawal procedures could result in the denial of the ability to bid on a market. The Commission retains the discretion to scrutinize multiple bid withdrawals on a single construction permit for evidence of anti-competitive strategic behavior, and take appropriate action when it deems necessary. For further guidance, please refer to Sections 1.2104 and 1.2109 of the Commission's rules. With this in mind, we adopt the proposed procedures for bid removal and bid withdrawal.

**a. Procedures**

Before the close of a bidding round, a bidder has the option of removing any bids placed in that round. By using the "remove bid" function in the software, a bidder may effectively "unsubmit" any bid placed within that round. A bidder removing a bid placed in the same round is not subject to withdrawal payments. Removing a bid will affect a bidder's activity for the round in which it is removed. This procedure will enhance bidder flexibility and, we believe, may serve to expedite the course of the auction. Therefore, we will adopt these procedures for the Closed Broadcast Auction.

Once a round closes, a bidder may no longer remove a bid. However, in the next round, a bidder may withdraw standing high bids from previous rounds using the "withdraw bid" function (assuming that the bidder has not exhausted its withdrawal allowance). A high bidder that withdraws its standing high bid from a previous round is subject to the bid withdrawal payments specified in 47 C.F.R. §§ 1.2104(g) and 1.2109. The procedure for withdrawing a bid and receiving a withdrawal confirmation is essentially the same as the bidding procedure described in "High Bids," Part 4.B.(3).

C0142

In previous auctions, we have detected bidder conduct that, arguably, may have constituted strategic bidding through the use of bid withdrawals. While we continue to recognize the important role that bid withdrawals play in an auction, *i.e.*, reducing risk associated with efforts to secure various construction permits or licenses in combination, we conclude that, for the Closed Broadcast Auction, adoption of a limit on their use to two rounds is the most appropriate outcome. By doing so we believe we strike a reasonable compromise that will allow bidders to use withdrawals. Our decision on this issue is based upon our experience in prior auctions, particularly the PCS D, E and F block auction, 800 MHz SMR auction, and LMDS auction, and is in no way a reflection of our view regarding the likelihood of any speculation or "gaming" in the Closed Broadcast Auction.

The Bureaus will therefore limit the number of rounds in which bidders may place withdrawals to two rounds. These rounds will be at the bidder's discretion and there will be no limit on the number of bids that may be withdrawn in either of these rounds. Withdrawals will still be subject to the bid withdrawal payments specified in 47 C.F.R. §§ 1.2104(g), and 1.2109. **Bidders are again reminded that abuse of the Commission's bid withdrawal procedures could result in the denial of the ability to bid on a market.**

If a high bid is withdrawn, the construction permit will be offered in the next round at the second highest bid price, which may be less than, or equal to, in the case of tie bids, the amount of the withdrawn bid, without any bid increment. The FCC will serve as a "place holder" on the construction permit until a new acceptable bid is submitted on that permit.

**b. Calculation**

Generally, a bidder that withdraws a standing high bid during the course of an auction will be subject to a payment equal to the lower of: (1) the difference between the net withdrawn bid and the subsequent net winning bid; or (2) the difference between the gross withdrawn bid and the subsequent gross winning bid for that construction permit. In the case of multiple withdrawals on a construction permit, the payment for the final withdrawer (i.e. that bidder who is the last bidder to withdraw before the license is won in an auction) will be computed as above. The payment for all other withdrawers will be computed as the lower of: (1) either the difference between the net withdrawn bid and the highest of the subsequent net withdrawn bids or the difference between the net withdrawn bid and the subsequent net winning bid, whichever is less; or (2) either the difference between the gross withdrawn bid and the highest of the subsequent gross withdrawn bids or the difference between the gross withdrawn bid and the subsequent gross winning bid, whichever is less. No withdrawal payment will be assessed for a withdrawn bid if either the subsequent gross or net winning bid or if any of the subsequent gross or net withdrawn bids exceed the gross or net amount of the withdrawn bid. In the event that a construction permit for which there have been withdrawn bids is not won in the auction, then those bidders with outstanding withdrawals will have 3 percent of their withdrawn bid withheld until such time as the construction permit can be reauctioned and a final payment assigned.

C0143

**(7) Round Results**

The bids placed during a round are not published until the conclusion of that bidding period. After a round closes, the FCC will compile reports of all bids placed, bids withdrawn, current high bids, new minimum accepted bids, and bidder eligibility status (bidding eligibility and activity rule waivers), and post the reports for public access.

Reports reflecting bidders' identities and bidder identification numbers for Auction No. 25 will be available before and during the auction. Thus, bidders will know in advance of this auction the identities of the bidders against which they are bidding.

**(8) Auction Announcements**

The FCC will use auction announcements to announce items such as schedule changes and round sequences and length. All FCC auction announcements will be available on the FCC remote electronic bidding system, as well as the Internet and the FCC Bulletin Board System.

**(9) Other Matters**

**a. Attachment A Deletions and Corrections**

A number of commenters argued that, for various reasons, certain applications should not have been included in the auction. Association of American Public Television Stations (APTS) and Rocky Mountain Public Broadcasting Network, Inc. (Rocky Mountain) request that so-called "noncommercial educational" applicants for secondary television facilities not be included in the auction.[107] APTS and Rocky Mountain note that, in the *Broadcast First Report and Order*, the Commission recognized that noncommercial educational applicants hold an explicit statutory exemption from auctions when applying for broadcast construction permits in the reserved spectrum.[108] With respect to whether the exemption should apply to noncommercial educational broadcasters applying for non-reserved spectrum, the Commission deferred rendering a decision on that question to its pending rulemaking concerning the reexamination of comparative standards for noncommercial educational applicants.[109] Rocky Mountain points out that the television translator and LPTV services do not have spectrum reserved for noncommercial educational use and all channels are non-reserved.[110] Thus, Rocky Mountain maintains that so-called "noncommercial educational" applications in the secondary television services should not have been included in the auction and that those applications should be held pending with the other AM, FM and full service TV applications and subject to the outcome of the noncommercial

---

107 Comments of APTS at 4; Comments of Rocky Mountain at 4; *see also* Comments of Four Rivers Community Broadcasting at 1; Comments of New Jersey Public Broadcasting Authority at 1.

108 *Id.* (citing First Report and Order, ¶ 24).

109 *See* Reexamination of the Comparative Standards for Noncommercial Educational Applicants, Notice of Proposed Rulemaking, MM Docket No. 95-31, *Notice of Proposed Rulemaking*, 10 FCC Rcd 2877 (1995).

110 Comments of Rocky Mountain at 2.

C0144

comparative standards rulemaking.[111] Rocky Mountain also argues that it would be a public policy mistake of grave consequence to subject these applications to auction because the continuation of public television service to areas currently served by television translators would be jeopardized.[112]

We decline the requests of APTS and Rocky Mountain to remove certain of the secondary television applications from the auction and disagree that they are exempt from auction. Section 309(j)(2)(C) of the Communications Act contains the exemption from auctions for noncommercial educational applicants.[113] That Section states that auction authority shall not apply to "licenses issued by the Commission - . . . for stations described in section 397(6) of this Act." Section 397(6) of the Communications Act contains the definition of the terms "noncommercial educational broadcast station" and "public broadcast station."[114] A "noncommercial educational broadcast station" is defined as "a television or radio broadcast station which -

> (A) under the rules and regulations of the Commission in effect on the effective date of this paragraph, is eligible to be licensed by the Commission as a noncommercial educational radio or television broadcast station and which is owned and operated by a public agency or nonprofit private foundation, corporation, or association; or
>
> (B) is owned and operated by a municipality and which transmits only noncommercial programs for education purposes."[115]

In this case, applicants in the secondary television services (LPTV and television translators) are not eligible to be licensed as noncommercial educational, a key element in the statutory definition. Unlike the AM radio, FM radio, FM Translator and full service television services, where applicants for non-reserved band spectrum may nevertheless apply as noncommercial educational entities, have their qualifications reviewed and their licenses issued as "noncommercial educational," there is no such counterpart licensing scheme in the secondary television services.

In its *Report and Order* establishing the low power television service, the Commission found it unnecessary to reserve channels for noncommercial low power stations. The Commission first considered whether to reserve channels for noncommercial use in the low power television service and, rejecting that concept, the Commission stated that "channel reservation comports with neither our overall approach to low power noncommercial operation

---

111 *Id.*
112 *Id.* at 3.
113 *See* 47 U.S.C. § 309(j)(2)(C).
114 *See* 47 U.S.C. § 397(6).
115 *Id.*

C0145

nor with the secondary status of all low power stations." An Inquiry Into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System, *Report and Order*, FCC 82-107, 47 FR 21468 (1982). As to whether applicants could apply for low power television facilities on a noncommercial basis, the Commission stated that it perceived several reasons for not imposing strict regulations regarding noncommercial operation of low power stations. With respect to all aspects except technical ones, the Commission stated that it envisioned "the low power service as an essentially unregulated service." The Commission left to the individual licensees the mode of support, including free and pay programming and the discretion whether to air commercials or not. The Commission specifically stated that it would not concern itself with the question of whether a low power television applicant would qualify as a "noncommercial educational" entity. The Commission noted that this was the same approach for television translator stations which were secondary by nature.

As such, the Commission does not require applicants for LPTV and television translator stations to demonstrate their status as noncommercial educational and their licenses are not issued as such. Licensees are free to air commercial or noncommercial programming, and they may change their programming without prior notice to or authorization from the Commission. Therefore, because stations are not licensed as "noncommercial educational" in the secondary television services, applicants in those services are not subject to the statutory exemption from auction. Accordingly, pursuant to Section 309(j)(1) of the Communications Act, the Commission must subject these applications to auction.

The second part of the definition provides an exemption from the auction requirement for applications for stations to be owned by municipalities seeking to transmit only noncommercial educational programming. Pending Commission resolution of statutory questions regarding the award of licenses to noncommercial applicants applying for commercial channels, *see Broadcast First Report and Order*, 13 FCC Rcd at 15929-31, it is therefore inappropriate to include in the September 28, 1999, auction groups of competing applications with one or more applications for municipality-owned stations proposing to transmit noncommercial educational programming only. As a result of the Commission's regulatory treatment of the LPTV and television translator services and its determination not to issue noncommercial licenses in these services, it is impossible to determine whether any pending applications currently scheduled for the upcoming auction, in fact, seek a station as defined by Section 397(6)(B) of the Act, and neither APTS nor Rocky Mountain has identified such pending LPTV or television translator applications. Accordingly, applicants that qualify as "municipalities" (as defined below) will be permitted to identify themselves in their short form (FCC Form 175) filing. Upon examination of the short forms, if it is determined that an applicant is a municipality, and that its intent is to transmit only noncommercial programs for educational purposes, then all of the applications in the corresponding MX Group will be removed from the auction and shall be subject to the Commission's pending rulemaking concerning the resolution of statutory questions regarding the award of licenses to noncommercial applicants applying for commercial channels. We shall employ the following definition for purposes of determining which applicants are

stations across the nation and concluded that the staff would undertake a traditional Section 307(b) analysis prior to conducting an auction for mutually exclusive AM applications. Furthermore, in light of the unique nature of the pending applications, the Commission recognized the need for additional information from the parties in order to evaluate the Section 307(b) considerations. On June 11, 1999, the staff issued letters to the pending mutually exclusive AM applicants, requesting submission of supplementary materials. Examination of the submitted amendments and a 307(b) analysis will appropriately ensue, as required.

**e. Minor Modifications to FCC Form 175 applications**

As noted in Section 3.B., *supra*, after the short-form filing deadline, applicants may make only minor changes to their FCC Form 175 applications. For example, permissible minor changes include deletion and addition of authorized bidders (to a maximum of three) and revision of exhibits. Filers should make these changes on-line, and submit a letter to Amy Zoslov, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, Federal Communications Commission, 445 12th Street, SW, Suite 4-A760 Washington, DC 20554, briefly summarizing the changes. Questions about other changes should be directed to Bob Allen of the FCC Auctions and Industry Analysis Division at (202) 418-0660.

**f. Maintaining Currency of Information in FCC Form 175 applications**

Applicants have an obligation under Section 1.65 of the Commission's Rules, 47 C.F.R. §1.65, to maintain the completeness and accuracy of information in their short-form applications. Amendments reporting substantial changes of possible decisional significance in information contained in FCC Form175 applications, as defined by 47 C.F.R. § 1.2105(b)(2), will not be accepted and may in some instances result in the dismissal of the FCC Form 175 application. Applicants should also be aware that failure to report ownership changes rendering them ineligible to participate in the auction under Section 309(l)(2) and applicable Commission rules, even if that failure is inadvertent, could result in serious financial penalties if they participate in competitive bidding and win a construction permit. These include default payments and revocation of construction permit or license. Section 1.65 amendments to pending long-form applications, however, should be filed after the auction and only by the winning bidder. The time for the filing of such amendments to the auction winners' long form applications will be announced by subsequent Public Notice.

## 5. POST-AUCTION PROCEDURES

### A. Down Payments and Withdrawn Bid Payments

After bidding has ended, the Commission will issue a public notice declaring the auction closed, identifying the winning bids and bidders for each license, and listing withdrawn bid payments due.

Within ten business days after release of the auction closing notice, each winning bidder must submit sufficient funds (in addition to its upfront payment) to bring its total amount of money on deposit with the Government to 20 percent of its net winning bids (actual bids less any applicable bidding credits). *See* 47 C.F.R. § 1.2107(b). In addition, by the same deadline all bidders must pay any withdrawn bid amounts due under 47 C.F.R. § 1.2104(g), as discussed in "Bid Removal and Bid Withdrawal," Part 4.B.(6), *supra*. (Upfront payments are applied first to satisfy any withdrawn bid liability, before being applied toward down payments.)

### B. Default and Disqualification

Any high bidder that defaults or is disqualified after the close of the auction (*i.e.*, fails to remit the required down payment within the prescribed period of time, fails to make full payment, or is otherwise disqualified) will be subject to the payments described in 47 C.F.R. § 1.2104(g)(2). In such event the Commission may offer the construction permit to the next highest bidders (in descending order) at their final bids, or reauction the spectrum. *See* 47 C.F.R. § 1.2109(b) and (c). In addition, if a default or disqualification involves gross misconduct, misrepresentation, or bad faith by an applicant, the Commission may declare the applicant and its principals ineligible to bid in future auctions, and may take any other action that it deems necessary, including institution of proceedings to revoke any existing construction permits or licenses held by the applicant. *See* 47 C.F.R. § 1.2109(d).

### C. Refund of Remaining Upfront Payment Balance

All applicants that submitted upfront payments but were not winning bidders for a Closed Broadcast Auction construction permit may be entitled to a refund of their remaining upfront payment balance after the conclusion of the auction. No refund will be made unless there are excess funds on deposit from that applicant after any applicable bid withdrawal payments have been paid.

Bidders that drop out of the auction completely may be eligible for a refund of their upfront payments before the close of the auction. However, bidders that reduce their eligibility and remain in the auction are not eligible for partial refunds of upfront payments until the close of the auction. Qualified bidders that have exhausted all of their activity rule waivers, have no remaining bidding eligibility, and have not withdrawn a high bid during the auction must submit

a written refund request which includes wire transfer instructions, a Taxpayer Identification Number ("TIN"), and a copy of their bidding eligibility screen print, to:

Federal Communications Commission
Billings and Collections Branch
Attn: Regina Dorsey or Linwood Jenkins
445 12th Street, SW, Room 1-A824
Washington, DC 20554

Bidders can also fax their request to the Billings and Collections Branch at (202) 418-2843. Once the request has been approved, a refund will be sent to the address provided on the FCC Form 159.

NOTE: Refund processing generally takes up to two weeks to complete. Bidders with questions about refunds should contact Michelle Bennett or Gail Glasser at (202) 418-1995.

Media Contact: Meribeth McCarrick at (202) 418-0654
Wireless Telecommunications Bureau:
Auctions and Industry Analysis Division: Bob Allen, Legal Branch, at (202) 418-0660; Jeff Garrettson, Auctions Operations Branch, at (202) 418-0660 or Bob Reagle, Auctions Operations Branch, at (717) 338-2807
Mass Media Bureau:
Video Services Division: Shaun Maher at (202) 418-2324
Audio Services Division: Lisa Scanlan at (202) 418-2700

**- FCC -**

**Attachment B**

# GUIDELINES FOR COMPLETION OF FCC FORMS 175 AND EXHIBITS

## A. FCC Form 175

Because of the significance of the FCC Form 175 application to the auction, bidders should especially note the following:

**Items 2-5:** Give a street address (not a Post Office box number) for the applicant, suitable for mail or private parcel delivery. The FCC will send all registration materials and other written communications to the applicant at this address.

**Item 8:** Applicants must indicate their legal classification. The FCC Form 175 requires the applicant to classify itself as an individual, joint venture, partnership, trust, corporation, consortium, association, limited liability company (LLC) or government entity.

**Items 9:** Applicants are also requested to indicate their status as a rural telephone company, minority-owned business and/or women-owned business, so that the FCC can monitor its performance in promoting economic opportunities for these designated entities.

**Item 10:** Be advised that this is the sole opportunity applicants have to select New Entrant status and bidding credit level (if applicable), and there is no opportunity to change the election once the short-form filing deadline passes.

- Applicants that qualify for the New Entrant Bidding Credit should enter the applicable bidding credit (25 percent or 35 percent) in Item 10. Applicants should be aware that this is the sole opportunity that they will have to elect the appropriate bidding credit.

**Item 11:** Applicants should identify the File Number of the pertinent broadcast application (*i.e.*, FCC Form 301 for AM, FM and televisions stations; FCC Form 346 for LPTV and television translators, or FCC Form 349 for FM Translators) you have filed for the facility on which you seek bidding eligibility. Be advised that there is no opportunity to change this list once the short-form filing deadline passes.

**Item 13:** Applicants must list the name(s) of the person(s) (no more than three) authorized to represent them at the auction. Only those individuals listed on the FCC Form 175 will be authorized to place or withdraw bids for the applicant during the auction.

**Certifications:** Applicants should carefully read the list of certifications on the FCC Form 175. These certifications help to ensure a fair and competitive auction and require, among other things, disclosure to the Commission of certain information on applicant ownership and

agreements or arrangements concerning the auction. Submission of an FCC Form 175 application constitutes a representation by the certifying official that he or she is an authorized representative of the applicant, has read the form's instructions and certifications, and that the contents of the application and its attachments are true and correct. Submission of a false certification to the Commission may result in penalties, including monetary forfeitures, license forfeitures, ineligibility to participate in future auctions, and/or criminal prosecution.

**Contact person:** If the Commission wishes to communicate with the applicant by telephone or fax, those communications will be directed to the contact person identified on the FCC Form 175. Space is provided for a telephone number, fax number, and e-mail address. All written communication and registration information will be directed to the applicant's contact person at the address specified on the FCC Form 175. Applicants must provide a street address; no P.O. Box addresses may be used.

**Completeness:** Applicants must submit all information required by the FCC Form 175 and by applicable rules, including a certifying signature on manual filings. **Failure to submit required information by the resubmission date will result in dismissal of the application and inability to participate in the auction.** *See* 47 C.F.R. § 1.2105(b).

**NOTE: Applicants must press the "Submit Form 175" button on the "Submit" page to successfully submit their FCC Form 175.**

**Continuing Accuracy:** Each applicant is responsible for the continuing accuracy and completeness of information furnished in the FCC Form 175 and its exhibits. *See* 47 C.F.R. § 1.65. Applicants are reminded that Certification 6 on the FCC Form 175 includes consent to be audited.

**B. Exhibits and Attachments**

In addition to the FCC Form 175 itself, applicants must submit additional information required by the FCC's rules. Although the FCC does not require a particular format for this information, it has developed the following guidelines that will facilitate the processing of short-form applications. The FCC encourages applicants to submit this information using the following format.

*If you find that an attachment has not converted properly to Adobe PDF format, take the following steps:*

*1) Delete the failed attachment.*
*2) Simplify the formatting of the file. For example, if using a Table structure in a WordPerfect document, remove the Table structure leaving the contents of the table, re-save the document.*
*3) Re-upload the attachment.*

**NOTE: In order to protect their privacy, Applicants should not list their TIN numbers on any Exhibits to their FCC Form 175s.**

**Exhibit A -- Applicant Identity and Ownership Information:** 47 C.F.R. § 1.2105(a)(2)(ii) requires each applicant to fully disclose the real party or parties-in-interest in an exhibit to its FCC Form 175 application. Each applicant applying for a New Entrant Bidding Credit must provide detailed ownership information for itself and its attributable interest holders, as defined by Section 73.3555 of the Commission's rules and by Note 2 to that Section. Ownership information must also be provided in the Closed Broadcast Auction in order for us to verify eligibility to participate in the auction. Accordingly, **whether or not a New Entrant Bidding Credit is being sought, all applicants must provide the information set forth in this section.** The following information is required:

**Ownership Information**

| ***Applicant Status*** | ***Required Information*** |
|---|---|
| Individual Applicant | Name, address and citizenship of the natural person seeking to hold in his or her own right, the authorization specified in the application. |
| Partnership applicants | Name, address and citizenship of all general partners and limited partners and the specific partnership interest held. However, ownership information need not be provided for any limited partner that is not materially involved, directly or indirectly, in the management or operation of the media-related activities of the partnership. In such case(s), a general partner shall certify under penalty of perjury, to the limited partner(s)' insulation, in lieu of providing the limited partner information. |
| Corporation | Name, citizenship, and address of the corporation and all officers and directors and all parties holding 5 percent or more of the outstanding voting stock, and the amount and percentage held. Ownership information need not be provided for any shareholder with non-voting stock who is not materially involved, directly or indirectly, in the management or operation of the media-related activities of the corporation. In such case(s), an officer shall so certify under penalty of perjury in lieu of providing the non-voting shareholder ownership information. |
| Limited Liability Company | LLC name and address; and names, addresses, titles, and citizenship of all members. Ownership information need not be provided for any member who is not materially involved, directly or indirectly, in the management or operation of the media-related |

| | |
|---|---|
| | activities of the LLC. In such case(s), a managing member shall certify under penalty of perjury, to the member(s)' insulation in lieu of providing the information regarding the insulated member(s). |
| Trust | Name, address and citizenship of trustee |
| All applicants | With respect to the foregoing, information must be provided for all attributable interest holders of the applicant as defined in Section 2.A.(1) and (3) of this Public Notice. (*See also* 47 C.F.R. § 73.3555 Note 2). *Also, bidders or attributable interest holders in bidders must certify under penalty of perjury that the bidder complies with the Commission's policies relating to media interests of immediate family members. See* Policy Statement, *Clarification of the Commission's Policies Regarding Spousal Attribution*, 7 FCC Rcd 1920 (1992). |

**Exhibit B -- Agreements with Other Parties/Joint Bidding Arrangements:** Applicants must attach an exhibit identifying all parties with which they have entered into any agreements, arrangements or understandings that relate in any way to the licenses being auctioned, including any relating to the post-auction market structure. *See* 47 C.F.R. § 1.2105(a)(2)(viii).

Be aware that pursuant to Certification (4) on the FCC Form 175, the applicant certifies that it will not enter into any explicit or implicit agreements or understandings of any kind with parties not identified in the application regarding bid amounts, bidding strategies, or the particular licenses the applicant will or will not bid. *See* 45 C.F.R. § 1.2105(a)(2)(ix). *To prevent collusion, the Commission's Rules generally prohibit communication among applicants for the same license areas between the initial short-form applications filing deadline and the down payment on licenses won, when such communications concern bids, bidding strategies, or settlements.* 47 C.F.R. § 1.2105(c).

**Exhibit C -- Status as a New Entrant Bidding Credit Recipient:** Applicants claiming status as a new entrant must attach an exhibit providing the following: With respect to those qualifying for a 35 percent credit the applicant must provide a certification under penalty of perjury that neither it nor any of its attributable interest holders have any attributable interests in any other media of mass communications, as defined in 47 C.F.R. § 73.5008. With respect to those qualifying for a 25 percent credit, the applicant must provide a certification under penalty of perjury that neither it nor any of its attributable interest holders have attributable interests in more than three media of mass communications, as defined in 47 C.F.R. § 73.5008. In addition, applicants claiming a 25 percent credit shall identify and describe such media of mass communications. *See* 47 C.F.R. §§ 73.5007 and 73.5008.

NOTE: **Each member of an applicant that is applying to bid as a consortium of new entrants must provide this information and qualify for the claimed status.**

**Exhibit D -- Information Requested of Designated Entities:** Applicants owned by minorities or women, as defined in 47 C.F.R. § 1.2110(b)(2), or that are rural telephone companies, as defined in 47 C.F.R. § 1.2110(b)(3), may attach an exhibit regarding this status. This information, in conjunction with the information in Item 9, will assist the Commission in monitoring the participation of these "designated entities" in its auctions.

**Exhibit E -- Miscellaneous Information:** Applicants wishing to submit additional information should include it in Exhibit E.

# ATTACHMENT B

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In re Applications of | ) | MM Docket No. 88-577 |
| | ) | |
| LIBERTY PRODUCTIONS, A LIMITED PARTNERSHIP | ) | File No. BPH-870831MI |
| WILLSYR COMMUNICATIONS LIMITED PARTNERSHIP | ) | File No. BPH-870831MJ |
| BILTMORE FOREST BROADCASTING FM, INC. | ) | File No. BPH-870831MK |
| SKYLAND BROADCASTING COMPANY | ) | File No. BPH-870831ML |
| ORION COMMUNICATIONS LIMITED | ) | File No. BPH-870901ME |
| For A Construction Permit For A New FM Broadcast Station on Channel 243A At Biltmore Forest, North Carolina | ) | |

## MEMORANDUM OPINION AND ORDER

**Adopted: April 12, 2001; Released: May 25, 2001**

By the Commission: Commissioner Tristani dissenting and issuing a statement.

1. In this order, we reverse the Administrative Law Judge's decision, *National Communications Industries*, 5 FCC Rcd 2862, 2879 ¶ 8 (ALJ 1990), insofar as it disqualified Liberty Productions, Limited Partnership (Liberty) on the site certification issue, and we accept the Amendment that Liberty filed on November 10, 1999. We also deny the motions to enlarge issues filed on November 12, 1999 by Orion Communications Limited (Orion) and Biltmore Forest Broadcasting FM, Inc. (BFBFM) and on November 24, and December 13, 1999 by Willsyr Communications, Limited Partnership (Willsyr). We also deny the Joint Request for Approval of Settlement filed November 14, 2000 by BFBFM and Liberty. For the reasons set forth below, we find

that Liberty is ineligible for the 35 percent New Entrant Bidding Credit that it received in the closed broadcast auction that commenced on September.28, 1999. Subject to the payment of the full gross amount of its winning bid in the Closed Broadcast Auction, and compliance with all applicable payment procedures, we therefore grant Liberty's pending long form application, as amended, and dismiss the mutually exclusive applications of the other remaining applicants.

## I. BACKGROUND.

2. The above-captioned applicants seek a construction permit for a new FM station on channel 243A at Biltmore Forest, North Carolina. After an evidentiary hearing before an Administrative Law Judge, the ALJ issued an Initial Decision disqualifying Liberty on site availability and site certification issues.[1] The Commission affirmed Liberty's disqualification on the site availability issue without considering the ALJ's findings on the site certification issue. The Commission also affirmed the ALJ's determination that Orion was the comparative winner based on its superior integration proposal.[2]

3. Timely notices of appeal of the Commission's decision in this case were pending before the United States Court of Appeals for the District of Columbia when that court issued its decision in *Bechtel v. FCC*,[3] invalidating the primary comparative criterion on which the Commission had relied in granting Orion's application. Thereafter, the Commission stayed all comparative broadcast proceedings[4] and ultimately determined to resolve frozen hearing proceedings by competitive bidding procedures.[5] The court, on March 15, 1994, remanded this case to the Commission for further consideration in light of *Bechtel* and, in a separate action, subsequently ordered the reinstatement of Orion as the interim operator on Channel 243A pending resolution of the above-captioned proceeding to select the permanent licensee.[6]

---

[1] The ALJ also disqualified BFBFM on site issues. The parties filed exceptions with the Commission's former Review Board. The Board affirmed the ALJ's disqualification of both applicants on site availability issues. *National Communications Industries*, 6 FCC Rcd 1978 (Rev. Bd. 1991).

[2] *National Communications Industries*, 7 FCC Rcd 1703 (1992), *recon. denied, Liberty Productions*, 7 FCC Rcd 7581 (1992), *recon. dismissed*, 8 FCC Rcd 4264 (1993).

[3] 10 F.3d 875 (D.C. Cir. 1993).

[4] *FCC Freezes Comparative Proceedings*, 9 FCC Rcd 1055 (1994), *modified*, 9 FCC Rcd 6689, *further modified*, 10 FCC Rcd 12182 (1995).

[5] *Implementation of Section 309(j) of the Communications Act — Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Services Licenses (First Report and Order)*, 13 FCC Rcd 15920 (1998), *recon. denied*, 14 FCC Rcd 8724 (1999), *aff'd sub nom. Orion Communications, Ltd. v. FCC*, 213 F.3d 761 (D.C. Cir. 2000).

[6] *Orion Communications Ltd. v. FCC*, 131 F.3d 176 (D.C. Cir. 1997).

C0052

4. Pursuant to the Commission's competitive bidding procedures for mutually exclusive commercial broadcast applications, the above captioned applicants were identified as the only qualified bidders eligible to compete for a license for Channel 243A in Biltmore Forest.[7] The order referring these applications to the Mass Media Bureau for processing in accordance with our auction procedures also indicated that, if Liberty were the high bidder, the hearing proceeding would resume to consider the ALJ's previously unreviewed findings on the false certification issue.[8]

5. Liberty filed its short-form application on August 19, 1999. The auction commenced on September 28 and closed on October 8, 1999. Liberty was the high bidder, followed by BFBFM, Orion, and Willsyr,[9] and the adjudicatory proceeding was resumed to consider the false certification issue involving Liberty's transmitter site and Liberty was afforded an opportunity to file a supplemental brief on that issue.[10]

6. In accordance with Section 73.5005 of the Commission's Rules, 47 C.F.R. § 73.5005, Liberty submitted an amendment to its long-form application on November 10, 1999. Two of the unsuccessful bidders, Orion and Willsyr, filed oppositions to Liberty's November 10, 1999 amendment of its long-form application.[11] Following the resumption of the adjudicatory proceeding on November 23, 1999, Orion, Willsyr and BFBFM also filed motions to enlarge the issues against Liberty.[12]

---

[7] *Liberty Productions, Inc.*, 14 FCC Rcd 7637 (OGC 1999).

[8] *Id.*, at 7640 ¶ 6.

[9] Each of the above-captioned long-form applicants filed a short-form application (FCC Form 175) by August 20, 1999. Skyland, however, did not meet the up-front payment deadline and thus was unable to bid in the auction. *Public Notice*, DA 99-1912, Attachment C (Non-Qualified Bidders) at 3 (Sept. 17, 1999).

[10] *Liberty Productions*, FCC 991-23 (OGC rel. Nov. 23, 1999). The following pleadings relating to the site certification issue have been filed: (a) Supplemental Brief filed on December 23, 1999 by Liberty Productions; (b) Response to Supplemental Brief filed on January 7, 2000 by Orion Communications Ltd.; (c) Opposition to Supplemental Brief filed on January 7, 2000 by Biltmore Forest Broadcasting FM, Inc.; (d) Response to Supplemental Brief filed on January 7, 2000 by Willsyr Communications; (e) Reply to (Orion's) Response to Supplemental Brief filed on January 24, 2000 by Liberty Productions; (f) Reply to BFBFM's Opposition to Supplemental Brief filed on January 21, 2000 by Liberty Productions; (g) Reply to (Willsyr's) Response to Supplemental Brief filed on January 21, 2000 by Liberty Productions; (h) Motion to Dismiss Liberty's Replies filed on February 7, 2000 by Orion; and (i) Opposition to Motion to Dismiss filed on February 17, 2000 by Liberty Productions.

[11] The following pleadings have been filed: (a) Opposition to Amendment filed on November 22, 1999, by Orion Communications Ltd.; (b) Reply to (Orion's) Opposition to Amendment filed on December 3, 1999, by Liberty Productions; (c) Motion to Strike Reply to Opposition to Amendment filed on December 29, 1999, by Orion Communications Ltd. (d) Opposition to Amendment filed on November 22, 1999, by Willsyr Communications; (e) Reply to (Willsyr's) Opposition to Amendment filed on December 3, 1999, by Liberty Productions; (f) Motion to Strike Reply to Opposition filed on January 3, 2000, by Willsyr Communications; (g) Consolidated Opposition to Motions to Strike filed on January 10, 2000, by Liberty Productions; and (h) Reply to Opposition filed on January 19, 2000 by Willsyr.

[12] The following motions to enlarge issues, and responsive pleadings, are pending before the Commission: (a) Motion to Enlarge Issues filed on November 12, 1999, by Biltmore Forest Broadcasting FM, Inc; (b)

7. Pursuant to Section 0.111(b) of the rules, 47 C.F.R. § 0.111(b), the Enforcement Bureau serves as the Commission's trial staff in this adjudicatory proceeding. The Assistant General Counsel, Administrative Law Division, has afforded the Enforcement Bureau an opportunity to file comments on the above-described pleadings.[13] The Bureau recommends that the issues be decided in Liberty's favor, and that the various motions to enlarge issues should be denied. However, the Bureau believes Liberty is ineligible for the 35 percent New Entrant Bidding Credit. Thus, it recommends that Liberty should be required to pay the full amount of its winning bid at the time of final payment. Separate replies have been filed by Liberty, Orion, BFBFM, and Willsyr.[14]

8. On November 14, 2000, BFBFM and Liberty filed a Joint Request for Approval of Settlement.[15] Pursuant to the attached agreement Liberty would dismiss its application, BFBFM would reimburse Liberty for its legitimate and prudent expenses,[16]

---

Opposition to Motion to Enlarge Issues filed on November 26, 1999, by Liberty Productions; (c) Reply to Opposition filed on December 7, 1999, by Biltmore Forest Broadcasting FM, Inc.; (d) Motion to Enlarge Issues Against Liberty Productions filed on November 12, 1999, by Orion Communications Ltd.; (e) Opposition to Motion to Enlarge Issues and Motion for Leave to File Out Of Time, filed on November 29, 1999, by Liberty Productions; (f) Supplement to Opposition filed on December 3, 1999, by Liberty Productions; (g) Motion to Enlarge The Issues filed on November 24, 1999, by Willsyr Communications; (h) Opposition to Motion to Enlarge Issues filed on December 3, 1999, by Liberty Productions; (i) Reply to Opposition of Liberty filed on December 13, 1999, by Willsyr Communications; (j) Second Motion to Enlarge The Issues filed on December 13, 1999, by Willsyr Communications; (k) Opposition to Second Motion to Enlarge The Issues filed on December 23, 1999, by Liberty Productions; and (l) Reply to Opposition of Liberty filed on January 3, 2000, by Willsyr Communications.

[13] *Liberty Productions*, FCC 001-01 (Jan. 14, 2000).

[14] The following pleadings have been filed: (a) Comments on Basic Qualifications Issues Concerning Liberty Productions, A Limited Partnership, filed on February 14, 2000 by the Enforcement Bureau; (b) Reply, filed on February 29, 2000 by Liberty Productions; (c) Reply to Enforcement Bureau's Comments, filed on February 29, 2000 by Biltmore Forest Broadcasting FM, Inc.; (d) Response to Comments of the Enforcement Bureau, filed on February 29, 2000 by Willsyr Communications; and (e) Reply Comments, filed on February 29, 2000 by Orion Communications Ltd.

[15] The following pleadings have also been filed: (a) Memorandum In Support of Joint Request for Approval of Settlement, filed November 14, 2000 by Biltmore Forest Broadcasting FM, Inc.; (b) Memorandum In Support of Joint Request for Approval of Settlement, filed November 17, 2000 by Liberty Productions; (c) Supplement to Joint Request for Approval of Settlement, filed November 20, 2000 by Liberty Productions; (d) Opposition to Joint Request for Approval of Settlement, filed November 29, 2000 by Willsyr Communications; (e) Partial Opposition to Joint Request for Approval of Settlement, filed November 29, 2000 by Orion Communications Ltd.; (f) Opposition to Joint Request for Approval of Settlement, filed December 5, 2000 by the Enforcement Bureau; (g) Consolidated Reply to Oppositions, filed December 11, 2000 by Biltmore Forest Broadcasting FM, Inc.; (h) Consolidated Reply to Oppositions, filed December 11, 2000 by Liberty Productions; (i) Reply to Opposition, filed December 15, 2000 by Liberty Productions; and (j) Motion to Strike, filed January 8, 2001 by Orion Communications Ltd.

[16] Under the proposed settlement Liberty would receive: (a) up to $170,000 in reasonable and prudent expenses in prosecuting its application; (b) up to $27,000 for its potential obligation for expenses related to the interim operation; and (c) $50,000 or such lesser amount as the Commission may approve representing interest owed on a loan made by Cumulus Broadcasting to Liberty and origination costs paid by Cumulus.

and BFBFM and Liberty's general partner would enter into a consulting agreement. The agreement, however, is contingent on BFBFM being designated the winning bidder based on its bid of $643,500 in Round 12 and on Liberty receiving a full refund of its down payment and not incurring any penalty under 47 C.F.R. § 1.2109(c) for not paying its high bid of $2,336,000. The settlement agreement is opposed by the Enforcement Bureau and by unsuccessful bidders Orion and Willsyr, who ranked third and fourth, respectively, in the auction. Consolidated replies have been filed by Liberty and by BFBFM, and Liberty has filed a separate reply to the Enforcement Bureau's opposition.

## II. DISCUSSION

9. For the reasons set forth below we find no basis to approve a settlement agreement that is contingent on Liberty and BFBFM being relieved of obligations incurred during the September 1999 auction. We also find no basis to dismiss Liberty's short-form application. We conclude further that its November 10, 1999 amendment specifying a new transmitter site may be accepted without regard to the Commission's earlier adverse resolution of the site availability issue, and that the amendment does not reflect a change of control of the applicant. As to Liberty's basic qualifications, we find no basis to specify either false certification or misrepresentation/lack of candor issues against Liberty and we reverse the ALJ's determinations on the site certification issue relating to Liberty's original proposal. Finally, we conclude that, because of the numerous attributable media interests of Cumulus Broadcasting, Liberty is not eligible for the 35 percent new entrant bidding credit.

### 1. Settlement Agreement

10. We reject the proposed settlement agreement insofar as it is expressly conditioned on BFBFM being designated the winning bidder for less than its final net bid of $1,518,400[17] and the dismissal of Liberty's application without a penalty and for a full refund of its down payment. The parties assert that Liberty participated in the auction in good faith and remains willing to honor the bids it made in the auction, but that, in the interest of expediting the resolution of this proceeding, is now willing to dismiss its application and relinquish its claim to the construction permit. BFBFM, alleging that Liberty's short-form application was defective, urges that it should receive the license for its Round 12 bid of $643,500 (the final net bid placed against an applicant other than Liberty), and that Liberty should not be liable for any default penalty. Liberty, on the other hand, maintains that its short-form application was not defective, that it has not defaulted, and that there is, in light of the proposed settlement, thus no basis for the Commission to impose a penalty or retain its down payment. The Enforcement Bureau

The agreement also contemplates a three-year consulting agreement between BFBFM and Liberty's general partner, Valerie Klemmer, whereby she will sign a covenant not to compete and will be paid $75,000 in exchange for providing a maximum of 50 hours of consulting services to the station each month.

[17] On its short-form application BFBFM claimed a 35 percent new entrant bidding credit, as did each of the other applicants filing short-form applications in this proceeding.

asserts that the possible benefits of the settlement agreement are too insubstantial to offset the direct and tangible loss to the treasury as well as the likely damage to the auction process and the likelihood of additional litigation concerning BFBFM's basic qualifications. It notes that Liberty's offer to relinquish its bid for the permit comes after the filing of numerous pleadings challenging Liberty's eligibility for a claimed bidding credit, its basic qualifications, and the acceptability of its short-form application. Waiving the default penalty and offering BFBFM the license for less than its final bid in these circumstances, the Bureau predicts, would have broad implications in future auction cases. Willsyr and Orion urge that, as a matter of fairness, the withdrawal of Liberty's application would require a second auction. Orion also objects to various aspects of the settlement agreement.

11. Section 1.2109(c) provides that, if a winning bidder defaults, "the Commission may either re-auction the license to existing or new applicants or offer it to the other highest bidders (in descending order) at their final bids."[18] It provides further that "[a] winning bidder who is found unqualified to be a licensee, fails to remit the balance of its winning bid in a timely manner, or defaults or is disqualified for any reason after having made the required down payment will be deemed to have defaulted and will be liable for the payment set forth in Section 1.2104(g)(2)." The settling parties urge that the voluntary withdrawal of Liberty's application pursuant to a post-auction settlement agreement does not constitute a default under Section 1.2109(c), and that no other provision of the Commission's rules precludes BFBFM from being designated the winning bidder based on its bid in Round 12 or requires that Liberty be assessed a penalty. But Section 1.2109(b) provides that "[i]f a winning bidder withdraws its bid after the Commission has declared competitive bidding closed . . . the bidder will be deemed to have defaulted, its application will be dismissed, and it will be liable for the default payment specified in Section 1.2104(g)(2)." Furthermore, default, as defined by Section 1.2104(g) of the rules, includes "bidders ... who default on payments due after an auction closes or is disqualified." Notwithstanding Liberty's asserted good faith during the auction and its continued willingness to make payments due after the auction, Liberty, by virtue of the settlement, will "withdraw[] a bid after the Commission has declared the competitive bidding closed" and it will not remit "payments due after an auction closes." Approval of an agreement expressly conditioned on BFBFM being offered the license for less than its final bid and Liberty not incurring a default penalty therefore would require a waiver of Sections 1.2104 and 1.2109.

12. The settling parties cite the unusual circumstances of this case, as well as the public interest benefit of expediting the resolution of a long-pending case, as justifying a waiver of the rules to allow BFBFM to return to its bid in Round 12 and to allow Liberty to withdraw its application with a full refund of its down payment and without incurring any penalty under section 1.2104(g). It is unclear, however, that the settlement would expedite resolution of this case, given that there are unresolved questions as to BFBFM's basic qualifications and that the other applicants would have an

[18] In adopting auction rules to govern the resolution of the frozen comparative cases, the Commission indicated its intent to offer the permit to the next highest bidder, rather than conduct a further auction, because this would be more expeditious. *First Report and Order*, 13 FCC Rcd at 15952 ¶ 86, 15953 n.81.

opportunity to raise additional issues against BFBFM following its designation as the winning bidder. [19] That this case was litigated through the Commission and the courts before we decided to use auctions to resolve these cases provides no basis to distinguish this case from other auction proceedings, and is therefore not a basis to waive these auction procedures. Indeed, the Commission specifically advised applicants in the hearing cases to "carefully consider the impact of auction rules prescribing penalties in the event of default or disqualification" in deciding whether to participate in the auction. 14 FCC Rcd at ¶ 16. None of BFBFM's other equitable arguments persuade us to waive section 1.2109(c) and offer the license to BFBFM for any amount less than its final bid in Round 27.

13. It would also not serve the public interest to approve a settlement agreement expressly conditioned on the license being offered for less than final net bids placed during the auction. The efficacy of auction procedures designed to discourage insincere bids would be seriously impaired if bidders could, without penalty, expunge their bids after the close of the auction. To permit such post-auction abandonment of final bids here would clearly be unfair to Orion and Willsyr, who might have pursued quite different bidding strategies, had they been aware that bids could be withdrawn after the auction. Similar considerations would militate against waiving any default penalty owed by Liberty under Section 1.2104(g)(2). Therefore, because we are not prepared to offer the license to BFBFM for less than its final net bid of $1,380,600 in Round 27 or to permit Liberty to dismiss its application without penalty, we deny the request to approve the agreement without considering whether any of its other provisions would provide additional reasons for its rejection.

[19] *See Liberty Productions*, 14 FCC Rcd 7637, 7640 ¶ 6 (OGC 1999), providing that the hearing proceeding would resume to consider, *inter alia*, "the question concerning BFBFM's representations as to the availability of its transmitter site." The settling parties urge that this matter can be expeditiously resolved since no issue was ever designated for hearing. Quick resolution of the concerns raised by the ALJ as to BFBFM's representations is, of course, possible. Another possibility, however, is that the Commission might conclude that there is a basis for specifying an issue. In that event, the case would be remanded for evidentiary hearings before an Administrative Law Judge. This would further delay resolution of this case.

## 2. Short-Form Application

14. There is no merit to BFBFM's contention that because Liberty's short-form application did not contain all requested information, it should now be summarily dismissed pursuant to Section 1.2105(b) of the Rules. 47 C.F.R. § 1.2105(b). The Public Notice, released July 9, 1999 by the Bureaus, announcing the filing procedures for this auction contains the following instruction that, as BFBFM notes, is addressed to "All applicants."[20] "*[B]idders or attributable interest holders in bidders must certify under penalty of perjury that the bidder complies with the Commission's policies relating to media interests of immediate family members.*" (Emphasis in original.)

15. This certification was not included in the short-form application that Liberty filed on August 19, 1999. This omission, however, is not a basis to now dismiss the application or to set aside the results of the auction without opportunity for resubmission after the filing deadline, as BFBFM claims. First, the applicable Commission rules do not expressly provide that a short-form application omitting this particular certification is unacceptable for filing and will be dismissed with prejudice (*i.e.*, with no opportunity to supply the missing certification after the short-form filing deadline). In this regard, Section 73.5002(b) provides that "[t]o participate in broadcast service or ITFS auctions, all applicants must timely submit short-form applications (FCC Form 175), along with all required certifications, information and exhibits, pursuant to the provisions of 47 C.F.R. § 1.2105(a) and any Commission public notices." Also, pursuant to Section 73.5002(c), applicants for a broadcast auction are subject to the provisions of 1.2105(b) regarding the modification and dismissal of their short-form applications. Section 1.2105(a) specifies information that must be included in the short-form application, but Section 1.2105(b) requires the dismissal with prejudice, without the opportunity to correct after the applicable filing deadline, only of any application "that does not contain all of the certifications required pursuant to this section," a narrower category of information. The certification as to media interests held by family members is not one of the ce·tifications specified in Section 1.2105(a), the omission of which renders a short-form application unacceptable for filing and subject to dismissal under Section 1.2105(b), if provided after the short-form filing deadline.[21] Thus, although

[20] *Public Notice: Closed Broadcast Auction: Notice and Filing Requirements for Auction of AM, FM, TV, LPTV, FM and TV Translator Construction Permits Scheduled for September 28, 1999*, 14 FCC Rcd 10632, 10639 (Jul. 9, 1999).

[21] The certifications mandated by Section 1.2105(a) include the following: (1) certification that the applicant is legally, technically, financially and otherwise qualified pursuant to section 308(b) of the Communications Act; (2) certification that the applicant is in compliance with the foreign ownership provisions of section 310 of the Communications Act; (3) certification that the applicant is and will, during the pendency of the application, remain in compliance with any service-specific qualifications applicable to the licenses on which it proposes to bid; (4) an exhibit, certified as truthful under penalty of perjury, identifying all the parties with whom the applicant has an arrangement of any kind relating to the license to be auctioned; and (5) certification that the applicant has not entered into any arrangements with any other party regarding the amount of of their bids or bidding strategy. All of these certifications were included in Liberty's short-form application.

Section 73.5002(b) specifies that the short-form application must contain any certification required by a Public Notice, the rules do not provide notice that the omission of such a certification, as opposed to a certification required by Section 1.2105(a), will result in the dismissal of the short-form application with no opportunity to amend.

16. Second, the Bureaus' July 9, 1999 Public Notice, on which BFBFM relies, does not expressly state that the omission of this particular certification or of any certification not specifically listed in Section 1.2105(a) will render the short-form application defective pursuant to Section 1.2105(b), such that it cannot later be amended. The Public Notice, although generally admonishing the pending long-form applicants to file complete short-form applications, only states generally that "[f]ailure to submit required information by the resubmission date will result in the dismissal of the application and inability to participate in the auction."[22] It does not state that failure to submit all of the requested information will render the application unacceptable for filing, such that the defect could not be cured after the filing deadline. Rather, this general admonishment merely echoes the general requirements applicable to all short-form information. As to that broader class of information, dismissal may be warranted after the filing deadline if the information is not provided, but only where the applicant has been advised by public notice that its application is defective and has failed to timely supply the information. *See* Section 1.2105(b)(3). The staff, however, did not advise Liberty of the omitted certification, nor afford it an opportunity to correct its short-form application by supplying the missing certification.[23] This circumstance, while insufficient to preclude the dismissal of an application subsequently found to have omitted certifications required by Section 1.2105(a) or to otherwise be in patent conflict with the Commission's rules,[24] further militates against BFBFM's suggestion that the earlier omission of the familial certification from Liberty's short-form application now warrants setting aside the results of the auction.

17. As noted, the record now contains the omitted information regarding Liberty's compliance with the Commission's policies relating to media interests held by family members. Liberty has submitted a declaration under penalty of perjury, dated November 24, 1999, from its sole general partner certifying that no member of her family has any interest in any medium of mass communications.[25] Having supplied the

[22] *Public Notice*, Attachment B (Guidelines for Completion of FCC Forms and Exhibits), 14 FCC Rcd at 10697.

[23] *See First Report and Order*, 13 FCC Rcd at 15976-47 ¶ 146 ("After reviewing the short-form applications, the Bureaus will issue a public notice listing all applications containing minor defects, and applicants will be given an opportunity to cure and resubmit defective applications").

[24] *See* 47 C.F.R. § 73.3564, providing that the acceptance for filing of an application does not preclude its subsequent dismissal, if it is later found to be patently in conflict with the Commission's rules.

[25] The declaration is dated November 24, 1999 and is attached to Liberty's November 26, 1999 Opposition to BFBFM's Motion to Enlarge Issues.

requisite certification regarding the insulation of the sole limited partner,[26] Liberty was generally required to submit ownership information only as to its sole general partner, Valerie Klemmer. Her declaration is therefore sufficient to supply the omitted information as to compliance with the Commission's policies regarding media interests held by family members. The accuracy of the certification has not been challenged. The initial omission of information now supplied by her unchallenged post-auction declaration is therefore not an impediment to the grant of Liberty's long-form application.[27]

18. Furthermore, as discussed above, the July 9th Public Notice, containing only a general admonishment as to the obligation to file complete short-form applications without specifying the consequences of omitting the certification in question, does not provide sufficient notice that a short-form application not containing the familial certification must be dismissed at this juncture even though the requested information has now been provided.[28] Fairness demands explicit notice for a severe sanction, such as the dismissal of an application. *See generally Salzer v. FCC*, 778 F.2d 869, 871-72 (D.C. Cir. 1985) ("fundamental fairness . . . requires that an exacting application standard, enforced by the severe sanction of dismissal without consideration on the merits, be accompanied by full and explicit notice of all prerequisites for such consideration"); *Trinity Broadcasting v. FCC*, 211 F.3d 618 (D.C. Cir.2000), vacating the Commission's denial of an application to renew a license for violation of a regulation that was insufficiently clear to warn the licensee of what was expected; *Satellite Broadcasting v. FCC*, 824 F.2d 1 (D.C. Cir. 1987), setting aside the dismissal of an application that had not been timely filed in the correct location because Commission rules had not clearly specified the location at which the applications should be filed.

19. The absence of the certification in Liberty's short-form application is therefore not a basis to dismiss its application. Nor does fairness demand that we set aside the result of the auction and hold a second auction to select the permittee. BFBFM claims that it relied on the omitted certification in Liberty's short-form application in developing its bidding strategy and that it would be unfair not to at least reauction the frequency under these circumstances. BFBFM, however, points to nothing in the Commission's rules, in its orders adopting the auction rules, or in Public Notices issued by the staff in connection with this particular auction affirmatively stating that the omission of the certification in question from a short-form application would warrant

[26] *See* Public Notice, 14 FCC Rcd at 10698 ("[O]wnership information need not be provided for any limited partner that is not materially involved, directly or indirectly, in the management or operation of the media-related activities of the partnership. In such case(s), the general partner shall certify under penalty of perjury, to the limited partner(s)' insulation, in lieu of providing the limited partner information").

[27] *See* Section 1.2105(b)(2), permitting applicants to make minor changes in the short-form application after the resubmission period.

[28] In this regard, the record before us reflects that the short-form application filed by Willsyr also omitted this same certification and that Willsyr was permitted to participate in the auction with impunity. *See Public Notice: CLOSED BROADCAST AUCTION Status of Applications to Participate in the Auction*, 14 FCC Rcd 14113, 14140 (Sept. 3, 1999), including Willsyr Communications, Limited Partner on the Accepted List as eligible to participate in the auction.

such an action. There were not, for example, conflicting provisions specifying different consequences for such an omission. Rather, BFBFM misinterpreted Sections 1.2105 and 73.5002 to require the dismissal now of Liberty's short-form application, based upon an over broad reading of the staff's July 9th Public Notice. That misunderstanding, however, does not warrant dismissing Liberty's application or impair the integrity of the auction so as to require that we set aside Liberty's selection as the permittee.

### 3. Amendment to Long-Form Application

20. Notwithstanding the contentions of Orion, Willsyr and BFBFM, there is no basis to reject the minor engineering change proposed in the amendment, filed November 10, 1999, by Liberty. The amendment was timely filed following Public Notices announcing the results of the auction and the resumption of the hearing proceeding to consider unresolved issues relating to the winning bidder's basic qualifications.[29] The Enforcement Bureau supports its acceptance, and the competing applicants, although raising various substantive objections to the amendment as discussed below, have not identified any technical deficiency that would bar its acceptance from an engineering standpoint.

21. Transmitter Site: When Liberty filed its application in August 1987, it specified a site located on Busbee Mountain. Upon learning that the site was unavailable, Liberty sought to amend to specify a second site. The ALJ, concluding that Liberty never had reasonable assurance of the original site, rejected the amendment and ultimately disqualified Liberty on site availability and site certification issues.[30] Citing that determination, Orion and Willsyr challenge the post-auction amendment insofar as it specifies a third transmitter site. They urge that Liberty should not be permitted to amend to a new location when it never had reasonable assurance of a transmitter site in the first place. Willsyr relies on earlier cases rejecting for lack of good cause site amendments, where the availability of the original site was not shown. Sections 73.3522(a) and 73.3573, governing post-auction amendments, do not require that an amendment be supported by good cause and the unavailability of the original site would not, in any event, be a basis to reject a site amendment. Now that competing broadcast applications are to be resolved by competitive bidding procedures, rather than by comparative hearing, the Commission has repealed the requirement that broadcast applicants certify the availability of a suitable transmitter site.[31] Winning bidders in the frozen comparative

---

[29] *Public Notice: Closed Broadcast Auction*, DA 99-2153 (Oct. 12, 1999).(announcing that any amendment to the long-form application would be due by November 10, 1999); *Public Notice: Clarification Regarding the Resumption of Hearing Proceeding In MM Docket No. 88-577*, DA 99-2355 (Oct. 28, 1999). *See also Liberty Productions*, FCC 991-23 (OGC 991-23) (ordering the resumption of the hearing proceeding).

[30] *National Communications Industries*, FCC 89M-1080 (ALJ rel. Apr. 5, 1989); *Initial Decision*, 5 FCC Rcd at 2866-67 ¶¶ 39, 49-51.

[31] *First Report and Order*, 13 FCC Rcd at 15987-89 (1998), noting that the site certification requirement, designed to deter the filing of frivolous and speculative applications that frustrated the Commission's processing goals, was no longer vital to the Commission's goal of expediting the initiation of new service to the public. *See also Memorandum Opinion and Order*, 14 FCC Rcd at 8732-33 ¶ 16 (1999), advising

cases face significant monetary penalties if they are disqualified for any reason (including the inability to secure a suitable transmitter site).[32] In these circumstances the Commission decided to adjudicate unresolved site issues, even against an auction winner, only to the extent there is a substantial and material question of false certification.[33]

22. The site availability issue, moreover, was never finally adjudicated. The Review Board affirmed the ALJ's adverse resolution of that issue, and the Commission denied Liberty's application for review, as well as its subsequent petition for reconsideration.[34] Liberty, however, appealed the denial of its application for lack of a transmitter site to the United States Court of Appeals for the District of Columbia Circuit. As noted above, the court remanded this proceeding to the Commission without considering the merits of any issue raised on appeal. To reject Liberty's amendment based on our earlier, non-final determination on the site availability issue would effectively require that Liberty renew its court appeal of that ruling, and that the parties litigate an issue that is no longer relevant now that the permittee will be selected by auction. Such litigation would, as we explained in the *First Report and Order*, serve only to delay service to the public and would, thus, disserve the public interest.

23. Cumulus Broadcasting: Orion urges that the amendment should be rejected on the separate ground that it impermissibly brings in a new investor, Cumulus Broadcasting. It relies in this respect on Liberty's September 10, 1999 loan agreement with Cumulus, reported to the Commission on September 27, 1999, the details of which were provided in the November 10, 1999 amendment. There, Liberty certified that, although the proceeds of the loan will exceed 33 percent of Liberty's total asset value, the agreement does not provide Cumulus an option to acquire the construction permit (or the license) and does not authorize it to broker time on or manage the station. According to Orion, Cumulus is the nation's third largest broadcaster with numerous media holdings and it would have a realistic potential to influence Liberty's conduct as a licensee. Orion further contends that the loan agreement, funded by such a large media group owner, undermines the Commission's premise that the auction price would reflect the applicants' similar prosecution expenses and circumvents the closed nature of the auction. It also cites the Commission's recent amendment of Section 73.5008, 47 C.F.R. § 73.5008, to specify that certain debt interests are attributable for purposes of determining eligibility for the new entrant bidding credit. The loan agreement with Cumulus, according to Orion, represents the type of manipulation of the process by a large broadcast group owner that the rules were intended to prevent. It requests, finally, that the Commission

---

pending applicants to carefully consider the impact of auction rules prescribing penalties in case of disqualification in deciding whether to participate in the auction.

[32] Section 73.5004(a) provides generally that broadcast applicants are subject to the provisions of 47 C.F.R. §. 1.2104(g) regarding payments upon disqualification.

[33] *First Report and Order*, 13 FCC Rcd at 15956 ¶ 99.

[34] *National Communications Industries*, 5 FCC Rcd at 2866 ¶ 39 (ALJ), *affirmed*, 6 FCC Rcd at 1979 ¶ 11 (Rev. Bd.), *review denied*, 7 FCC Rcd 1703 (1992), *recon denied*, *Liberty Productions*, 7 FCC Rcd 7581 (1992), *recon. dismissed*, 8 FCC Rcd 4264 (1993).

order Liberty to submit copies of the September 10, 1999 loan agreement and any amendments to the agreement.

24. Section 309(l)(2) restricts qualified bidders to applicants who filed mutually exclusive applications before July 1, 1997. Neither the statute nor the Commission's implementing rules, however, precludes applicants from borrowing money from a bank or another lender in order to participate in the auction. The Commission has specifically rejected the view that the closed nature of these auctions required the adoption of special disclosure requirements to ensure against the participation of new investors. The uniform Part 1 ownership disclosure standards, the Commission concluded, were sufficient to effectuate the purpose of Section 309(l)(2)'s requirement that the auction be limited to the pending applicants. But it agreed that, consistent with the Part 1 rules providing that a short-form application is considered newly filed and would be dismissed if it is amended by a major amendment, a change in the control of an applicant subject to 309(l), would render it ineligible to participate in the auction.[35] A major amendment to a long-form application subject to Section 309(l)(2) would likewise render the application ineligible to be granted after an auction that is statutorily restricted to applicants who filed their applications before July 1, 1997.

25. In this regard, the applicable auction rule, Section 1.2105(b)(2), 47 C.F.R. § 1.2105(b)(2), provides that "an application will be considered newly filed if it is amended by a major amendment and may not be resubmitted after the applicable filing deadline." A major amendment is defined as including "changes in ownership of the applicant that would constitute an assignment or transfer of control, changes in an applicant's size which would affect eligibility for designated entity provisions, and changes in the license service areas identified on the short-form application on which the applicant intends to bid." That provision, significantly, has not been amended to reflect either the New Entrant Bidding Credit, or eligibility standards requiring the attribution of media interests of investors holding significant debt interests, as well as significant equity interests, in an auction bidder claiming new entrant status.[36] A change affecting eligibility for the New Entrant Bidding Credit, in other words, does not necessarily constitute a major amendment within the meaning of Section 1.2105(b)(2). Thus, absent evidence that Cumulus has a controlling *ownership* interest in the applicant, Liberty's September 17, 1999 amendment reporting the September 10, 1999 loan agreement does not constitute a major amendment within the meaning of Section 1.2105(b)(2).

26. The issue, therefore, is whether the September 10, 1999 loan agreement with Cumulus constitutes a change in the control of the applicant so as to warrant the dismissal of its application, or the rejection of the November 10 amendment, pursuant to

[35] *First Report and Order*, 13 FCC Rcd at 15942 ¶ 57, *citing* 47 C.F.R. § 1.2105(b)(2).

[36] A new entrant bidding credit of 35 percent is available to bidders with no attributable media interests in any medium of mass communications. *See* 47 C.F.R. § 73.5007(a). Media interests held by an individual or entity with equity and/or debt interests in the bidder will be attributed if the equity and debts interest(s), in the aggregate, exceed 33 percent of the total asset value of the winning bidder. *See* 47 C.F.R. § 73.5008(c).

the Part 1 disclosure standards. We conclude that it does not. The Cumulus loan was first reported in Liberty's September 27, 1999 amendment to its short-form application. And, in the November 10, 1999 amendment, Liberty has certified that, in accordance with the Part 1 rules, the loan agreement, as amended, does not provide Cumulus with an option to acquire the license or any right to broker time on or manage the station.[37] It has also stated that the agreement never contained such an option.[38] In these circumstances, there is no basis to direct Liberty to submit a copy of the loan agreement to the Commission, as Orion requests. Such submission would not be required under section 1.2112(a)(4) unless Cumulus had an ownership interest, or an option to acquire an ownership interest, in Liberty. Orion has not raised a substantial and material question as to the reliability of Liberty's certification that would warrant rejecting the November 10 amendment to Liberty's long-form application, or directing Liberty to submit a copy of the agreement.

27. To the extent Orion relies on the amendment of Section 73.5008, the adoption of special attribution rules governing eligibility for the new entrant bidding credit did not modify the applicable Part 1 disclosure rules. In deciding to attribute for this purpose certain debt and equity interests, the Commission "emphasize[d] that this debt/equity standard does not preclude an individual or entity (including any existing broadcaster) from investing any amount in a prospective broadcast auction applicant."[39] The adoption of special eligibility criteria is therefore not a basis to reject Liberty's November 10, 1999 amendment.

28. Orion suggests, nevertheless, that Cumulus may have replaced Liberty's limited partner and 65 percent equity holder, David Murray. Only speculation supports the suggestion that there has been an (unreported) structural change in the applicant, however. Orion relies on certifications that Liberty made regarding Murray that were intended to support the claim that no ownership information needed to be provided for Murray. Specifically, Liberty certified in the November 10, 1999 amendment that Murray has not been involved (and will not be involved) directly or indirectly, in the management or operation of the applicant's media-related activities, that he is not a creditor of the applicant, and that his total equity contribution does not exceed 33 percent of the total asset value of the applicant. These certifications do not raise a substantial and material question that Murray no longer has an ownership interest in Liberty, but are completely consistent with his stated position as limited partner. And, as noted above, Orion has not raised a substantial and material question as to the reliability of Liberty's various certifications regarding the Cumulus loan agreement. In these circumstances, its funding of Liberty's participation in the auction is not inconsistent with Section 309(l)(2), or with the Part 1 disclosure rules generally, and this funding does not raise a substantial or material question that Cumulus has an ownership interest in the applicant. There is

---

[37] Amendment, Exhibit D.

[38] Reply to Opposition, filed December 3, 1999, by Liberty Productions, at ¶ 10.

[39] *Implementation of Section 309(j) of the Communications Act — Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Services Licenses*, 14 FCC Rcd 12541, 12545-46 ¶ 10 (1999) (Hereafter *Eligibility Order*).

thus no basis to reject the amendment. We address below the separate question of whether media interests of Cumulus are attributable to Liberty for the purpose of determining Liberty's eligibility for the new entrant bidding credit. We note, however, that the provisions of the loan agreement have no relevance to that question inasmuch as Liberty does not rely on the terms of the agreement to support its claim that Cumulus' media interests are not attributable.

29. In a related context, we deny Willsyr's second motion to enlarge issues that likewise questions whether there has been an unreported change in Liberty's ownership structure. Willsyr relies primarily on representations contained in the November 10 amendment regarding the lack of involvement in partnership affairs and the extent of the equity contributions of Liberty's sole limited partner (David T. Murray). On this basis Willsyr seeks an issue to determine whether Liberty has misrepresented its ownership structure. (These representations relate to Liberty's certification that Murray's media interest is not attributable for purposes of the New Entrant Bidding Credit.[40]) In this respect, the motion, filed December 13, 1999 is untimely. *See* Section 1.229(b)(3), 47 C.F.R. § 1.229(b)(3), specifying that motions to enlarge issues based on newly discovered facts must be filed within fifteen days after the discovery of such facts.[41]

30. Even assuming that the motion had been timely filed, it is without merit. It does not raise a substantial and material question of fact as to whether Liberty has misrepresented Murray as a current 65 percent limited partner. Willsyr focuses on the certification in the November 10 amendment that Murray's total equity contributions are less than 33 percent of the total asset value of the applicant and that there has been no communication with Murray since 1990.[42] It also cites the general partner's November 24, 1999 declaration stating that Murray's total equity contribution was only $36,000, although Willsyr's reliance on this additional information is less than clear. Without mentioning the Cumulus loan explicitly, Willsyr alleges that the "some $2 Million in debt" that Liberty assumed without communicating with Murray evidently diluted his partnership share.[43] But the declaration is clear that the general partner calculated that Murray's total equity contribution was less than 33 percent of total asset value before she

---

[40] As discussed in greater detail below, a media interest held by Murray would be attributable, pursuant to Section 73.5008(c), if Murray were materially involved in the partnership's media-related activities, or if his total equity contribution exceeded 33 percent of the total asset value (i.e., total debt plus total equity) of the applicant.

[41] *See also Liberty Productions*, FCC 99I-23, ¶ 4 (OGC Nov. 23, 1999) ("Motions to enlarge filed in response to Liberty's November 10, 1999 amendment must be filed by November 26, 1999"). Willsyr timely filed a motion to enlarge issues on November 24, 1999.

[42] Amendment, filed on November 10, 1999 by Liberty, at Exhibit C. The Exhibit also states that its limited partner is not a creditor of the applicant.

[43] Motion at 2. Elsewhere there is a reference to Liberty having "assumed in 1999 some $2 Million in debt from a broadcast group owner." Motion at 1. This makes it evident that Willsyr is referring to the Cumulus loan.

certified on the short-form application that Liberty was eligible for the New Entrant Bidding Credit and before the September 10 loan agreement with Cumulus.

31. To the extent that Willsyr questions the continued status of Murray based on the substantial costs Liberty presumably incurred since 1990, the general partner has exclusive authority to borrow money on behalf of the partnership. Thus, the assertion that the partnership allegedly incurred significant expenses without asking for a further capital call from (or even communicating with) Murray does not raise a substantial and material question as to Murray's continued status as limited partner. And, in any event, Liberty disputes the costs alleged by Willsyr, and states that, thus far, it has only borrowed $303,680 from Cumulus. Finally, there would be no motive for Liberty to conceal the ouster or resignation of Murray as limited partner under the circumstances before us.

### 4. Eligibility for New Entrant Bidding Credit

32. Background: To fulfill its statutory responsibilities regarding designated entities, the Commission adopted a new entrant bidding credit for bidders with no, or very few, other media interests.[44] Section 73.5007(a) provides that "[a] thirty-five (35) percent bidding credit will be given to a winning bidder if it, and/or any individual or entity with an attributable interest in the winning bidder, have no attributable interest in any other medium of mass communications, as defined in Section 73.5008." Section 73.5008(c) of the rules specifies that attributable interests in a winning bidder or in a medium of mass communications shall be determined in accordance with the broadcast multiple ownership rules (that is, 47 C.F.R. § 73.3555 and note 2). Additionally, on August 5, 1999, the Commission amended that provision to provide for the attribution of media interests held by individuals and entities whose interest in the bidder would not otherwise be attributable under the Commission's multiple ownership rules (*e.g.*, a lender or a limited partner not materially involved in the partnership's media activities).[45] Specifically, section 73.5008(c), as amended, specifies that: "[i]n addition, the attributable mass media interests, if any, held by an individual or entity with an equity and/or debt interest(s) in a winning bidder shall be attributed to that winning bidder for purposes of determining its eligibility for the new entrant bidding credit, if the equity (including all stockholdings, whether voting or nonvoting, common or preferred) and debt interest or interests, in the aggregate, exceed thirty-three (33) percent of the total asset value (defined as the aggregate of all equity plus all debt) of the winning bidder." The Commission advised that participants in the September 28, 1999 auction would be subject to the revised attribution standards.[46]

---

[44] *First Report and Order*, 13 FCC Rcd at 15994-96 ¶¶ 189-90; *Memorandum Opinion and Order*, 14 FCC Rcd at 8761-67 ¶¶ 71-82.

[45] *Eligibility Order*, 14 FCC Rcd at 12543-45 ¶¶ 7-8.

[46] *Memorandum Opinion and Order*, 14 FCC Rcd at 8762 ¶ 71 ("For purposes of applying the general broadcast eligibility for the new entrant bidding credit in any future auction, we will apply those attribution rules as they exist at the time of the short-form filing deadline for that auction."); *Eligibility Order*, 14

33. To support its claimed eligibility for a 35 percent New Entrant Bidding Credit, Liberty certified on its August 19, 1999 short-form application that "neither it nor any of its attributable interest holders have any attributable interest in any other media of mass communications as defined in 47 C.F.R. § 73.5008." On September 27, 1999, as noted above, Liberty amended the short-form application to reflect the September 10 loan agreement with Cumulus. Additionally, Liberty's November 10, 1999 amendment to the long-form application reflects that its 65 percent limited partner, David Murray, has a 50 percent interest in the permittee of a station in Colonial Heights, Tennessee. Liberty asserts that, for purposes of the new entrant bidding credit, the media interests of Cumulus are not attributable, because the loan agreement was executed after the August 20, 1999 deadline for filing short-form applications. The interest of David Murray is not attributable, according to Liberty, because his limited partnership interest does not exceed 33 per cent of Liberty's combined debt and equity.

34. Cumulus Broadcasting: Turning first to the September 10, 1999 loan agreement with Cumulus, we reject Liberty's assertion that, because the loan agreement was executed after the short-form filing deadline, the lender's numerous media interests are not attributable for purposes of the New Entrant Bidding Credit. Liberty relies on language in the July 9, 1999 Public Notice,[47] advising that "[t]he bidder's attributable interests shall be determined as of the short form (FCC Form 175) filing deadline – August 20, 1999."[48] That statement, read in context, does not reflect that eligibility for the New Entrant Bidding Credit is unaffected by subsequent ownership changes, however. Indeed, the very next sentence in the Public Notice directs that "[b]idders intending to divest a media interest or make any other ownership changes, such as resignation of positional interests, in order to avoid attribution for purposes of qualifying for the New Entrant Bidding Credit must have consummated such divestment transactions or have completed such ownership changes by no later than the short-form filing deadline – August 20, 1999." Both sentences are in boldface. Read together, they clearly reflect that a bidder could not qualify for, or upgrade a previously claimed bidding credit, based upon ownership or positional changes occurring after the short-form filing deadline. But the impact of subsequent changes that, if recognized, would eliminate or diminish a previously claimed bidding credit is not expressly addressed.

35. That issue, as the Enforcement Bureau notes, was directly addressed in a later Public Notice, issued September 17, 1999, clearly reflecting that changes made after

FCC Rcd at 12542 ¶ 3. See also *Public Notice: New Rule Now In Effect Concerning Equity/Debt Threshold For Use With Determining Eligibility for New Entrant Bidding Credit*, DA-1663 (Aug. 19, 1999) ("The purpose of this Public Notice is to provide notification that OMB approval has been obtained and Federal Register publication occurred today, August 18, 1999. Therefore, the new equity/debt threshold rule is now in effect . . . Bidders participating in the September 28, 1999 Closed Broadcast Auction and seeking a New Entrant Bidding Credit are reminded that they will be subject to the [new] equity/debt threshold rule").

[47] *Public Notice: Notice and Filing Requirements for Auction of AM, FM, TV, LPTV, and FM and TV Translator Construction Permits Scheduled for September 28, 1999*, 14 FCC Rcd 10632 (Jul. 9, 1999).

[48] *Id.* at 10639.

the August 20, 1999 short-form filing deadline could reduce, or completely eliminate, a previously claimed New Entrant Bidding Credit. In a section advising applicants of their Section 1.65 responsibility to maintain the accuracy and completeness of information contained in their short-form applications, bidders were "reminded that if ownership changes result in the diminishment or loss of a New Entrant Bidding Credit due to the attributable interests of new attributable interest holders, such information must be clearly stated in the bidder's amendment material."[49] "In such cases," the staff advised, "the Commission will make appropriate adjustments in the New Entrant Bidding Credit prior to computation of down and final payment amounts due from any affected winning bidders." Liberty narrowly reads the September 17, 1999 Public Notice as applying only to ownership interests. The language, however, expressly encompasses "attributable interests of new attributable interest holders." Cumulus, by virtue of its debt interest in Liberty, is a "new attributable interest holder." Because Cumulus's ownership interest in more than three broadcast stations is attributable to Liberty, there has been an "ownership change . . . due to the attributable interests of [a] new attributable interest holder[]."

36. Contrary to Liberty's assertion, the July 9, 1999 Public Notice is not a final action that became effective upon its release to the public and that is no longer subject to review or reconsideration. Prospective bidders were expressly advised in the July 9 Public Notice that "[t]he Commission may amend or supplement its public notices at any time, and will issue public notices to convey any new or supplemental information to bidders . . . [and that] it is the[ir] responsibility . . . to remain current with all Commission Rules and with all public notices pertaining to this auction."[50] Nor does the fact that the Commission continued to advise prospective bidders in subsequent broadcast auctions that eligibility for the New Entrant Bidding Credit would be determined as of the short-form filing deadline support Liberty's claims. Clearly, material included in public notices for subsequent auctions has no bearing on the terms governing this particular auction. More importantly, those notices contain the identical language quoted above indicating that, in order to avoid attribution for purposes of the New Entrant Bidding Credit, the divestiture of media interests must have been consummated by the short-form filing deadline. As in the case of the July 9, 1999 Public Notice, the cited language does not provide that eligibility for the New Entrant Bidding Credit is established as of the short-form filing deadline without regard to the subsequent acquisition of debt or equity interests.

37. Furthermore, Section 5008(c), as amended, is clear that the media holdings of a lender are attributable, for purposes of the New Entrant Bidding Credit, if the lender's debt interest exceeds 33 percent of the bidder's total asset value. Liberty has certified in its November 10, 1999 Amendment, Exhibit D, that the proceeds of the Cumulus loan will exceed 33 percent of Liberty's total asset value. By virtue of its loan agreement with Cumulus, the numerous media interests of Cumulus are attributable to Liberty. Liberty is thus ineligible for the New Entrant Bidding Credit without regard to whether the media interest of its sole limited partner, David Murray, is also attributable.

[49] *Public Notice: Closed Broadcast Auction 224 Qualified Bidders*, DA 99-1912, pp. 5-6 (Sept. 17, 1999).

[50] 14 FCC Rcd at 10637.

38. Having concluded that Liberty does not qualify for the 35 percent bidding credit, we next consider the appropriate remedy. As the Enforcement Bureau notes, the Commission, in implementing its statutory obligations regarding the prevention of unjust enrichment, previously determined not to require reimbursement from licensees who utilized a New Entrant Bidding Credit to obtain a broadcast licensee if they subsequently acquired media interests that would have rendered them ineligible for the New Entrant Bidding Credit. The Commission's concern, 13 FCC Rcd at 15998 ¶ 195, was that this would effectively punish the most successful broadcasters. The attribution of Cumulus' extensive media holdings, based on the pre-auction loan agreement and pursuant to the Commission's effort "to insure that only true new entrants qualify for the bidding credit," 14 FCC Rcd at 12543-45 ¶ 7, does not raise similar concerns. The stricter attribution standards were based on a record reflecting "that holders of nonvoting stock and debt interests may be able to influence broadcast licensees in a significant manner" so that disregarding such interests "would be contrary to the new entrant bidding credit's diversification goals." *Id.* at 12545 ¶ 7. In order to effectuate the intent of the revised attribution standards it is appropriate to require that Liberty remit in full its winning bid.

39. It is not appropriate, however, to dismiss Liberty's application or to set aside the results of the auction because it incorrectly claimed the 35 percent bidding credit. For the reasons set forth in paragraph 25 above, there is no merit to BFBFM's contention that the change in Liberty's bidding status is a major amendment warranting the dismissal of Liberty's application pursuant to Section 1.2105(b) of the rules. We are also not persuaded that the change in Liberty's bidding status so alters the circumstances under which the auction was conducted as to require that we set aside its results. BFBFM is correct that we have generally refused to allow a bidder to change its designated status after an auction. We have taken this position in recognition of the facts that bidding credits confer significant advantages on auction participants and that a post-auction increase in such credits alters core circumstances likely to have influenced the bidding strategies of the other auction participants.[51] The same cannot be said for a post-auction change that removes a credit believed to have been in place during the auction. Clearly, Liberty's mistaken belief that it was entitled to a 35 percent bidding credit could have affected the amount it was willing to bid for the license. But we fail to see how that mistake would have deprived the other auction participants of information as to Liberty's valuation of the frequency, or would have otherwise influenced their bidding strategies. Indeed, requiring full payment of Liberty's winning bid preserves the integrity of the auction.

40. Nor is there a basis to add false certification or character issues, as requested by BFBFM and Willsyr, because Liberty erroneously claimed the 35 percent New Entrant Bidding Credit. Motions filed by BFBFM and Willsyr requesting such

---

[51] *See Two Way Radio of Carolina*, 14 FCC Rcd 12035 (1999), *affirming*, 12 FCC Rcd 958 (WTB 1997), upholding a staff action that had rejected a post-auction amendment purporting to increase the bidder's designated entity status, based on the applicant's mistaken calculation as to its small business size. *Accord Clearcall Inc.*, 12 FCC Rcd 965 (WTB 1997).

issues are therefore denied. Prior to the start of the auction and prior to the filing of any motions to enlarge issues, Liberty disclosed its loan agreement with Cumulus, acknowledged that the proceeds of the loan would exceed 33 percent of Liberty's total asset value, and explained its belief that Cumulus' media interests were not attributable. And, although the attribution of Cumulus' interests is required to effectuate the underlying purpose of the New Entrant Bidding Credit, Liberty's certification of eligibility under the circumstances reflected above does not raise a substantial and material question that the certification was deliberately false, or otherwise raise a question as to the basic qualifications of either Liberty or Cumulus.

41. To raise a substantial and material question of deceit, it is necessary to show that the statement was inaccurate or materially incomplete and that there was an intent to deceive. *See Fox River Broadcasting, Inc.*, 93 FCC 2d 127, 129 (1983). Intent may, as BFBFM suggests, be inferred from motive. *Joseph Bahr*, 10 FCC Rcd 32, 33 (Rev. Bd. 1994). However, the Commission has generally not found an intent to deceive where the misstatement resulted from a mistaken interpretation of the law. *High Country Communications*, 4 FCC Rcd 6237, 6238 (1989). *See also Baker Creek Communications*, 13 FCC Rcd 18709 (WTB 1998) (finding bidder qualified for LMDS license despite its erroneous assertion of designated entity status, where applicant had fully disclosed its ownership structure and acted under the erroneous assumption that the structure comported with the requirements of the Commission's designated entity provisions).

42. Significantly, Liberty's view that Cumulus' interests are not attributable is based on a literal reading of language in the July 9, 1999 Public Notice. That interpretation, although erroneous, is not so specious or frivolous as to raise a question as to Liberty's truthfulness and reliability in dealing with the Commission. And, as noted above, Liberty divulged sufficient facts prior to the auction to permit a determination as to its eligibility for the New Entrant Bidding Credit. In these circumstances we find no basis for a false certification issue, particularly since this is the first case applying the requirements for entitlement to a bidding credit for new entrants. At the same time, however, we do not find BFBFM's request for a false certification issue so frivolous as to warrant, as Liberty suggests, the imposition of sanctions against BFBFM.

43. Although the date of the execution of the Cumulus agreement is irrelevant in determining eligibility for the New Entrant Bidding Credit, Liberty's truthfulness and reliability is pertinent in assessing its basic qualifications. *See WOKO, Inc. v. FCC*, 329 U.S. 223 (1946) (immaterial misrepresentations can be a basis for disqualification). Here, both BFBFM and Willsyr suggest that, contrary to Liberty's representation, the loan agreement may have been entered into prior to the August 20, 1999 filing. Willsyr, for example, intimates that the agreement may have been "formalized" after the short-form filing deadline. These allegations, however, are based on sheer speculation. As such, they likewise do not raise substantial and material questions of fact that would warrant the specification of misrepresentation or other character issues against Liberty.

44. <u>David T. Murray</u>: We agree with Liberty that, for purposes of determining eligibility for the New Entrant Bidding Credit, the media interests of its limited partner,



C0070

David Murray, are not attributable, and that its failure to report these interests on its short-form application is not a basis to specify false certification and lack of candor issues. As required by Sections 73.5002(b) and 1.2105(a), governing such filings, Liberty's short-form application accurately reflected that Murray is a 65 percent limited partner. It also contained the requisite certification that "no limited partner is or will be involved, directly or indirectly, in the management or operation of the media-related activities of the partnership."[52] Relying on the Bureaus' July 9, 1999 Public Notice reflecting that "ownership information need not be provided" with respect to such a limited partner,[53] Liberty did not disclose on its short-form application that Murray has a 50 percent ownership interest in Murray Communications, the permittee of Station WRZK, located in nearby Colonial Heights. That information was fully disclosed on Liberty's November 10, 1999 amendment to the long-form application, however.[54]

45. BFBFM asserts that the attribution standards adopted August 5, 1999 made it clear that the media interests of an ostensible limited partner, such as Murray, are attributable. It surmises further that the media interest held by Murray renders Liberty ineligible for the claimed bidding credit, giving it a motive to conceal this interest. Merely stripping Liberty of its bidding credit, according to BFBFM, is an inappropriate remedy, because its misrepresentation compromised the integrity of the auction to the detriment of the other participants. Orion likewise asserts that the Commission made it expressly clear that it intended to consider not only the individual equity and debt interests of an investor, but also the extent of those combined interests.

46. As the Enforcement Bureau notes, however, Liberty adhered to Section 73.5008, as amended, in determining that Murray's media interests were not attributable for purposes of the New Entrant Bidding Credit. To the extent that Orion and BFBFM rely on statements in the text of the order revising Section 73.5008 explaining the rationale for the revised attribution standards or in notices announcing the revision, they do not allege that the rule is ambiguous. The rule's underlying purpose, however, cannot provide the fair notice required by due process except to the extent it is reflected in the language of the rule. *Trinity Broadcasting*, 211 F.3d at 631. The actual language of revised Section 73.5008(c) without regard to any statements as to the intended impact of the revision, therefore, must govern whether Murray's media interest is attributable. In this regard, the mass media interests of a limited partner are attributable within the meaning of Section 73.5008(c) only in two circumstances. First, such interests are attributable to the winning bidder to the same extent as those of a general partner, absent

[52] *See* FCC Form 175, filed August 19, 1999, by Liberty Productions, Exhibits A and C.

[53] *Public Notice*, DA-99-1346, Attachment B (Guidelines for Completion of FCC Forms 175 and Exhibits), 14 FCC Rcd at 10698, stating that "[o]wnership information need not be provided for any limited partner that is not materially involved, directly or indirectly, in the management or operation of the media-related activities of the partnership. In such case(s), a general partner shall certify under penalty of perjury, to the limited partner(s)' insulation, in lieu of providing the limited partner information." *See also Public Notice: Closed Broadcast Auction Ownership Disclosure Requirements For Auctions Scheduled For September 28, 1999*, 14 FCC Rcd 13283 (Aug. 10, 1999).

[54] Amendment, submitted November 10, 1999, Exhibit C.

a certification of no material involvement by the limited partner in the management or operation of the partnership's media-related activities.[55] Murray's interest in the Colonial Heights station is not attributable on this basis because Liberty's August 19, 1999 short-form application contained the requisite certification of noninvolvement.

47. Second, despite such a certification, a limited partner's media interests are attributable pursuant to Section 5008(c) insofar as its equity and/or debt interest(s) in the winning bidder "exceed thirty-three (33) percent of the total asset value (defined as the aggregate of all equity plus all debt) of the winning bidder." Murray has a 65 percent equity interest in Liberty. But Liberty has certified that Murray is not a creditor of Liberty and that his total equity contribution to the applicant does not exceed 33 percent of its total asset value.[56] Additionally, Liberty has submitted a declaration, dated November 24, 1999 from its general partner, Valerie Klemmer. The declaration reflects that, before submitting the short-form application, she had determined that Murray's total equity investment of about $36,000 was substantially less than 33 percent of Liberty's total asset value of more than $120,000.[57] BFBFM has raised no substantial or material question as to the accuracy of that calculation or the reliability of Liberty's certification that Murray is not (and will not be) materially involved in the partnership's media-related activities. As such, the media interests of Murray are not attributable for purposes of determining Liberty's eligibility for the bidding credit. It is worth noting that, if Murray were the general partner, his media interest would be attributable without regard to his debt/equity contribution. To the extent that BFBFM suggests otherwise, it has misunderstood that, pursuant Section 73.5008(c) of the rules, the debt/equity calculus is relevant only with respect to interests that are not otherwise attributable under the Commission's multiple ownership rules.

48. We do not find that Liberty was less than forthcoming in failing to disclose on its short-form application that David Murray has an ownership interest in the Colonial Heights station. As Liberty notes, neither Section 1.2105, nor FCC Form 175 (short-form application), was amended to reflect the revised standards providing for the attribution, in certain circumstances, of media interests held by a limited partner. Having properly concluded that Murray does not have an attributable interest for purposes of the New Entrant Bidding Credit, Liberty did not have an affirmative obligation to disclose, on the short-form application, either Murray's media interests or its basis for the conclusion that they were not attributable. Disclosure of his partnership interest, together with the general partner's certification that he has not been, and will not be, materially involved, directly or indirectly, in the management or operation of the media-related

---

[55] Section 73.3555, note 2(g)(1), of the multiple ownership rules provides for the attribution of a limited partnership interest unless "th[e] partner is not materially involved, directly or indirectly, in the management or operation of media-related activities of the partnership and the [applicant] so certifies."

[56] Amendment, submitted for filing on November 10, 1999, by Liberty, Exhibit C.

[57] She calculated total asset value as the combined equity investments of the general partner and the limited partner plus all debt. See Declaration, dated November 24 1999, at ¶¶ 3-4. The Declaration is attached to Liberty's November 26, 1999 Opposition to BFBFM's Motion to Enlarge Issues.

activities of the partnership was sufficient. Of course, it would have been helpful if Liberty's short-form application had also disclosed Murray's media interest and had included a certification that his 65 percent equity interest (plus no debt interest) was substantially less than 33 percent of Liberty's total asset value. Such disclosures on the short-form application might have avoided questions being raised concerning the media interests held by Murray. We cannot say, however, that Liberty breached any reporting obligation, or lacked candor, in failing to include this information on the short-form application.

## 5. False Site Certification Issue

49. Background: When Liberty filed its application on August 31, 1987, it specified a transmitter site on property owned by Vickey Utter. Liberty's general partner, Valerie Klemmer, certified that the applicant had reasonable assurance that the site would be available. In response to a motion to enlarge issues filed by Orion, the ALJ specified issues to determine whether Liberty has reasonable assurance of its site and whether it has made misrepresentations about the availability of the proposed transmitter site.[58]

50. After an evidentiary hearing the ALJ resolved both issues against Liberty. Based upon the statements and deposition testimony of Vickey Utter that she had never agreed to lease or otherwise promised that Liberty could use her property as a transmitter site, the ALJ found that Liberty did not have reasonable assurance of its specified transmitter site and that Klemmer had misrepresented facts about the availability of the transmitter site. This misrepresentation, the ALJ determined, was an independent basis for disqualifying Liberty. The Review Board, although reciting the ALJ's findings on both the site availability and the false site certification issues,[59] affirmed only the ALJ's adverse resolution of the former issue. Specifically, the Board agreed with the ALJ that "vague discussions with the site owner, and Liberty's hopes and expectations, do not support a finding that there was the requisite meeting of the minds required for reasonable assurance."[60] Having affirmed Liberty's disqualification for lack of a transmitter site, the Board did not consider the separate issue of whether Liberty's certification was false.[61] The Commission likewise affirmed Liberty's disqualification for lack of a transmitter site without addressing the merits of the false certification issue. Liberty appealed the denial of its application to the court of appeals. The court

[58] *Memorandum Opinion and Order*, FCC 89M-1025 (ALJ Mar. 10, 1989).

[59] A summary of the Judge's findings, with appropriate citations to the Initial Decision, is set forth in paragraph 8 of the Review Board's Decision. *National Communications Industries*, 6 FCC Rcd at 1979 ¶ 8.

[60] *National Communications Industries*, 6 FCC Rcd at 1979 ¶ 11, noting that the mere possibility that the site will be available is insufficient.

[61] *Id.* at 1979 ¶ 12 ("Since Liberty is not basically qualified because of its disqualification on the site issue, we need not reach the issue of whether it misrepresented to the Commission when it certified that a transmitter site was available, nor do we have to consider whether Liberty is entitled to any comparative credit . . .").

remanded the case to the Commission after *Bechtel*, without considering the merits of any issue raised on appeal.

51. As noted in ¶ 21 above, the Commission, in implementing its auction authority for commercial broadcast services, has repealed the requirement that broadcast applicants must certify the availability of a transmitter site.[62] We must, however, review the ALJ's determination that Liberty's general partner misrepresented the availability of the transmitter site when the application was filed, inasmuch as candor remains important.[63]

52. Discussion: The issue before us concerns the state of Ms. Klemmer's mind when she certified on the August 31, 1987 application that Liberty had a transmitter site. We must determine whether that certification was deliberately false, or whether she believed (even if such belief was incorrect) that the landowner, Ms. Utter, had made a commitment to lease the site in the event Liberty secured the construction permit.

53. As an initial matter, we decline Liberty's invitation to revisit the site availability issue. The Review Board denied Liberty's exceptions on this issue, and the Commission denied Liberty's application for review and petition for reconsideration. The fact that it did so without specifying reasons is not, as Liberty submits, a basis for the Commission to again consider this issue. Although the Commission's resolution of the site availability issue is not final, it would be a waste of private and public resources to reconsider an issue that is no longer relevant to Liberty's basic qualifications, now that the construction permit is to be awarded after an auction. In this respect, Willsyr's reliance on *Damsky v. FCC*, 199 F.3d 527 (D.C. Cir. 2000), involving an analogous issue that would be rendered moot under auction procedures, is misplaced. There, the court affirmed our adjudication of the financial issue against a non-settling applicant in the context of a settlement agreement filed before the implementation of auction procedures. By virtue of the settlement, *Damsky* was decided without resort to an auction or the policies pertinent to our auction procedures. In this case, however, there has been no settlement agreement or other circumstance making it appropriate to adjudicate an issue that would be relevant only if the licensee were selected through a process other than an auction.

54. Despite our determination not to revisit the site availability issue (that is, whether there was a meeting of the minds sufficient to establish reasonable assurance of a transmitter site), we recognize that resolution of the false certification and site availability issues both entail consideration of the disputed events of August 1987 when Liberty principal Valerie Klemmer, accompanied by Tim Warner, allegedly discussed with landowner Vickey Utter the possibility of using her property for a transmitter site.

---

[62] *First Report and Order*, 13 FCC Rcd at 15956 ¶ 99; *Memorandum Opinion and Order*, 14 FCC Rcd at 8732-33 ¶ 16.

[63] *First Report and Order*, 13 FCC Rcd at 15956 ¶ 99. *See also Dorothy O. Schulze and Deborah Bingham*, 13 FCC Rcd 3259, 3264 ¶ 14 (1998), aff'd sub nom. *SL Communications v. FCC*, 168 F.3d 1354, 1359 (D.C. Cir. 1999) (affirming the Commission's refusal to approve a settlement agreement that would have effectively granted an authorization to an applicant lacking character qualifications).

There is thus some similarity between Liberty's contentions regarding its disqualification on the false certification issue and arguments previously rejected by the Commission in upholding the ALJ's adverse resolution of the site availability issue. Inasmuch as Liberty's disqualification on the site issue has not become final (and will never be litigated to a final decision), the principles of res judicata do not, as BFBFM suggests, preclude challenges to underlying findings of fact made in connection with the site availability issue, insofar as they also pertain to the false certification issue.[64] Nor are, as Orion suggests, challenges to the reliability of record evidence barred by the Commission's rejection of virtually identical claims in upholding the ALJ's adverse resolution of the site issue. But more important here, as a matter of law the determination that there was not a meeting of the minds between Klemmer and the site owner sufficient to establish reasonable assurance of Liberty's original site does not foreclose a determination that Klemmer mistakenly believed that the landowner had agreed to lease the property and thus made the certification in good faith. Resolution of the misrepresentation issue thus requires us to consider an additional factual question not previously addressed in either the Board's or the Commission's disposition of the site availability issue.

55. Turning to the merits of the false certification issue, it is well established that substantial evidence of an intent to deceive is necessary to support a finding of misrepresentation.[65] For the reasons that follow we conclude that the ALJ's disqualification of Liberty on the false certification issue is not supported by substantial evidence. At the outset, we note that, contrary to the assertions of BFBFM, Orion and Willsyr, the ALJ made no credibility findings against Liberty that are entitled to special deference on review.[66] Indeed, the Initial Decision is devoid of any specific finding addressing the credibility of either Ms. Klemmer or Tim Warner, who also testified about this issue. The ALJ does not acknowledge, let alone assess the credibility of, Mr. Warner's lengthy testimony about the negotiations Klemmer claims to have had with Ms. Utter before certifying on Liberty's application that it had reasonable assurance of a transmitter site located on her property. Nor does the Initial Decision cite any aspect of Ms. Klemmer's demeanor -- including the expression of her countenance, how she sat or

---

[64] *See Georgia Public Telecommunications Commission*, 7 FCC Rcd 7996, 7999 n.29 (1992), *citing Pantex Towing Corp. v. Glidewell*, 763 F.2d 1241, 1245 (11th Cir. 1985) (case in which exceptions concerning a particular issue were filed but never considered by the Review Board, the Commission found that it would be inappropriate to give a res judicata or collateral estoppel effect in future proceedings to the ALJ's adverse findings on that issue since they were not actually litigated to a final decision in which they were necessary to the outcome).

[65] *Swan Creek Communications v. FCC*, 39 F.3d 1217 (D.C. Cir. 1994), *citing*, *Weyburn Broadcasting Ltd. Partnership v. FCC*, 984 F.2d 1220, 1232 (D.C. Cir. 1993) ("'intent to deceive [is] an essential element of a misrepresentation or lack of candor showing'").

[66] *See Heidi Damsky*, 13 FCC Rcd 11688, 11693 ¶ 12 (1998), *aff'd on other grounds*, *Heidi Damsky v. FCC*, 199 F.3d 527 (D.C. Cir. 2000), citing *Walnut Creek Honda Associates v. NLRB*, 89 F.3d 645, 646 (9th Cir. 1996); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994); *WHW Enterprises, Inc. v. FCC*, 753 F.2d 1132, 1141-42 (D.C. Cir. 1985).

stood, whether she was inordinately nervous, her coloration during critical examination, or other non-verbal communication -- which might convince an observing judge that a witness was testifying falsely or truthfully but which would be unavailable to a reader of the written transcript.[67] Ms. Utter, whose recollection concerning the site contradicts that of Liberty's witnesses (Klemmer and Warner), did not testify at the hearing. As such, the ALJ's conclusion, based on the deposition and statements of Utter, that Klemmer intentionally deceived the Commission in certifying reasonable assurance of a transmitter site was not based on any specific credibility findings that are entitled to special deference on review.[68] And, as the Enforcement Bureau notes, the ALJ did credit Klemmer's testimony on other matters.

56. The language cited by the competing applicants does not support their contention that the ALJ made credibility findings against Liberty. The ALJ, in resolving the false certification issue against Liberty, found that "Valerie Klemmer has blatantly dissembled in a manner that doesn't befit a prospective broadcast applicant." *Initial Decision*, 5 FCC Rcd at 2879 ¶ 8. This, however, merely reflects the ALJ's ultimate resolution of the issue. Ms. Klemmer "had blatantly dissembled," the ALJ concluded, because "when [she] represented to the Commission that Liberty had available the site specified in their application, she . . . knew she had no basis for so certifying." He found further that "it strains credibility . . . [t]o argue that her feeble, half-hearted effort to obtain some of Vicki [sic] Utter's land on Busbee Mountain constitutes 'reasonable assurance.'" What "strain[ed] credibility," in the ALJ's view, was not the testimony of Ms. Klemmer or any other witness as to the facts and circumstances surrounding her certification, but that Ms. Klemmer could believe that the landowner had promised to lease the site. These determinations based upon the ALJ's assessment of the evidence presented, however, do not constitute credibility findings. The lack of specific credibility findings, while not undermining the legal sufficiency of the ALJ's ultimate determination of misrepresentation, affects the nature of the review pertaining to that conclusion on appeal. Because that determination is not supported by specific demeanor findings, we accord it no special deference but assess whether the ALJ's determination is supported by substantial evidence in the record. It is the right and the duty of the trier of fact to assess the credibility of any witnesses based on his observations of their demeanor. But where, as in this case, the presiding judge has not made any specific demeanor findings, a reviewing body must proceed to make its own findings of fact without the benefit of a dispassionate ALJ's appraisal of the witnesses.[69]

---

[67] *TeleSTAR, Inc.*, 2 FCC Rcd 7352, 7353 ¶ 11 (1987), *citing Penasquitos Village v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977).

[68] *See Heidi Damsky*, 13 FCC Rcd at 11693 ¶ 17 (noting specific findings by the ALJ that "[t]he Presiding Judge has had an opportunity to observe [HPI's] witnesses and finds their testimony forthcoming, candid, and entirely believable"); *Dorothy O. Schulze and Deborah Bingham*, 1 FCC Rcd 120, 124 (ALJ 1986), aff'd sub nom. *SL Communications v. FCC*, 168 F.3d 1354, 1357 (D.C. Cir. 1999) (upholding ALJ's credibility findings rejecting testimony as "sheer fabrication" and a "web of lies") (intervening history omitted).

[69] *See, e.g., Mid-Florida Television Corp.*, 70 FCC 2d 281, 293-94 ¶ 25 (Rev. Bd. 1975), *settlement agreement approved*, 49 RR 2d 1477 (1981), where the ALJ's observations were deemed untrustworthy because he had placed presumptive weight on the witnesses' status as practicing attorneys.

57. Based upon our required *de novo* review of the record, we find that substantial evidence in the record does not support the ALJ's conclusion that the certification was deliberately false. Relying primarily on Utter's statements and on the existence of a written lease for virtually the same transmitter site executed only days before she purportedly made an oral commitment to lease that property to Klemmer for the same purpose, the ALJ found that "what appears to have happened" is that Klemmer, apprised of the need to make an immediate payment to secure the landowner's commitment to lease her property to Liberty, declined to do so and went ahead and made the certification on Liberty's application.[70] Substantial evidence does not support that finding, however.

58. The record reflects that, before certifying reasonable assurance of a transmitter site, Valerie Klemmer investigated only one site, located on property owned by Ms. Utter, and that she believed, based upon her brief August 1987 meeting with Utter, that Utter had agreed to lease her property for $4000 per year if Liberty got the license. Klemmer had contacted Utter at the recommendation of her friend and neighbor, Tim Warner, who worked at local noncommercial station WCQS. (Tr. 651-52, 849, 851, 933) Warner had dealt previously with Utter and already knew that her property was desirable as a transmitter site. (Tr. 841, 835, 849) Klemmer's detailed and lengthy testimony as to what transpired when she met with Utter approximately five days before Liberty's application was filed, is corroborated in all material respects by the testimony of Tim Warner, who also attended that meeting.

59. At the meeting, which Klemmer had arranged, Warner introduced Klemmer and identified her as an applicant for the Biltmore Forest FM station. (Tr. 670, 871) Utter remarked that there had been a lot of recent inquiries about using her property for a site. (Tr. 676-77) According to the testimony of Klemmer and Warner, however, Utter did not specifically name anyone who had contacted her regarding a site or indicate that she had agreed to lease her property for that purpose. (Tr. 676-77, 679, 876-77, 940-42) Warner is certain he would have remembered any mention of Brian Lee having a lease with Utter since the Lee family was well known. (Tr. 940) Both Warner and Klemmer claim that, when Liberty's application was filed, they were unaware of the written lease executed August 21, 1987 between Utter and Orion's Brian Lee. (Tr. 659, 676-79, 915, 941, 987) Under the terms of that lease Utter was entitled to yearly payments of $1500 that increased to $4000 once the tower was constructed. The lease was for three years, and was renewable, at the lessee's option, for two three-year terms. (Orion Ex. 4; Tr. 2462-64)

60. Klemmer and Warner testified that they indicated that Klemmer was interested in leasing a portion of Utter's property for use as a transmitter site, and that their conversation with Utter included a discussion of the annual rent and the location of the tower. (Tr. 872) Klemmer, aware of the need to firm up the cost in order to secure reasonable assurance, asked Utter how much the rent would be. (Tr. 653, 672, 674, 922)

[70] *Initial Decision*, 5 FCC Rcd at 2867 ¶ 50.

When Utter indicated she would need $4000 and Warner indicated that this was a fair price, Klemmer advised Utter that $4,000 was acceptable.[71] (Tr. 655-57, 878-80) Both Warner and Klemmer believed, based on their August 1987 conversation with Utter, that she had agreed to lease her property for $4000.00 annually if Liberty got the license, and that she understood that Klemmer would not need the site for 18 months to two years, since FCC proceedings tend to be lengthy. (Tr. 661, 665-67, 680, 810, 884-86, 889, 961) They understood further that if Liberty received the construction permit, Utter would be willing to sign a lease at that point. (Tr. 893) Klemmer believed that the only thing left to work out was the duration of the lease.[72] (Tr. 810-13)

61. Further contributing to Klemmer's belief that she had reasonable assurance of a site was that the August 1987 meeting with Utter included a discussion, largely between Utter and Warner, as to the general location of the site. Klemmer, having no experience in selecting transmitter sites, relied on Warner, who had a great deal of experience in this area and had dealt previously with Utter. (Tr. 653, 662-63) He recommended that the site be located at the highest possible elevation and as close as possible to the television tower already located on Utter's land, and he pointed to a relatively flat area between the dog pen and the tower. (Tr. 881-83) Both Warner and Klemmer understood from the August 1987 meeting that this area was acceptable to Utter, in part because of its close proximity to the existing television tower. (Tr. 663, 678, 881-83)

62. After meeting with Utter, Warner and Klemmer discussed whether she could make a certification of reasonable assurance on Liberty's application. (Tr. 875) Based on Warner's experience in securing transmitter sites, Warner's previous dealings with Utter, and the television tower already located on Utter's property, Warner and Klemmer believed that Utter's oral commitment to enter into a future lease was sufficient. (Tr. 681, 809, 905) Warner had had considerable experience in securing transmitter sites for Station WCQS, and on at least one occasion he had been the one to certify reasonable assurance on an FCC application. (Tr. 825, 952-55) Additionally, he had an oral agreen..nt with Utter allowing station employees to cross her land in order to work on the station's tower located on adjacent property. (Tr. 845, 846) His experience was that Utter was willing to enter into verbal agreements, that she honored such agreements, and that she had never required either a written agreement or monetary compensation to secure a verbal promise for a current lease of her property. (Tr. 898-99, 964) Warner was comfortable advising Klemmer that she had obtained reasonable assurance, as defined by the Commission, of a future lease of Utter's property for use as

---

[71] Warner later explained that, although $4000 was higher than he had hoped, it was not unreasonable. (Tr. 878-79, 904) He knew there were other area sites where the rent would be lower. Those sites would be less economical in the long run, he advised, because they would entail costs that Klemmer would not face with the already developed Utter site. He was aware of what was available in the area because he had tried to find an alternate site for WCQS when access to its current site became a problem.

[72] Warner testified that, although the duration of the lease was not discussed specifically, he inferred that Utter was amenable to a multi-year lease comparable to the lease for the existing television tower on her property. (Tr. 963)

C0078

site if Liberty were awarded the construction permit. (Tr. 899-900) His understanding from station WCQS's attorney is that, so long as a commitment is obtained from the landowner, there is no need for a written agreement. (Tr. 976) This is what Warner advised Klemmer, but he also told her to check with her own attorney before making the certification. (Tr. 906)

63. Other than Liberty's evident interest in establishing its basic qualifications, there is little reason to reject the detailed testimony of Klemmer and Warner. First, the competing applicants urge us to infer a motive to misrepresent the site's availability from the fact that Klemmer, having contacted Utter only days before the August 31, 1987 filing deadline, did not investigate any alternative sites. The record is clear, however, that Warner advised that Utter's was the best site but that there were other suitable sites. (Tr. 834-35, 957) The desirability of Utter's property is corroborated by Brian Lee, who testified that Orion's engineer had likewise advised that a site on Busbee Mountain would be preferable. (Tr. 2445) The availability of other suitable sites is illustrated by the fact that the original thirteen Biltmore Forest applicants specified eleven different sites and by the ease with which Liberty, upon learning in March 1989 that Utter was no longer willing to lease her property, specified a second site.[73] Significantly, Liberty in its November 10, 1999 amendment has specified a third site, located on property adjacent to Utter, that it proposes to share with noncommercial station WCQS. Neither the timing of the negotiations with Utter, nor the failure to investigate other sites is probative evidence that Klemmer knew the most desirable site was unavailable when she certified its availability.

64. The competing applicants also attack the credibility of Warner's testimony, asserting that he is not a disinterested witness. But we discern no basis to infer a motive to deceive on Warner's part. Despite lengthy cross-examination and repeated questioning by the ALJ, there is no evidence that Warner has any interest in, or managerial position with, Liberty. Warner, a career public broadcaster, is fairly committed to public radio and, although he does not foreclose the possibility of a really good offer tempting him into commercial radio, he repeatedly testified that he had no interest in the Biltmore Forest FM station and no ownership interest in Liberty.[74] (Tr. 856-57, 951) It is unclear that friendship, standing alone, would motivate Warner to perjure himself on Liberty's behalf, particularly given his commitment to public broadcasting and his station's ongoing contractual relationship with Utter at the time of

[73] Liberty's second site was the existing television tower located on Utter's property, already specified by Skyland, a competing applicant. The ALJ rejected Liberty's site amendment, finding that it was not supported by good cause inasmuch as it did not have reasonable assurance of the site (on Utter's property) specified in its August 31, 1987 application.

[74] He did, however, explore the possibility of noncommercial station WCQS applying for the Biltmore Forest allotment and then working out a channel swap with a commercial station, because this would have helped with a third adjacent channel problem at the station's current frequency. (Tr. 951) He had also hoped that the owner of the station 's current transmitter site would apply for the FM allotment and would propose to use that same property for a transmitter site, thereby minimizing the possibility of station WCQS having to find another transmitter site because of the property's owner's growing ambivalence about the use of his property as a transmitter site. (Tr. 932)

C0079

the hearing. It is problematic, in our view, that Warner would have been willing to jeopardize a relationship on which Station WCQS depended to access its site, and presumably his position as station manager of that station, by testifying falsely as to the events surrounding Liberty's specification of a site. Our analysis is not changed by the fact that Klemmer has apparently retained Warner to provide engineering services in connection with Liberty's November 10, 1999 filing insofar as it seeks to amend to a new transmitter site that, as reflected above, is to be shared with Station WCQS. [75]

65. We note, moreover, that despite Klemmer's extensive reliance on Warner in selecting the site and in negotiating with Utter, his pre-certification efforts on Liberty's behalf were based primarily upon information already available to Warner and entailed a minimal time commitment. Warner had been contacted by other potential Biltmore Forest applicants for advice in locating a site, because of his experience in selecting sites generally and because of the location of his station's tower on Busbee Mountain. (Tr. 830-31) He knew that Utter's property would be suitable for Klemmer's purposes, given his dealings with Utter and his investigation of other Busbee Mountain sites. (Tr. 833-35, 843, 848-49) He also knew that Utter's property was one of the few without restrictive covenants precluding the construction of a tower because, in exploring alternate sites for WCQS, he had researched the deeds in the spring of 1987. (Tr. 837, 840-41, 843-44) We do not find it incredible that a neighbor and friend would be willing to give advice, based largely on his own expertise and involving little time commitment, without expecting an interest in the application. Neither Warner's friendship with Klemmer, nor the extent of her reliance on his expertise, provide a basis to infer that Warner had a motive to deceive the Commission or to otherwise reject his very extensive testimony as to what occurred when he and Klemmer met with Utter in August 1987.

66. There is a direct conflict, we recognize, between the testimony of Warner and Klemmer and the denials of Vickey Utter that she ever gave Valerie Klemmer or anyone connected with Liberty any assurance that her property would be available for a transmitter site. But as noted by the Enforcement Bureau, based on its independent analysis of this matter, Utter's deposition testimony and various statements are inconsistent and, viewed in the best light, reflect only a very sketchy recollection of the events of August 1987 concerning the possible lease of her property for construction of a tower.

67. In this regard, the record shows that Orion's Brian Lee asked Vickey Utter to explain Liberty's specification of virtually the same piece of property that was the subject of their August 21, 1987 written lease. In response, she signed a statement under penalty of perjury on February 22, 1989, declaring that she did not know Valerie Klemmer, had never heard of Liberty Productions or given any representative of Liberty

[75] At the time of the hearing, Warner was the general manager of station WCQS. We take official notice of the fact that Warner has signed the Engineering Exhibit to Liberty's November 10, 1999 amendment, identifying himself as a technical consultant. The record does not reflect whether Mr. Warner is still general manager of station WCQS.

any assurance that her property would be available for use as a transmitter site.[76] The substance of that statement was largely withdrawn, however, after a visit from Warner and Klemmer on March 10, 1989, refreshed Utter's recollection of the August 1987 encounter. During that visit Utter refused to sign a statement Klemmer had prepared indicating her willingness to lease the site if Liberty received the construction permit. But she drafted and signed a second statement on March 13, 1989, reflecting that she then remembered meeting with Valerie Klemmer and Tim Warner about one and a half years before and discussing the possibility of leasing a portion of her land to Klemmer for a tower.[77] In that second statement, Utter indicated that "[a]t that time I told them that I had leased a portion of my land to Brian Lee for a tower to be constructed should he be awarded the new FM station. It was also discussed the posibility [sic] of leasing Valerie a piece of land for the same purpose but since she never contacted me again I assumed she found someplace more suitable for her project." At the request of Brian Lee and Orion's attorney, Utter signed a third statement on March 29, 1989.[78] In addition to repeating information to explain the inaccuracies in the February 22, 1989 declaration, Utter stated in the March 29, 1989 statement that: "We talked, in my yard, for a brief period concerning my property lease to Brian Lee. At that time or any other time I never gave Valerie the promise or assurance that she could use my land or my name when she filed the application with the FCC."

68. Ms. Utter was deposed on April 27, 1989. Her deposition testimony reflects only a vague memory of the meeting with Klemmer and Warner. She did not recall being introduced to Klemmer or being told of her intention to apply for the FM station. She had no idea why Klemmer had accompanied Warner, and assumed that she was connected with Warner's station, whose tower was located on property adjacent to Utter's. (Liberty Ex. 13, p. 24-28). And, despite her March 13, 1989 statement, she had no recollection of ever discussing the possibility of leasing Valerie Klemmer a portion of her land for a tower. (Liberty Ex. 13, p. 27). She claims to have included that statement in the March 13, 1989 document because Warner insisted that there had been such a discussion. (Liberty Ex. 13, p. 41). Yet, according to Brian Lee's testimony, she remembered this discussion and she had no qualms about entering into a lease with someone else for another portion of her property. (Tr. 2501-04) Her deposition testimony confirms that, as reflected in her March 13 and 29, 1989 Statements and as recounted by Brian Lee (Tr. 2499-500), she remembered discussing their written lease with Klemmer and Warner when they stopped by her house in August 1987. Utter's recollection is that Warner was aware of the lease, and even knew the annual rent. Her vivid recollection of a snippet of an otherwise forgotten conversation is a bit curious. Also troublesome is her admission in her deposition that she had included information in the March 13, 1989 statement, of which she had no independent recollection, based entirely on the recollection of others.

[76] The February 22, 1989 statement is attached to Liberty Exhibit 13 and is identified as Exhibit 1. (Liberty Exhibit 13 is a transcript of Vickey Utter's deposition.)

[77] The March 13, 1989 statement is attached to Liberty Exhibit 13 (transcript of deposition) as Exhibit 2.

[78] The March 29, 1989 statement is attached to Liberty Exhibit 13 (deposition transcript) as Exhibit 3.

69. Thus, even crediting only the deposition testimony and various statements of Ms. Utter (and disregarding entirely the contrary testimony of Klemmer and Warner). there is not substantial evidence of an intent to deceive. Utter's statements, rather than providing a comprehensive and coherent account of the disputed events, reflect only that she has no clear memory of the August 1987 conversation with Klemmer and Warner. In her statements and in her deposition she has variously denied that any meeting occurred at all, or recalled meeting Klemmer but not being aware that Klemmer intended to apply for the FM station, or meeting with Klemmer and specifically discussing a lease for the FM station. In the circumstances, and given Utter's inconsistent statements, we do not give substantial weight to Utter's assertions that purport to provide detailed descriptions of what was said or might have been said, including, for example, her certainty that in any discussion of leasing her property, she would have insisted on a commitment (presumably a monetary payment) from Liberty, and would have expected Klemmer to contact her again. (Deposition at 41-42, 45 (Liberty Exhibit 13); March 13, 1989 Statement; March 29, 1989 Statement) She is likewise sure that, in August 1987, Warner and Klemmer were aware of her written lease with Brian Lee. (Deposition at 26-27, 41; March 13, 1989 Statement; March 29, 1989 Statement)

70. The record reflects, moreover, that Utter understood that only one applicant would ultimately need a transmitter site and that Brian Lee would not likely renew the lease unless Orion received the license. (Tr. 2502; Liberty Exhibit 13, p. 14) In these circumstances, there may have been a casual discussion of a future lease with Klemmer, long forgotten by Utter, that Klemmer and Warner, not fully understanding that reasonable assurance requires something more than a possibility of a future lease, misconstrued as providing reasonable assurance. Consistent with her only vague recollection of these events, moreover, she might have felt compelled to reassure Brian Lee that, while she did not feel constrained from leasing other portions of her property, she had advised Klemmer and Warner of the written lease agreement for Orion's site, whereas Klemmer and Warner testified that she had not done so. None of this provides substantial evidence that, when Klemmer certified reasonable assurance, she knew that the certification was false.

71. One final matter warrants comment. The existence of the written lease with Brian Lee is admittedly troublesome. It is somewhat problematic that Utter, having just signed a lease providing for up-front payments before the license was awarded, would have been willing to consider leasing Valerie Klemmer a portion of her property for the same purpose without requesting a similar monetary commitment.[79] For purposes of the false certification issue, however, the pertinent question is not whether Utter had agreed to lease the site to Liberty if it received the construction permit. The critical question instead is Klemmer's understanding at the time of certification. Particularly in the absence of any reliable evidence that Klemmer was, or should have been, aware of

[79] But the record contains no evidence as to Utter's precise understanding of the lease in 1987; it is not inconceivable that she believed that she could agree to (or at least discuss) a future lease to be signed only if Orion, having failed to win the license, did not renew the lease for a second term.

Brian Lee's lease at that time, its existence is not probative of false certification. Apart from Utter's otherwise faulty recollection of her August 1987 conversation with Klemmer and Warner, however, there is nothing to indicate that anyone connected with Liberty was aware of the lease at the time of certification, or that, during that conversation, Utter had demanded a similar written commitment from Liberty. Awareness of Brian Lee's lease, moreover, cannot be inferred from its recordation on August 21, 1987. Warner's research of the Busbee Mountain properties ended in March or April 1987, and there is no evidence that Klemmer's former husband, a real estate attorney, was involved in any transactions concerning Busbee Mountain during the pertinent time period. (Tr. 944) Nor can awareness of the lease be inferred, as Willsyr suggests, from the location of Liberty's originally specified transmitter site. It contends that the area described in the August 21, 1987 lease is the best possible site, and that Liberty's specification of a different (less desirable) site can only be explained by its awareness that Utter had already agreed to lease the more desirable portion of her property to Orion's Brian Lee. But the terms of the lease do not include an exact specification of the site. The location of Orion's site, therefore, could not have been determined from the August 21, 1987 lease. The coordinates of the sites specified by Orion and by Liberty, moreover, vary by only one degree. Furthermore, Warner's detailed testimony reflects that the site's location was influenced by the terrain of the land and by Utter's desire that it be as close as possible to the existing television tower, and that its location on higher ground made Liberty's original site preferable to Orion's site. (Tr.881-83)

72. There is, in sum, no basis to reject the consistent testimony of Klemmer and Warner, contradicted only by Utter's faulty recollection, that they first learned of the written lease in March 1989 after the filing of Orion's petition to add the site availability and site certification issues against Liberty, and that they believed, based upon their August 1987 conversation, that Utter had expressed a willingness to lease the land to Klemmer in the event Liberty was the successful applicant. Only the hearsay testimony of Brian Lee as to what Utter told him in early 1989 about what had occurred in August 1987, and the existence of the Utter-Lee lease lend credence to Utter's version of what occurred. Particularly in light of Utter's admitted lack of recollection and her clear interest in reassuring Orion's Brian Lee that her dealings with Liberty were consistent with their written lease arrangement, neither the existence of the lease nor Utter's various statements and deposition testimony provides substantial evidence that Klemmer deliberately misrepresented the availability of the site when she certified reasonable assurance.[80] Indeed, if Utter had told Liberty about her lease agreement with Orion and had then specifically relied on it to demand a similar commitment from Liberty, it is

[80] We do not draw any adverse inferences from the fact that Ms. Utter, in contrast to Tim Warner and Valerie Klemmer, did not testify at the hearing. There is merit to the suggestion that Liberty, having subpoenaed Utter and having elected not to enforce that subpoena, cannot take advantage of her failure to appear. Liberty's failure to enforce the subpoena, however, cannot obscure the inconsistencies in Utter's various statements and deposition testimony and that, by her own admission, she has little recollection of the events in question. Indeed, Liberty was "happy" to rely on her deposition and statements precisely because it believed that, given her evident lack of recollection, it would get nothing further from her by forcing her to testify. We cannot fault Liberty for not enforcing the subpoena under these circumstances.

difficult to believe that Liberty would have falsely certified about a matter relating to a site location so well known to a competing applicant. Because we find no probative evidence of intentional deceit by Klemmer, let alone substantial evidence of such deceit, we reject the ALJ's findings on the false certification issue and reverse his disqualification of Liberty on this issue. We conclude, therefore, that Liberty is basically qualified to be awarded the construction permit for a new FM station on channel 243A in Biltmore Forest.

## IV. ORDERING CLAUSES

73. ACCORDINGLY, IT IS ORDERED, That the Joint Request For Approval of Settlement, filed November 14, 2000 by Biltmore Forest Broadcasting FM, Inc. and Liberty Productions IS DENIED, and the Motion to Strike, filed January 8, 2001 by Orion Communications, Ltd. IS DISMISSED as moot.[81]

74. IT IS FURTHER ORDERED, That the Motions to Strike Reply to Opposition, filed on December 29, 1999 by Orion Communications Limited and on January 3, 2000 by Willsyr Communication Limited Partnership, ARE DENIED;[82] and the Amendment, tendered for filing on November 10, 1999 by Liberty Productions, A Limited partnership IS ACCEPTED.

75. IT IS FURTHER ORDERED, That the Motions to Enlarge Issues, filed on November 12, 1999 by Orion Communications Limited and by Biltmore Forest Broadcasting FM, Inc. ARE DENIED; and that the Motion to Enlarge Issues and the Second Motion to Enlarge Issues, filed on November 24, and December 13, 1999 by Willsyr Communications Limited Partnership ARE DENIED.

---

[81] Our action herein denying the proposed settlement agreement is without regard to the allegedly improper statements contained in the responsive pleadings filed by Liberty and by BFBFM.

[82] The issue concerns replies that Liberty filed in response to oppositions to its November 10, 1999 amendment. These replies, according to Willsyr and Orion, are unauthorized under Section 1.294 of the rules. As the Enforcement Bureau notes, however, Section 73.3522(b), 47 C.F.R. § 73.3522(b), governing the filing of amendments to long-form applications, does not specifically authorize the filing of oppositions to such amendments. Furthermore, the Order, FCC 991-23 ¶ 4 (OGC 1999), resuming the hearing proceeding in MM Docket No. 88-577contemplated only that motions to enlarge issues could be filed in response to Liberty's November 10, 1999 amendment to its long-form application. Insofar as oppositions to that amendment raise questions as to Liberty's basic qualifications, or otherwise request the denial of its long-form application, they are, in effect, motions to enlarge issues to which Liberty, clearly, is entitled to respond. *See First Report and Order*, 13 FCC Rcd at 15956 ¶ 98, providing that the auction winner will have 15 days to respond to any new petitions to enlarge. Instead of dismissing the oppositions as unauthorized, as the Enforcement Bureau has suggested, we have considered the arguments raised in both the oppositions to the amendment and in the related replies. By doing so, we have given the unsuccessful bidders multiple opportunities to challenge Liberty's qualifications beyond what the rules specifically authorize but have, as a matter of fairness, also afforded Liberty ample chance to respond.

76. IT IS FURTHER ORDERED, That the Motion to Dismiss Replies, filed on February 7, 2000 by Orion Communications Limited IS DENIED;[83] that *National Communications Industries*, 5 FCC Rcd 2862 (ALJ 1990), is set aside to the extent reflected herein; and that the hearing proceeding in MM Docket No. 88-577 IS TERMINATED.

77. IT IS FURTHER ORDERED, That, subject to full payment of the gross amount of Liberty's high bid of $2,336,000 for the permit and full compliance with all of Commission's payment procedures, the application filed by Liberty Productions, A Limited Partnership (File No. BPH-870831MI), as amended, IS GRANTED; and that the following applications ARE DISMISSED: (a) Willsyr Communications Limited Partnership (File No. BPH-870831MJ); (b) Biltmore Forest Broadcasting FM, Inc. (File No. BPH-870831MK); (c) Skyland Broadcasting, Inc. (File No. BPH-870831ML); and (d) Orion Communications Limited (File No. BPH-870831ME).

FEDERAL COMMUNICATIONS COMMISSION

Magalie Roman Salas
Secretary

[83] Orion requests that we dismiss on procedural grounds the separate replies that Liberty filed in response to the Oppositions filed by Willsyr, BFBFM and Orion. According to Orion, the delegated authority order, FCC 991-23, rel. Nov. 23, 1999, according Liberty an opportunity to file a supplemental brief on the site issue contemplated that Liberty would file a single, rather than multiple, replies in response to any oppositions to its brief. However, the Order, ¶ 7, specifies a deadline by which "replies MAY BE FILED," thus reflecting that multiple replies are authorized.

## Dissenting Statement of Commissioner Gloria Tristani

In Re Applications of Liberty Productions, a limited partnership, Willsyr Communications limited partnership, Biltmore Forest Broadcasting company, Orion Communications Limited, *for a construction permit for a new FM broadcast station on channel 243A at Biltmore Forest, North Carolina*

Because I do not believe the record justifies reversing both the F.C.C. Review Board ("Review Board") and the F.C.C. Administrative Law Judge ("ALJ") who held the hearing and heard the witnesses in this matter, I respectfully dissent. I write separately because the majority's decision renders our rule against misrepresentation by a licensee almost unenforceable by requiring direct proof of intent to deceive.[1]

### I. Procedural History

The ALJ held a trial-type hearing lasting 8 days.[2] The ALJ framed the issue:

> To determine whether Liberty has made misrepresentations to the Commission about the proposed transmitter site's availability, and, if so, what impact that has on Liberty's basic qualification to be a Commission licensee.[3]

The factual dispute arose from a conversation between the landowner of the tower site, and two witnesses for Liberty. At the hearing, Liberty's two witnesses Valerie Klemmer and Tim Warner testified about the meeting with the site owner.[4] Liberty subpoenaed the site owner, Ms. Vickey Utter, but declined to enforce the subpoena, instead relying on her deposition and sworn statements.[5] Following the proceeding the parties submitted findings of fact and conclusions of law.[6] After hearing from Liberty's witnesses, the ALJ rejected their testimony stating:

> When Valerie Klemmer certified to the Commission that Liberty had a transmitter site, she had absolutely no basis

[1] *See e.g. American Communications Ass'n v. Douds*, 339 U.S. 382, 411 (1950) (noting that "courts and juries every day pass upon knowledge, belief and intent ... having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred").
[2] *In re Applications*, 5 FCC Rcd. 2862, 2863 (1990)
[3] *Id.*
[4] *Id.* at 2866-67; 2879; *see also Memorandum Opinion and Order*, at para. 55.
[5] *See Memorandum Opinion and Order*, at n75.
[6] *See In re Applications*, 5 FCC Rcd. at 2863.

> for doing so. Moreover, she knew she had no basis for so certifying.[7]

After the ALJ's adverse disposition, Liberty sought relief from the Review Board.[8] The Review Board affirmed the ALJ stating:

> The ALJ found that Liberty never had reasonable assurance that the site which it specified in its application was available, and that its *principal falsely certified that the transmitter site was available because, "she had absolutely no basis for doing so.* Moreover she knew she had no basis for so certifying." His findings and conclusions were based on the verified statements and deposition testimony of the site owner. Her testimony was in turn corroborated by the fact that other applicants who has sought permission to use her land were required to enter into a written lease.[9] (emphasis added)

The Review Board went on to conclude that Liberty's two witnesses supported, rather than controverted the ALJ's findings, stating:

> Like the ALJ, we find no reason in the record to reject the firm denial of the site owner that she had ever given assurance to Liberty that the property would be available, especially where twice before she had insisted on written agreements.[10]

Following a remand from the D.C. Circuit for reasons unrelated to the merits of this dispute, the matter ultimately came before the Commission. The majority reverses because, "we find that substantial evidence in the record does not support the ALJ's conclusion that the certification was deliberately false."[11] The majority supports this conclusion saying, "no probative evidence of intentional deceit," exists and by relying on the failure of the ALJ to make a "specific finding addressing the credibility" of Klemmer and Warner, Liberty's witnesses.[12] The majority thus reaches a different conclusion than the ALJ who heard the testimony, and the Review Board that examined the entire record.

---

[7] *See In re Applications*, 5 FCC Rcd. at 2867; *see also Id.* at 2879 (ultimate conclusion of law).

[8] *See In re Applications II*, 6 FCC Rcd.1978 (1991).

[9] *Id.* at 1979.

[10] *Id.*

[11] *Memorandum Opinion and Order*, at para. 57.

[12] *Memorandum Opinion and Order*, at para. 72.

## II. Substantial Evidence Exists that Liberty Falsely Certified the Availability of the Tower Site and is Unqualified to be an F.C.C. Licensee.

*De novo* review is not trial *de novo.* Thus, while *de novo* review authorizes a review of the whole record without deference to facts found by the ALJ, there can be no doubt that our law universally favors disposition of questions of credibility or motive by the person or body that hears the testimony. *De novo* review in the instant case means we must consider whether the challenged outcome was based on a consideration of the relevant factors, whether there is record evidence to support the disposition and whether there has been a clear error of judgment. While this inquiry must be searching and careful, a hearing on the merits before an ALJ should be, "the 'main event,' and not simply a 'tryout on the road' to appellate review."[13]

Here, the property owner swore she did not give any assurance whatsoever to Ms. Klemmer that the property would be leased to Liberty. If credited by the factfinder, this fact alone is substantial evidence sufficient to sustain the adverse determination against Liberty. Moreover, as the Review Board noted, the rejection of Ms. Klemmer and Mr. Warner's testimony is supported, rather than controverted by the record. The sworn testimony of Ms. Utter was not undermined by extrinsic evidence and was actually supported by the submission of an existing written lease with Liberty's competitor, Orion. The lease was probative of the fact that Liberty did not receive the type of site availability assurance Ms. Utter knew how to give, and in fact had given to Orion. As found by the ALJ and the Review Board, there is substantial evidence that Liberty's witness, Ms. Klemmer, knew the representations she made to the Commission regarding the availability of Ms. Utter's land were simply false.

### A. The Majority Errs When it Holds No Probative Evidence of Licensee Deceit Exists in this Record.

Despite the existence of "admittedly troublesome" documentary evidence, and a "direct conflict" between the testimony of the site owner and Liberty's witnesses, the majority makes the surprising claim that the record contains no "probative evidence" of deceit by Liberty.[14] "Probative evidence" has an evidentiary meaning quite distinct from that which the majority attributes to it.[15] Careful examination of paragraphs 58-72 of the majority's opinion discloses not a lack of probative evidence but instead a complete reweighing of the evidence and testimony presented. While perhaps permissible, such reweighing is not advisable. The majority's review of the record proves too much. It is

---

[13] *Freytag v. Commissioner,* 501 U.S. 868, 895 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

[14] *See Memorandum Opinion and Order* at para. 71 ("admittedly troublesome"); para. 66 ("direct conflict").

[15] "'Probative value' addresses the tendency of the evidence to establish a 'material' proposition." *U.S. v. Bagley,* 473 U.S. 667, n.5 (1985) (Marshall, J. dissenting)(citing E. Cleary, McCormick on Evidence § 185 (3d ed.1984)); *See also* 1 J. Wigmore, Evidence § 2 (P. Tillers rev.1982).

precisely material inconsistencies and contradictions in and between the evidence and testimony that is sufficient to support adverse credibility determinations.[16]

### B. The Majority Errs When it Requires Direct Evidence of Intent to Deceive.

The most troubling aspect of the majority's approach is its conflict with our cases on the quantum of evidence necessary to find misrepresentation by licensees. It is well settled that, "intent to deceive" is a necessary element of proving misrepresentation or lack of candor in FCC proceedings.[17] The evidence reviewed by the ALJ and the Review Board is more than sufficient to support the finding that Liberty did misrepresent the site's availability *and* intended to deceive the Commission. The D.C. Circuit has said,

> [T]he fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity [is] enough to justify a conclusion that there was fraudulent intent.[18]

Applying the D.C. Circuit's logic, the majority's preference for an explicit finding that Liberty's witnesses lied, instead of the existing finding that Liberty's witnesses had no basis for their representations to the Commission, is a distinction without a difference. But, it has the unfortunate effect of suggesting the Commission will not find intent to deceive unless there is a smoking gun. Questions of credibility, motive and state of mind are almost universally resolved by reasonable inferences from direct and circumstantial evidence. The D.C. Circuit has said, "[I]n almost any claim involving motive, a [civil] defendant's state of mind is typically established by circumstantial evidence because of the difficulty in obtaining direct evidence of motive."[19] This general understanding also

---

[16] *See e.g. S&L Communications v. FCC*, 168 F.3d 1354, 1355 (1999)(affirming FCC decision without explicit credibility findings on each witness, "The ALJ rejected as "sheer fabrication"--a "web of lies," as he also put it--the contrary testimony of three S&B witnesses, including Schulze."); *Saballo-Cortez v. INS*, 761 F.2d 1259, 1264 (9th Cir.1984); *de Leon-Barrios v. INS*, 116 F.3d 391, 393 (9th Cir.1997).

[17] *See Swan Creek Communications*, 39 F.3d 1217, 1222 (D.C.Cir. 1994); *Fox River Broadcasting, Inc.*, 93 F.C.C.2d 127, 129 (1983).

[18] *Leflore Broadcasting. Co., v. FCC*, 636 F.2d 454, 462 (1980).

[19] *Kimberlin v. Quinlan*, 6 F.3d 789, 808 (1993); *see also United States v. Jackson*, 513 F.2d 456, 461 (D.C.Cir.1975) (footnotes omitted); *see also United States v. Bank of New England, N.A.*, 821 F.2d 844, 854 (1st Cir.) ("Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts."), *cert. denied*, 484 U.S. 943 (1987); *Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir.1984) ("Because intent is formed in the mind in secrecy and silence ..., a determination of whether a deliberate intent was formed must be drawn from all the circumstances of the case. Circumstantial evidence of this subjective fact is therefore indispensable."); *United States v. Pope*, 739 F.2d 289, 291-92 (7th Cir.1984) ("Proof of the requisite state of mind need not be by direct evidence; it may be inferred from the surrounding facts and circumstances."); *United States v. Hudson*, 717 F.2d 1211, 1213 (8th Cir.1983) ("Willfulness, intent and guilty knowledge may also be proven by

applies in criminal cases, where the burden of proof is considerably higher than in a civil action.[20]

If circumstantial evidence and inferences therefrom suffice to prove intent beyond a reasonable doubt in criminal trials, it should certainly satisfy this Agency's standard in a civil licensing matter. Construing the record before us as lacking "probative evidence" on the question of deceit amounts to calling for a record that contains a confession of intent to deceive or requiring the Commission find direct evidence of deceit. This is a nearly impossible burden to put on the F.C.C.'s bureaus and judges and renders the bar on misrepresentation unenforceable except in the most extreme cases. It would also have the effect of requiring more evidence of deceit at the pleading stage at the F.C.C. than is required to win a Title VII case or convict a defendant at trial in Federal court.

### C. The Majority Errs when it Requires the ALJ to Enter Findings Stating Witnesses Lack Credibility Prior to Making Adverse Rulings if the Credibility Determinations are Implicit in the Adverse Ruling.

The ALJ found Liberty's arguments, "strained credulity."[21] The majority concluded this finding, together with the ALJ's finding that Liberty lacked "any basis" for certifying the site's availability did, "not constitute credibility findings."[22] The majority's conclusion, that the absence of an express finding regarding the credibility of Liberty's witnesses weakens the ALJ's ultimate disposition, is unsupported by any citation to a rule or case that requires that an ALJ enter an express finding regarding witness credibility.[23] While such findings may be preferred, the majority should not create such a duty out of thin air.

---

circumstantial evidence and frequently cannot be proven in any other way."); *United States v. Childs*, 463 F.2d 390, 392 (4th Cir.) ("Intent is not susceptible of direct proof; it must be proved by circumstances.") (footnote omitted), *cert. denied*, 409 U.S. 966, 93 S.Ct. 271, 34 L.Ed.2d 232 (1972); 2 Charles A. Wright, FEDERAL PRACTICE AND PROCEDURE § 411 (2d ed. 1982) ("Though circumstantial evidence is used in virtually every criminal case, there are certain kinds of cases and issues on which it is almost indispensable, because it is so unlikely that direct evidence will be available. These include such matters as the existence of a conspiracy, criminal intent, or other issues involving state of mind.") (footnotes omitted); 2 John H. Wigmore, EVIDENCE IN TRIALS AT COMMON LAW §§ 242, 244, 245 (Chadbourn rev. 1979) (intent, knowledge, belief, and state of mind may be evidenced by external circumstances and the defendant's conduct).

[20] *See generally, Kimberlin v. Quinlan; see also United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir.1986) (same); *United States v. Harris*, 558 F.2d 366, 369 (7th Cir.1977) (same); *United States v. White*, 557 F.2d 233, 236 (10th Cir.1977) (per curiam) (same).

[21] *In re Applications*, 5 F.C.C.Rcd. at 2879.

[22] *Memorandum Opinion and Order*, at para. 56.

[23] The majority seems to be calling for a rule like that used in the immigration asylum context, where factfinders must explicitly enter findings on witness credibility prior to making an adverse determination on a petition. *See e.g. Garcia- Ramos v. INS*, 775 F.2d 1370, 1374-75 (9th Cir.1985); *Argueta v. INS*, 759 F.2d 1395, 1397-98 (9th Cir.1985).

Only the ALJ can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the Commission may well find error even in a finding purportedly based on a credibility determination.[24] But when an ALJ's finding is based on a decision to credit testimony that tells a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can almost never be error.

I am at a loss to explain how the ALJ's rejection of Liberty's testimony and explicit finding that its position on the evidence, "strained credulity," can be held to be an inadequate credibility finding.[25] The strongly worded findings and conclusions entered by the ALJ, and affirmed by the Review Board, leave no doubt that Liberty's witnesses were not only lacking in credibility, but were disbelieved and thought to have testified falsely. It is an inescapable inference from the ALJ's findings and conclusions entered that any credibility issues were resolved against Liberty.

**Conclusion**

The majority opinion constitutes an unwise use of our *de novo* review power. *De novo* review is not for the purpose of retrying the matter. While the site owner may not have testified at the hearing, the ALJ did hear from two of three key witnesses. The majority has thus exchanged a result that turned on credibility assessments made by a judge, who heard the testimony from two of three witnesses, for a result made by four Commissioners who did not hear from a single witness. Surely the ALJ is better positioned than this Commission to decide the issue in question.[26] The majority's disposition does not reduce the likelihood of erroneous deprivation of rights in the future nor does it prescribe improved due process in the future. Thus it does not comport with the usual purpose of *de novo* review, which is to clarify the application of legal standards to facts.

Direct conflicts in sworn testimony, and documentary evidence surely constitutes "probative evidence." A finding that Liberty had, "no basis," for its certification to the

[24] *See, e.g., United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948)(reversing trial court because documentary evidence outweighed credibility determinations).

[25] *See e.g. Anderson v. Sullivan*, 914 F.2d 1121 (9th Cir. 1990)(rejecting claim that administrative factfinder must make explicit findings in absence of rule compelling such findings); *United States v. Mastropierro*, 931 F.2d 905, 906 (D.C.Cir.1991)(holding agency must apply and consider relevant factors rather than list findings on each factor to be in compliance).

[26] *See e.g. Miller v. Fenton*, 474 U.S. 104, 114 (1985)(noting deference is owed to the judicial actor best positioned to decide the issue in question.).

Commission and that its argument. "strained credulity." is sufficiently clear to constitute any necessary credibility determination. The Commission. after expending its ALJ resources in a week long hearing. should be reluctant to substitute its own view of the facts in the absence of a wildly implausible result. Here, the majority sends the wrong enforcement message to licensees and wrong procedural message to its judges. The ALJ's findings and conclusions. as affirmed by the Review Board. are not implausible and should be affirmed.