No. 07-316C
(Judge James E. Merow)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BILTMORE FOREST BROADCASTING FM, INC.,

Plaintiff

v.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

DONALD J. EVANS
RAYMOND J. QUIANZON
Fletcher, Heald & Hildreth, P.L.C.
1300 North 17th Street, 11th Floor
Arlington, VA 22209
Tel: 703-812-0400
Fax: 703-812-0486

Attorney for Plaintiff

September 14, 2007

## TABLE OF CONTENTS

| | | PAGE(S) |
|---|---|---|
| TABLE OF AUTHORITIES | | ii |
| I. | COUNTERSTATEMENT OF THE CASE | 2 |
| II. | ARGUMENT | 5 |
| | A. The FCC Auction Process Establishes A Contractual Relationship | 5 |
| | B. The FCC Must Be Held To The Terms Of Its Contract | 6 |
| III. | THE COURT OF CLAIMS AND THE D.C. CIRCUIT CAN BOTH HAVE EXCLUSIVE JURISDICTION OVER DISTINCT ASPECTS OF THE MATTER AT ISSUE | 7 |
| IV. | DIFFERENCE BETWEEN THIS CASE AND THE FCC LICENSING PROCEEDING | 10 |
| V. | THE INAPPLICABILITY OF *FOLDEN* | 13 |
| VI. | CONCLUSION | 16 |

## TABLE OF AUTHORITIES

**PAGE(S)**

### CASES

*Bell Atlantic Telephone Companies v. FCC*
24 F.3d 1441, 1444-5 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 8

*Barclay v. United States*
333 F.2d 897 (C.C. Cir., 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cellco Partnership v. United States*
54 Fed. Cl. 260 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Erie Coke and Coal v. U.S.*
266 U.S. 518, 520 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*FCC v. Nextwave Personal Communications, Inc.*
537 U.S. 392 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Folden v. United States*
59 Fed. Cl. 43, 51-55 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Folden v. United States*
379 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Implementation of Section 309(j) of the Communications Act*
14 F.C.C.R. 8724, 8732-3 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*McKay v. Wahlenmaier*
226 F.2d 35 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Metromedia Company*
1 F.C.C.R. 1227 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mobile Oil Exploration & Producing Southeast, Inc. v. United States*
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Notice and Filing Requirements for Auction of AM, FM, TV, LPTV and FM and TV Translator Construction Permits*
14 F.C.C.R. 10632 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Portland Cement Association v. Ruckelshaus*
486 F.2d 375 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Presault v. ICC*
494 U.S., 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Punxsutawney Communications, LLC*
DA 07-3803, rel. by FCC, August 30, 2007 . . . . . . . . . . . . . . . . . . . . 5

*Spectrum Leasing Corp. v. U.S.*
764 F.2d 891 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 12

*Superior Oil Co. v. Udall*
409 F.2d 1115 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sturm v. United States*
412 F.2d 723, 727 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Transamerica Access Policy Study Group v. FERC*
225 F.3d 667, 607 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*United States v. L.A. Tucker Truck Lines*
334 U.S. 33, 37 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Winstar Corp.*
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Wisconsin Valley Improvement v. FERC*
236 F.3d 738 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

**STATUTES**

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1491(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

47 U.S.C. §§ 207-209 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 11

47 U.S.C. § 307(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 309(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 U.S.C. § 402(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

## REGULATIONS


47 C.F.R. § 1.2101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 C.F.R. § 1.2104(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 C.F.R. § 1.2105(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

47 C.F.R. § 1.2109(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 C.F.R. § 73.5001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BILTMORE FOREST BROADCASTING FM, INC., Plaintiff, | ) | |
| v. | ) | No. 07-316C (Judge James E. Merow) |
| THE UNITED STATES, Defendant. | ) | |

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Plaintiff Biltmore Forest Broadcasting FM, Inc. ("Biltmore") hereby opposes the motion of the United States to dismiss Biltmore's complaint or be granted summary judgment. The nub of the government's motion is that Biltmore is raising here "exactly the same issues" as those which arose in connection with the Federal Communications Commission's ("FCC's") licensing proceeding for the radio station at issue. As will be shown below, the issues raised here are not only *not* "exactly the same" as in the earlier case, but in fact they involve an entirely different factual analysis, a different standard of construction, a different standard of review, and must be raised in a different court under a different governing statute. For these reasons, <u>none</u> of the issues raised here were presented to either the FCC or the Court reviewing the FCC's licensing decision, nor could they have been. And given that, the matters raised here have obviously not been either considered or decided by any other forum. This Court is the proper and only forum to consider whether the FCC has breached a contract with Biltmore. Dismissal of the suit

would leave Biltmore with no possible remedy for the damages caused by the government's breach.

## I. COUNTERSTATEMENT OF THE CASE

In 1997, Congress authorized the FCC for the first time to award broadcast licenses by a "system of competitive bidding" otherwise known as an auction. 47 U.S.C. Section 309(j). The FCC established general rules to govern the auction process, as well as rules for each service for which licenses were to be auctioned and rules that specifically apply to each individual auction. The general auction rules are set forth at 47 C.F.R Section 1.2101, *et seq*. and the rules specific to broadcast licenses are found at 47 C.F.R. 73.5001, *et seq*. These rules, along with the auction-specific rules for particular auctions, establish a regime for awarding licenses under which the highest qualified bidder is both required to pay the amount bid and is entitled to the license upon payment of the bid amount (assuming it is not otherwise unqualified). See Sections 47 C.F.R. 1.2104(g)(2) ("A bidder assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of the auction.") and 1.2109(a) ("Licenses will be awarded upon the full and timely payment of winning bids and any applicable late fee.")

The FCC's auction process, while highly stylized and now conducted via electronic bidding, is no different in principle from the auction of a prize bull: as long as a bidder complies with the stated terms of the auction, the high bidder is required to pay the amount he bid, and the seller is required to sell the item at that price. That is the implied and enforceable contract among the buyers and seller in any auction, and the FCC routinely asserts its right to enforce the auction contract by compelling winning

bidders to pay their wining bids (plus penalties). Plaintiff will prove that in this case it was the FCC which breached its obligations under the auction contract by failing to grant the license for the radio station to the highest qualified bidder under the stated terms of the auction, and it must therefore pay the appropriate damages.

For purposes of this Motion to Dismiss, the Court need not determine that there was indeed a contract – that is the ultimate issue for resolution – but it should understand clearly the claim that is being made and why the case is being brought in this Court. Briefly, the rules applicable to this particular FCC auction for a radio station license for Biltmore Forest, North Carolina were set forth in an FCC public notice issued a few weeks before the auction process was to begin. *Notice and Filing Requirements for Auction of AM, FM, TV, LPTV, and FM and TV Translator Construction Permits Scheduled for September 28, 1999.* 14 F.C.C.R. 10632 (1999) ("July 9 Public Notice"). This public notice set out various requirements for participation in the auction, including the submission of short-form applications including information about the bidding parties. The notice expressly required potential bidders to submit a certification regarding the other media interests held by relatives of their principals,[1] and further expressly provided that failure to supply any required information by a date certain would result in the dismissal of the application

---

[1] "[B]idders or attributable interest holders in bidders must certify under penalty of perjury that the bidder complies with the Commission's policies relating to the media interests of immediate family members." (July 9 Public Notice at Attachment B, pp. 3-4. "Bidders must certify (in Exhibit A) compliance with the Commission's policies relating to media interests of immediate family members." (July 9 Public Notice at p.10.)

and inability to participate in the auction.[2] The FCC's rules further provided that the application could not be amended to correct such defects after the date certain.[3]

One of the potential bidders in the auction, Liberty Productions, L.P. ("Liberty"), failed to submit this required family media certification. The FCC apparently overlooked this omission prior to the auction, but the auction rules precluded other applicants from raising this defect at that point. (The FCC has consistently ruled that it will not entertain challenges to other bidders at the pre-auction stage since the defective applicant might not win the auction and the inquiry would have been unnecessary. *Implementation of Section 309(j) of the Communications Act*, 14 F.C.C.R. 8724, 8732-3 (1999)). Biltmore noticed this bar to Liberty's eligibility to participate in the auction and assumed the FCC would enforce the stated auction eligibility criterion if and when Liberty was the high bidder. Inevitably, the auction came down to two bidders, Biltmore and Liberty. Biltmore recognized that Liberty was ineligible to be participating at all, yet every additional bid placed by Biltmore raised the ante another couple of hundred thousand dollars. Accordingly, Biltmore stopped bidding in the confidence that it was the highest qualified bidder under the stated ground rules of the auction. Biltmore promptly pointed out to the FCC after the auction that Liberty was ineligible to participate. The FCC

---

[2] **"Failure to submit required information by the resubmission date will result in dismissal of the application and inability to participate in the auction**." (*Id.* At Attachment B, p. 2) (Bold type in original)

[3] 47 C.F.R. 1.2105(b)(1): "Any short form application … that does not contain all of the certifications required by this section is unacceptable for filing and cannot be corrected subsequent to the applicable filing deadline." Subsection (b)(2) of that rule, relied on by the government here, provides that the "Commission will provide bidders with a limited opportunity to cure defects specified herein (except for failure to sign the application *and to make certifications*) and to resubmit a corrected application." (Emph. added.) Since the particular defect involved here was a failure to make a certification -- one of the two expressly carved out categories of defect which were uncorrectable -- it is unclear why the government feels that this rule allowed a post-auction correction.

thereupon ruled that the mandatory eligibility criteria announced before the auction were mere "admonishments" and it permitted Liberty to correct the defect. The FCC then awarded the license to Liberty. It is this breach of the auction contract between Biltmore and the FCC for which Biltmore seeks compensation in this Court.

## II. ARGUMENT

### A. The FCC Auction Process Establishes A Contractual Relationship

The contract between Biltmore and the FCC, though it contained a number of quirks peculiar to FCC license proceedings, was neither arcane nor unusual. As in any auction arrangement, a commodity was offered to bidders who successively placed higher and higher bids, with the highest qualified bidder being both obligated to pay for, and entitled to receive, the license at the high bid. The mutual obligation imposed by the auction contract is an extremely common and time-honored method of buying and selling commodities which is routinely enforced by all civil courts, including this one. See, for example, *Barclay v. United States*, 333 F.2d 897 (C.C. Cir. 1964). It should be stressed that the FCC routinely treats the obligations of a winning bidder at its auctions as a contractually binding commitment from that bidder. See, for example, *Punxsutawney Communications, LLC,* DA 07-3803, rel. August 30, 2007. (Copy attached for convenience). The FCC assesses certain penalties prescribed by the auction rules and then vigorously pursues collections actions to enforce its right to the debt owed to the United States. The *Punxsutawney* case is just one of a host of cases in which the FCC has relentlessly pursued winning auction bidders who defaulted to recover the amount of the winning bid. In the context of the present case, had Biltmore been the high bidder,

there is no question that the FCC could and would have scrupulously held it to its obligation to pay the amount bid at the auction.

The basic premise of this suit is simply that the obligations arising from an auction run both ways: the high bidder must pay the high bid, but the auctionor must sell to the highest qualified bidder under the stated auction terms. This is consistent with the longstanding holding of the Supreme Court: "The terms and conditions of [a government auction sale], as set forth in the advertisement, were binding alike upon the United States and the bidders. *Erie Coke and Coal v. U.S.*, 266 U.S. 518, 520 (1925).

**B. The FCC Must Be Held To The Terms Of Its Contract**

This case is strikingly similar to the situation presented in *McKay v. Wahlenmaier*, 226 F.2d 35 (D.C. Cir. 1955). There the Secretary of the Interior had conducted a public drawing for certain oil and gas rights on public land pursuant to a public notice and pertinent rules. The public notice required applicants to include an affidavit disclosing any interest held indirectly in other applications for leases. The winning applicant, it turned out, had failed (among other things) to include in his application this affidavit. The Secretary nevertheless granted his application and entered into the lease because the defect was not noticed until after the drawing. The Secretary also indicated that the error was harmless because, even if the disclosure had been made, the applicant would have been within the lease ownership limits prescribed by law. The second-place applicant appealed the Secretary's action administratively and then in court. The Court held that since the application lacked the required disclosure, it was defective under the departmental regulation and should not have been allowed to be included in the drawing.

The Secretary's refusal to cancel the lease had unjustly deprived the second-place applicant of his right to the lease. *Id.* at 41.

A similar principle was later followed in *Superior Oil Co. v. Udall*, 409 F. 2d 1115 (D.C. Cir. 1969). There the high bidder for an oil lease had failed to include the required signature in its sealed bid. The Secretary of the Interior nevertheless wanted to forgive the defect or hold a new bidding proceeding so that the government could maximize its take on the oil leases. The Court disagreed in terms which apply directly to the case at hand:

> It is also very important that bidders who comply faithfully and scrupulously with bidding regulations should not in effect be penalized by the errors of less careful bidders who fail to follow correct procedures . . . The requirement of steadfast compliance with competitive bidding procedures comports best with the need to promote the integrity of the bidding process. Although such a stance may entail some limitation on the Secretary's discretion, it seems clear that this is an indispensable ingredient to the maintenance of the competitive bidding processes which will engender public confidence and that of persons dealing with the government.

*Id.* at 1121.

## III. <u>THE COURT OF FEDERAL CLAIMS AND THE D.C. CIRCUIT CAN BOTH HAVE EXCLUSIVE JURISDICTION OVER DISTINCT ASPECTS OF THE MATTER AT ISSUE</u>

It is undisputed that the Court of Federal Claims has exclusive jurisdiction over contract claims against the United States over $10,000. 28 U.S.C. 1491(a)(1). It is also undisputed that the United States Court of Appeals for the District of Columbia Circuit has exclusive jurisdiction over licensing decisions of the FCC. 47 U.S.C. 402(b). These distinct jurisdictions can co-exist in perfect harmony, as the D.C. Circuit has itself repeatedly noted. In *Wisconsin Valley Improvement v. FERC*, 236 F.3d 738 (D.C. Cir. 2001), for example, the D.C. Circuit reviewed the administrative action of a federal

agency which had attached onerous conditions to its renewal of a license for a hydroelectric dam. The Court found that FERC's action in imposing the conditions was perfectly lawful as an administrative licensing action, even though it might constitute a compensable taking over which the D.C. Circuit had no authority to rule. The aggrieved dam company was invited to take its claim to the Court of Federal Claims. The fact that a licensing decision was administratively proper did not preclude the subsequent recovery of damages in a Court of Federal Claims suit. Similarly, in *Transamerica Access Policy Study Group v. FERC*, 225 F.3d 667, 670 (D.C. Cir. 2000), the circuit court reviewed the lawfulness of the agency's action under the Administrative Procedures Act, noting that if the result of the agency action was a 5th Amendment taking, the claimant could go to the Court of Federal Claims for relief once the agency proceeding was over. See also *Bell Atlantic Telephone Companies v. FCC*, 24 F.3d 1441, 1444-5 (D.C. Cir. 1994).

These cases confirm that administrative agencies can take licensing actions, as the FCC did in this case, which can be deemed reasonable and lawful within the agency's statutory charge. The agency's actions may withstand review for arbitrariness and capriciousness. However, the fact that an agency action may be lawful as a licensing matter does not immunize the agency from liability on other grounds, whether for a 5th Amendment taking or damages for breach of contract. As noted by the Court in *Bell Atlantic*, *supra* at note 2, "the *Tucker Act* remedy is presumed available unless Congress has explicitly foreclosed it by another enactment, *Presault v. ICC*, 494 U.S. at 12, 110 S. Ct. at 922, and nothing in the Communications Act does so." Indeed, the D.C. Circuit expressly invited petitioners aggrieved by licensing decisions who incur money damages based on takings claims to go to the Claims Court for relief after the licensing decision

has been upheld. That is precisely the course pursued by Plaintiff here: the FCC made a licensing decision which has been finally found to be lawful by the appropriate appellate courts; now it must contend with the fact that its licensing decision breached a contract it had entered into, a claim which can only be pursued in this Court.

That is what the *Winstar* case was all about. *United States v. Winstar Corp.*, 518 U.S. 839 (1996). There entities acquiring savings and loans institutions contracted with the Federal Home Loan Bank Board to ensure that good will would be treated as an asset which could be counted toward capital reserve requirements imposed on such institutions. Congress later changed the law to eliminate reliance on such assets toward the capital reserve, causing the affected thrifts to fall out of compliance with the new regulations implementing the statute. The Supreme Court held that, while Congress was free to change the regulatory paradigm governing regulated parties such as thrifts, it could not thereby escape the contractual obligations the federal government had incurred by promising, in effect, that the regulatory scheme would not change. *Mobile Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000) is in accord. There too a federal agency had contracted with private parties to permit offshore oil exploration in designated areas so long as the companies complied with the existing regulatory regime governing such exploration and obtained the permits required by that regime. Again, Congress changed the law to preclude the issuance of permits which would have been issuable under the pre-existing regime. Again, the Supreme Court held that the government was bound by its contract; the fact that regulatory considerations changed its willingness to issue the permits could not abrogate its contractual commitments.

These cases teach that the government is always free to pursue its regulatory objectives and goals in what it views as the public interest. Here, for example, the FCC was able to get a higher price for the auctioned license by permitting Liberty to place bids on the license, even though it had been disqualified under the stated rules. (No other conceivable public interest reason appears for the FCC's action.[4]) The FCC had the power to do that, but at the same time *Winstar* requires that, when the FCC has entered into a contract binding itself to abide by the auction rules, it must pay damages to the aggrieved party.

## IV. DIFFERENCE BETWEEN THIS CASE AND THE FCC LICENSING PROCEEDING

The government insists that the issues arising in this case are exactly the same as those which arose in connection with the licensing proceeding. The fundamental error of that assertion can be seen by examining the critical distinctions in this cause of action from the earlier proceedings.

1. The administrative proceedings associated with the FCC's license award were based entirely on whether the grant of the license to Liberty was in the public interest, since the "public interest, convenience and necessity" are the sole criteria for awarding licenses. 47 U.S.C. 307(a). Whether or not the FCC had contractually bound itself to issue the license to Biltmore was not an issue in the proceedings since, at the most fundamental level, the FCC's decision was not grounded in its contractual obligation but rather in its public interest mission. The facts relevant to the inquiry in this

[4] Biltmore is owned by a distinguished pioneer broadcaster with long roots in the Biltmore Forest community, while Liberty was owned by a woman with no broadcast experience whatsoever who had already been found by the Administrative Law Judge to have dissembled under oath about key aspects of her proposal.

court – offer, acceptance, consideration, damages – arise out of contract law and had no place in the FCC proceedings or subsequent appeals.

2. For that reason, neither Biltmore nor any other party alleged that the auction constituted a contract between the Commission and Biltmore. The FCC is not empowered or competent to rule on civil contractual claims. Since those issues were never presented to the FCC, they obviously were not and could not have been presented to the DC Circuit on appeal. *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952), *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973).

3. Since the FCC was itself a party to the contract, it could hardly have been the arbiter of whether a contract existed and whether it had breached that contract, thus subjecting itself to damages. Nor is the FCC empowered to award damages other than for claims against common carriers. See 47 U.S.C. §§ 207-209. See also *Metromedia Company*, 1 F.C.C.R. 1227 (1986) (The FCC does not "adjudicate claims arising out of private contractual agreements.") A breach of contract claim could only be brought outside the FCC process in a forum with jurisdiction and competence to consider and rule on the issue.

4. Under ordinary principles of contract law, any ambiguity in a contract is construed against the drafter – here the FCC. *Sturm v. United States*, 412 F.2d 723, 727 (Ct. Cl. 1970) Although Biltmore asserts that the terms of the auction contract were entirely clear, to the extent there is any room at all for interpretation, the ambiguity would go against the FCC. In the administrative licensing proceeding, however, the Court of Appeals' decision hinged on its extreme deference to the FCC's interpretation of its own rules, despite the apparent conflict of those rules with the FCC's action.

5. The D.C. Circuit generally disclaims any jurisdiction to consider claims against the United States for money damages in excess of $10,000. See, for example, *Spectrum Leasing Corp. v. U.S.*, 764 F.2d 891 (D.C. Cir. 1985). It therefore would not have entertained any claim by Biltmore that a contract existed, and no such claim was made to that court. Indeed, we may presume that had Biltmore argued to the court that a contract existed, the court would have responded as it did in the *Wisconsin Valley* and *Transamerica Access* cases, *supra*: the agency's licensing decision is affirmed, but you can take your claim for money damages resulting from that decision to the Court of Federal Claims.

6. Review of the FCC's license award was based on the principles of judicial review set out in the Administrative Procedure Act. 5 U.S.C. 706(2). As noted above, the D.C. Circuit gives considerable deference to the FCC's decision making process, since the agency is expert in its relevant field. In a contract dispute involving the FCC, however, the reviewing court would not treat the FCC as an expert in contract matters. The review would therefore be far more evenhanded as between the litigant parties.

There are therefore two very distinct juridical paradigms at work here. The issue of whether the award of the FCC license was lawful – *i.e.*, not irrational, arbitrary, capricious, or otherwise in conflict with law – has already been made and finally affirmed. The second paradigm – whether the FCC's award nevertheless breached a contract between the FCC and Biltmore – is what the instant case is intended to address. Biltmore is not seeking and is not expecting the license as a result of this suit; it is seeking only the difference between its high bid and the value of the license as money damages.

## V. THE INAPPLICABILITY OF FOLDEN

In *Folden v. United States*, 379 F.3d 1360 (Fed. Cir. 2004), the Federal Circuit considered a claim by a group of applicants that the FCC had breached a "contract" with them to hold a lottery for the assignment of certain cellular licenses. In that case, plaintiffs argued that because the FCC had originally announced its intention to hold a lottery, and they had submitted lottery applications in anticipation of the lottery, the FCC was thereby contractually bound to proceed with the lottery. The Court of Federal Claims ruled that there was no implied-in-fact contract under those circumstances: the FCC was free to change its license awarding procedures as it saw fit and it had never bound itself to conduct a lottery. *Folden v. United States*, 59 Fed. Cl. 43, 51-55 (2003). The analog here would be if the FCC had announced its intention to hold an auction but then cancelled it before the auction began. Surely the *Folden* court would have looked at the matter differently if, as here, the FCC had actually conducted a lottery according to prescribed rules, selected the winning applicant's ball, and then decided to award the license to someone else. Here the existence of an implied-in-fact contract is apparent on the very face of the arrangement.

To be sure, in *Folden* both this court and the Federal Circuit ruled that jurisdiction to review the FCC's licensing decisions was exclusively within the province of the D.C. Circuit under Section 402(b) of the Communications Act. As we have seen above, however, the courts have consistently ruled that while the D.C. Circuit has exclusive jurisdiction over licensing issues, that circumstance does not defeat the jurisdiction of the Court of Federal Claims to consider monetary claims against the government which arise

out of licensing proceedings. That rule of law is both logical and a practical necessity. Let us consider several examples.

We have seen that the D.C. Circuit acknowledges that the FCC's licensing decisions may raise takings issues under the 5th Amendment which may be redressed at the Claims Court even if the licensing decision is upheld. Any other rule would create the unconstitutional anomaly of the FCC being able to lawfully take private property without any recourse in any court. So of course there must be jurisdiction in this Court to consider the takings claim despite the D.C. Circuit's exclusive jurisdiction over licensing matters.

Similarly, in *Cellco Partnership v. United States*, 54 Fed. Cl. 260 (2002), this court took jurisdiction over a contract dispute between an auction winner and the FCC. The FCC had required the winner to pay billions of dollars for the licenses in issue but then had refused for several years to grant the licenses. Although the case was eventually mooted by the return of the auction payments, this court noted that the D.C. Circuit could decide that it did not have jurisdiction over the contract claim by the plaintiffs (who were simultaneously seeking relief from that court). It also noted that the D.C. Circuit had no jurisdiction to award money damages. *Id.* at 261-263. One can see how this ruling was a practical necessity: absent jurisdiction in some court to provide redress for the FCC's breach of its auction contract, the FCC could simply hold on to billions of dollars in contravention of its contractual obligation, inflicting enormous financial damage on the other party to the contract. Since the D.C. Circuit would have no jurisdiction, there would be nowhere for the injured party to turn for relief. Congress cannot possibly have intended for the FCC to be immune from monetary liability under circumstances where

every other federal agency and every private party would be liable for damages. While the dollar amount here is only in the low millions, the principle that the FCC should not be immune from liability for misconduct in the course of a "licensing" proceeding still stands.

We may consider yet a third circumstance. It has been alleged in pending proceedings at the FCC that the Commission has routinely been violating the debtor protection provisions of the Uniform Commercial Code in connection with its installment payment procedures for various licenses. Such activity would normally subject the Commission as a creditor to monetary damages in civil court. Similarly, suppose the FCC entered into a confidentiality agreement with an applicant in the course of a licensing proceeding and then violated the agreement by disclosing the confidential information to the financial detriment of the applicant. The fact that the misconduct occurs in connection with the FCC's licensing process should not immunize the Commission from any challenge to its breaches in appropriate courts other than the D.C. Circuit, which would have no power to grant relief.

Finally, in *FCC v. Nextwave Personal Communications, Inc.*, 537 U.S. 392 (2003), the Supreme Court ruled in no uncertain terms that the FCC's exclusive licensing power could be trumped by other provisions of commercial law such as the bankruptcy laws. Because the bankruptcy laws apply to certain FCC licensing actions, the Bankruptcy Court and appropriate appellate courts also have jurisdiction over those matters. None of this impairs the FCC's exclusive licensing power or the D.C. Circuit's exclusive jurisdiction to review the FCC's exercise of that power; it simply means that ordinary commercial arrangements or conduct which are associated with or ancillary to the FCC's

licensing power are within the purview of other forums such as the Court of Federal Claims for the matter in issue here.

The *Folden* case therefore cannot be read to vest exclusive jurisdiction in the D.C. Circuit to review all issues which might arise in the context of an FCC licensing proceeding -- that jurisdiction extends only to the license award itself. Here Biltmore is not challenging the license award -- the FCC gave the license to someone else and that decision is final. What Biltmore is seeking is the damages that have resulted from the FCC's breach of the contract it entered into, a contract which required it to award the license to Biltmore.

## VI. CONCLUSION

Biltmore urges the Court to deny the government's motion to dismiss this case or be granted summary judgment. The government should be required to pay the damages it owes for breaching the auction contract.

Respectfully submitted,

DONALD J. EVANS
RAYMOND J. QUIANZON

Fletcher, Heald & Hildreth, P.L.C.
1300 North 17th Street, 11th Floor
Arlington, VA 22209
Tel: 703-812-0400
Fax: 703-812-0486

September 14, 2007

Attorneys for Plaintiff

# ATTACHMENT

Federal Communications Commission
Washington, D.C. 20554

August 30, 2007

**DA 07-3803**

**Via Certified Mail, Return Receipt Requested**

Punxsutawney Communications, LLC
Attn: Paul M. Posner, President
1999 Gulfmart, Suite 514
San Antonio, Texas 78217

**Re: Final Bid Withdrawal Payment For Auction No. 58**

Dear Mr. Posner:

Punxsutawney Communications, LLC ("Punxsutawney"), a participant in Auction No. 58, withdrew its high bid on the Personal Communications Services license CW-BTA056-C5 (Brownsville-Harlingen, TX) in that auction.[1] Auction No. 71, the subsequent auction for that license, has closed.[2] As shown on Attachment A, in accordance with the Federal Communications Commission's ("Commission's") rules, we are now able to calculate Punxsutawney's final bid withdrawal payment obligation.

Under the Commission's rules, a bidder that withdraws a high bid during the course of an auction is subject to a bid withdrawal payment equal to the difference between the amount of the withdrawn bid and the amount of the subsequent winning bid. Under the rule in effect at the time of Auction No. 58, if a high bid is withdrawn on a license that remains unsold at the close of the auction, the withdrawing bidder will be required to make an interim payment equal to three percent (3%) of the net amount of the withdrawn bid.[3] This payment amount is deducted from any upfront payments or down payments deposited for this bidder's account with the Commission.[4] If, in a subsequent auction, that license receives a winning bid in an amount equal

[1] Punxsutawney also withdrew its high bids on licenses CW-BTA274-C4 and CW-BTA318-C5 in Auction No. 58. Those two licenses received winning bids in Auction No. 58 and the Commission assessed final withdrawal payments totaling $301,250.00. *See* Broadband PCS Spectrum Auction Closes, Winning Bidders Announced for Auction No. 58, *Public Notice*, 16 FCC Rcd. 2339, Attachment C (2005).

[2] *See*, Broadband PCS Spectrum Auction Closes, Winning Bidders Announced for Auction No. 71, *Public Notice*, 22 FCC Rcd. 9247 (2007).

[3] Implementation of Section 309(j) of the Communications Act—Competitive Bidding, PP Docket No. 93-253, *Fifth Report and Order*, 9 FCC Rcd 5532, 5563 at n. 51 (1994); C.H. PCS, Inc., 11 FCC Rcd 14495 (1996) (requiring a three percent deposit).

[4] 47 C.F.R. § 1.2106(d) and (e).

to or greater than the withdrawn bid amount, then no final bid withdrawal payment will be assessed, and, upon appropriate request, the Commission will refund the interim three percent (3%) payment.[5] If, in a subsequent auction, the winning bid for that license is less than the bidder's withdrawn amount, then the bidder will be required to make a final bid withdrawal payment equal to either the difference between the bidder's net withdrawn bid and the subsequent net winning bid, or the difference between the bidder's gross withdrawn bid and the subsequent gross winning bid, whichever is less.[6]

As shown in Attachment A, in accordance with Section 1.2104(g)(1), after applying any interim bid withdrawal payment or amounts on deposit with the Commission, Punxsutawney has an outstanding balance of $414,892.00.

Punxsutawney is in debt to the United States in the amount of $414,892.00,[7] payable in full, immediately, and without further demand. As permitted under 31 U.S.C. § 3717, the debt is subject to interest, penalties, and administrative costs, and interest accrues from the date of this letter, which is also its mailing date. Punxsutawney, the debtor, may avoid payment of the interest if it tenders to the Commission full payment within 30 days of the date of the letter. Moreover, the debt is subject to an additional charge to cover the cost of processing and handling of delinquent debts, and a penalty charge in the amount permitted by law. The penalty charge for delinquent debt payments permitted by 31 U.S.C. § 3717 currently is 6 percent a year for the failure to pay any part of the debt more than 90 days past due.

**Ordering Clauses**

Accordingly, IT IS ORDERED that, pursuant to Sections 4(i) and 309 of the Communications Act of 1934 as amended, 47 U.S.C. §§ 154(i), 309, and Section 1.2104(g) of the Commission's rules, 47 C.F.R. §§ 1.2104(g), Punxsutawney Communications, LLC is ASSESSED a final bid withdrawal payment as computed in Attachment A.

IT IS FURTHER ORDERED that, pursuant to 47 C.F.R. §§ 1.2104 and 1.2106, Punxsutawney Communications, LLC's interim bid withdrawal payment or funds on deposit will be applied towards the sum of the final bid withdrawal payment.

IT IS FURTHER ORDERED that Punxsutawney Communications, LLC's debt of $414,892.00 be paid immediately, in accordance with the payment instructions in Attachment B within 30 days of the date of this letter, and if it is unpaid 30 days after the date of this letter, interest will accrue from the date of this letter along with penalties and administrative costs permitted by 31 U.S.C. § 3717.

---

[5] 47 C.F.R. § 1.2104(g)(1).

[6] 47 C.F.R. § 1.2104(g)(1).

[7] *See* Attachments A and B.

IT IS FURTHER ORDERED that this letter shall be sent to the applicant and its representatives by certified mail, return receipt requested. This action is taken pursuant to authority delegated by Section 0.331 of the Commission's rules, 47 C.F.R. § 0.331.

Sincerely,

Rita Cookmeyer
Financial Policy Analyst
Auctions and Spectrum Access Division
Wireless Telecommunications Bureau

## ATTACHMENT A

### Multi-Auction Bid Withdrawal Payment Report

| License Number Frequency Block | Withdrawn Gross Bid Auction No. 58 | Withdrawn Net Bid Auction No. 58 | Re-auction Gross Bid Auction No. 71 | Re-auction Net Bid Auction No. 71 | Final Bid Withdrawal Payment |
|---|---|---|---|---|---|
| CW-BTA056-C5 | $1,127,000.00 | $845,250.00 | $540,000.00 | $405,000.00 | $440,250.00 |

| | |
|---|---|
| Final Bid Withdrawal Payment | $440,250.00 |
| Less Total of Interim Withdrawal Payment and Amounts on Deposit | $25,358.00 |
| **Outstanding Balance Due on Final Withdrawal Payment** | $414,892.00 |

# ATTACHMENT B

The following information is being provided to assist you in making your payment.

**PAYMENT INSTRUCTIONS**

All payments must be made in U.S. currency in the form of a wire transfer. No personal checks, cashier's checks or other forms of payment will be accepted. Wire transfer payments must be received by Mellon Bank by 6:00 PM Eastern Time, no later than thirty days from the date of the ORDER; however, if the 30th day falls on a non-business day, e.g., Saturday, Sunday or holiday, it is due the next business day. Applicants must allow sufficient time for the wire transfer to be initiated and for the transmission to be completed prior to the deadline. To submit funds by wire, applicants will need the following information to properly effect the transmittal:

ABA Routing Number: 043000261
Receiving Bank: Mellon Pittsburgh
500 Ross Street
Pittsburgh, PA 15262
BNF: FCC/Account #911-6106
OBI Field: (Skip one space between each information item)
"AUCTIONPAY"
FCC REGISTRATION NO. (FRN) (same as FCC Form 159, Block 11 and/or 21)
PAYMENT TYPE CODE (enter "APEN") same as FCC Form 159, Block 24A
FCC CODE 1 (same as FCC Form 159, Block 28A: "58")
PAYOR NAME (same as FCC Form 159, Block 2)
LOCKBOX No.: 358850

A completed FCC Remittance Advice Form (FCC Form 159, Version 2/03) must accompany payments. On the same business day that the applicant submits payment to Mellon Bank, the applicant must submit a completed FCC Form 159 via facsimile at (412) 209-6045, at least one-hour prior to placing the order for the wire transfer. The specified debt is due and payable to the United States immediately and without demand, and it is subject to interest, penalties, and additional administrative costs. Interest accrues from the date of the ORDER; however, to avoid the payment of charges (i.e., interest, penalties, and administrative costs) and enforced collection, full payment must be made and received within 30 days from the date of the ORDER. Debtor's failure to make complete timely payment will result in assessment of such charges permitted by 31 U.S.C. § 3717.

For questions regarding the submission of payment, and the FCC Form 159, contact Gail Glasser, Office of the Managing Director, Financial Operations Center, Auctions Accounting Group, at (202) 418-0578.

**CERTIFICATE OF SERVICE**

I, Donald J. Evans, hereby state that true copies of the foregoing PLAINTIFF'S RESPONSE TO MOTION TO DISMISS OR ALTERNATAIVE, MOTION FOR SUMMARY JUDGMENT, was mailed, postage prepaid, this 14th day of September, 2007, to the following:

Peter D. Keisler
Jeanne E. Davidson
Mark A. Melnick
Marla T. Conneely
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530

Grey Pash (By Hand Delivery)
Office of General Counsel
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

Donald J. Evans