# In the United States Court of Federal Claims

No. 07-316 C
(Filed January 25, 2008)

| | | |
|---|---|---|
| BILTMORE FOREST BROADCASTING FM, INC. | ) | |
| | ) | Subject matter jurisdiction; bid protest; |
| Plaintiff, | ) | claim preclusion. |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

*Raymond J. Quianzon*, Arlington, VA, for plaintiff. *Donald J. Evans*, of counsel.

*Marla T. Conneely*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Mark A. Melnick*, Assistant Director. *Grey Pash*, Office of General Counsel, Federal Communications Commission, of counsel.

## OPINION

**Merow**, *Senior Judge*

Plaintiff asserts breach of an implied-in-fact contract with the Federal Communications Commission ("FCC") for an auction to obtain a FM broadcast license in Biltmore Forest, North Carolina. Plaintiff, the second-highest bidder, asserts that the highest bidder and eventual licensee, Liberty Productions, L.P. ("Liberty"), was not a qualified bidder under the published terms of the auction. By an action filed in the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), plaintiff contested the FCC's decision to award the license to Liberty and dismiss plaintiff's competing application. The D.C. Circuit upheld the FCC's licensing decision, rejecting claims of plaintiff and others concerning the conduct of the auction. *Biltmore Forest Broad., FM, Inc. v. FCC*, 321 F.3d 155 (D.C. Cir.), *cert. denied*, 540 U.S. 981 (2003) ("*Biltmore Forest*").

Responding to plaintiff's instant breach of contract suit, defendant filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, asserting the Court of Federal Claims lacks subject matter jurisdiction over this matter, in that the D.C. Circuit Court of Appeals has exclusive jurisdiction over all FCC licensing and related disputes under the Communications Act, 47 U.S.C. § 402 (2000). Alternatively, defendant argues that if this court has subject matter jurisdiction, over the breach of contract claim pleaded, then any recovery is barred by the doctrine of claim preclusion.

**Factual background**

Operation over FM bandwidth requires an FCC license. Bidders, including plaintiff and Liberty had license applications pending prior to the auction.[1/] Bidding instructions and application criteria were contained in the FCC's Public Notice dated July 9, 1999. *Notice and Filing Requirements for Auction of AM, FM, TV, LPTV, and FM and TV Translator Construction Permits Scheduled for September 28, 1999* ("Public Notice"), 14 F.C.C.R. 10632, 10697-99 (1999).[2/] The Public Notice warned that failure to submit "required" information would result in dismissal of the application and inability to participate in the auction. **"Failure to submit required information by the resubmission date will result in dismissal of the application and inability to participate in the auction**. See 47 C.F.R. § 1.2105(b)." 14 F.C.C.R. at 10697 (emphasis in original).

A certification of media interests held by family members was among the requirements of the Public Notice: [3/]

---

[1/] Although not owned by the federal government, since 1927, electromagnetic radio spectrum has been federally regulated, because "[w]ithout government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375-76 (1969).

[2/] The Public Notice is Attachment A to the Complaint.

[3/] For reasons of economic competition and diversity in granting licenses, the FCC considers any media interests held by members of an applicant's family. *See generally* 47 C.F.R. § 73.3555 (2007).

> **whether or not a New Entrant Bidding Credit[4/] is being sought, all applicants must provide the information set forth in this section.** The following information is required:
>
> > *. . . bidders or attributable interest holders in bidders must certify, under penalty of perjury that the bidder complies with the Commission's policies relating to media interests of immediate family members. See* Policy Statement, *Clarification of the Commission's Policies Regarding Spousal Attribution*, 7 FCC Rcd 1920 (1992).

14 F.C.C.R. at 10698-99 (emphasis in original) (footnote added).

Liberty did not file a family media certification prior to the auction. Plaintiff alleges the FCC "apparently overlooked" this defect and there was no procedural vehicle for bidders to contest the bona fides of other bidders. Indeed, applicants were precluded from doing so. *Implementation of Section 309(j) of the Communications Act*, 14 F.C.C.R. 8724, 8732-33 (1999) ("We thus reaffirm our determination that, regardless of how many applicants remain and whether an issue is potentially dispositive, the public interest is best served by deferring the consideration of outstanding qualifications issues until after the auction and resolving such issues only with respect to auction winners.").

The auction began on September 28, 1999. On November 8, 1999 when the hammer fell following protracted bidding, there were only two remaining bidders – plaintiff and Liberty. Plaintiff knew Liberty, the highest bidder, had not submitted a family media certification and assumed the FCC would reject Liberty's bid and license application on that basis. Any additional bid by plaintiff, the second highest bidder, would have raised the ante by several hundred thousand dollars.[5/] Plaintiff

---

[4/] Under certain circumstances, bidders with limited or no broadcast experience were entitled to a bidding credit of up to 35 percent of their bid.

[5/] Although the FCC had discretion in this regard, minimum bid increments were ten percent. 14 F.C.C.R. at 10663. Illustratively, Liberty's winning bid was $2,336,000; plaintiff's was $1,518,400. *In re Liberty Prods.*, 16 F.C.C.R. 12061, 12065 (adopted April 12, 2001; released May 25, 2001).

asserts it promptly pointed out Liberty's deficiency to the FCC. On November 25, 1999, Liberty filed its family media certification.[6/]

In its Complaint filed in this court on May 21, 2007, plaintiff asserts breach of an implied contract that the FCC would conduct the sale according to the terms of the Public Notice. Plaintiff claims it was the highest qualified bidder and should have been awarded the license. Plaintiff requests $8,000,000 in damages, the difference between its bid and the current value of the FCC license.

Liberty's application was ultimately approved by the FCC, its tardily-filed family media certification notwithstanding. Plaintiff contested the granting of the license to Liberty in administrative proceedings before the FCC.[7/] In a Memorandum Opinion and Order adopted on April 12, 2001, and released on May 25, 2001, resolving the applications of several of the bidders, the FCC reversed an earlier determination by an Administrative Law Judge ("ALJ") disqualifying Liberty on a site certification issue. The ALJ had found Liberty misrepresented facts concerning the availability of a transmitter site. *In re Applications: Nat'l Commc'ns Indus.*, 5 F.C.C.R. 2862, 2879 (ALJ 1990).[8/]

Pursuant to 47 U.S.C. § 402(b)(1) (2000), plaintiff appealed the FCC's licensing decision to the United States Court of Appeals for the District of Columbia Circuit. Plaintiff characterized that appeal as from a final order of the FCC granting Liberty's application for a construction permit and dismissing plaintiff's mutually

---

[6/] Some facts were taken from *Biltmore Forest*, discussed *infra.*

[7/] Qualification issues were raised by motions to enlarge before the FCC filed by plaintiff and other applicants. In briefing before the D.C. Circuit, plaintiff stated the family media certification was not a "mere technicality. In fact, it turned out that the wife of Liberty's 65% limited partner owns a large interest in a nearby market . . . . [T]he FCC came up with a novel interpretation of its new way of calculating attributable ownership percentages that resulted in the limited partner's interest being treated as smaller than the 33% threshold." 2002 WL 335537, at *18 n.9.

[8/] When applications for this license were initially filed in 1987, the FCC's practice was to hold comparative hearings to resolve any issues relating to the applicants and determine which of the remaining qualified applicants would best serve the public interest. *Biltmore Forest*, 321 F.3d at 156. In 1997, before final determinations had been made, due to intervening statutory changes, the FCC adopted competitive bidding auction procedures. Pub. L. 105-33, § 3002, 111 Stat. 251, 258-60 (1997) (codified at 47 U.S.C. § 309(j) (2000)).

exclusive application. Jurisdiction under 47 U.S.C. § 402(b)(1), (5)-(6) and 28 U.S.C. § 2342(1) (2000) was asserted.[9] *See Final Brief for Appellant*, *Biltmore Forest*, 2002 WL 3424519, at *ix. (D.C. Cir. 2002) (No. 01-1392).

The first-listed issue presented for review by the D.C. Circuit is identical to plaintiff's Complaint here:

> 1. The FCC issued a Public Notice establishing mandatory pre-auction requirements for participation in an action for broadcast licenses. The winner of the auction did not comply with one of these prerequisites. Other bidders had recognized that the bidder's application was defective and placed their bids accordingly. Could the FCC excuse the winning bidder's non-compliance after the auction and declare it the winner?

2002 WL 34244519, at *1.

After the conclusion of the bidding process, "[t]he FCC then had to consider a number of petitions to deny [the award to Liberty] which were filed by the losing applicants. Chief among the issues raised were (1) the fact that Liberty had failed to include in its auction application form a certification which the FCC's public notices had represented to be an essential prerequisite to participation in the auction."

> Liberty's omission of basic eligibility information and its claim to an unwarranted bidding credit dramatically affected the integrity of the auction itself. By the latter stages of the auction, [Biltmore] was bidding only against Liberty, an applicant who the FCC's own public notices indicated should not have been permitted to participate at all. [Biltmore] was boxed in the quandary of either continuing to bid up the price against a presumptively ineligible applicant or resting on its last high bid in the expectation that the FCC would enforce its own mandates.

---

[9] 28 U.S.C. § 2342 provides in relevant part: "[t]he courts of appeals (other than the United States Court of Appeals for the Federal Circuit) has [sic] exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of – (1) all final orders of [the FCC] made reviewable by section 402(a) of title 47[.]"

2002 WL 34244519, at *8-9. Authority cited included *Erie Coal & Coke v. United States*, 266 U.S. 518, 520 (1925), also relied upon in this case for the fundamental precept that the terms of an auction sale are binding on the government and bidders alike (Pl.'s Opp'n 6). In conclusion, plaintiff implored the D.C. Circuit to "requir[e] [the FCC] to abide by the rules it proclaimed for Auction 25, by dismissing Liberty's application, and by ordering it to designate [Biltmore] as the auction winner." 2002 WL 34244519, at *33.

Plaintiff argued to the D.C. Circuit, as it does here, that the family media certification was required and because it was not timely filed, Liberty's license application should not have been granted. The difference between the cases is the remedy sought. Before the D.C. Circuit, plaintiff sought the license. Before this court, plaintiff seeks to recover the economic benefit of the bargain.

The D.C. Circuit affirmed the FCC's award of the license to Liberty, holding the FCC did not act arbitrarily and capriciously in determining its regulations did not require the dismissal of Liberty's application for failure to timely file a family media certification, deferring to the agency's interpretation of its regulations, which were controlling "unless . . . plainly erroneous or inconsistent with the regulation." *Biltmore Forest*, 321 F.3d at 160. The FCC's findings in this regard were found not to fall below that standard. Specifically, the D.C. Circuit found that agency regulations permitted the FCC to allow Liberty an opportunity to cure the defect by filing the family media certification after the deadline. *Id*. Noting that the family certification was required not by regulation but by the Public Notice, the D.C. Circuit reasoned:

> the family certification is not among those required under [47 C.F.R.] Section 1.2105, the omission of which incurably disqualifies the applicant as specified in § 1.2105(b)(1).[10/] It was not unreasonable for

---

[10/] As discussed in *Biltmore Forest,* deficient or incomplete applications fall into two categories – one curable – one not. Failure to submit certain certifications is not curable and dismissal is required. 47 C.F.R. § 1.2105(b)(1) provides:

> *(b) Modification and Dismissal of Short-Form Application (FCC Form 175)*. (1) Any short-form application . . . that does not contain all of the certifications **required pursuant to this section** is unacceptable for filing and cannot be corrected

(continued...)

> the Commission to treat the omission of a certification required only by a public notice as a "defect" other than "failure to make a certification" as that term is used in § 1.2105(b), and thus to provide the opportunity for correction that § 1.2105(b)(2) allows for such a defect.

321 F.3d at 160-61. The D.C. Circuit added that "it should not – more properly, that it need not – disqualify Liberty after the auction on the basis of an omission that, according to the Notice, would disqualify an applicant if discovered prior to the auction." 321 F.3d at 161.

In its administrative determination, the FCC concluded the Public Notice did not clearly require automatic disqualification for failure to submit the family media certification. Although the Public Notice stated that a bidder who failed to submit "required information" before the auction would be "[unable] to participate in the auction," it did not state that such an omission was incurable if it came to light after the auction was held. Because the Public Notice did not directly speak to this

---

[10/] (...continued)
subsequent to the applicable filing deadline. The application will be dismissed with prejudice and the upfront payment, if paid, will be returned.

The FCC has some discretion under section 1.2105(b)(2) to allow other types of defects in applications to be cured. "The Commission will provide bidders a limited opportunity to cure defects specified herein (except for failure to sign the application and to make certifications) and to resubmit a corrected application." Minor amendments or modifications "include, but are not limited to, the correction of typographical errors and other defects not identified as major." 47 C.F.R. § 1.2105(b)(2). Major amendments include changes in ownership or size of the applicant or in the proposed service area. *Id.*

The parenthetical exception in subsection (b)(2) taking "failure to . . . make certifications" out of the class of curable defects under that subsection, does not apply to the family certification, the FCC reasoned, because the "certifications" in question are only those implicated in subsection (b)(1), namely "the certifications required pursuant to" Section 1.2105. Those certifications are that the applicant is: (1) "legally, technically, financially and otherwise qualified" under the Communications Act; (2) in compliance with foreign ownership provisions; (3) willing to comply with service-specific qualifications; (4) has not entered any bid deals; and (5) is not in default of any agency obligation or non-tax debt. Because the family media certification was required by the July 9 Public Notice rather than by Section 1.2105(a) (incurable disqualification), the D.C. Circuit did not find the FCC's exercise of discretion to allow Liberty to cure to be arbitrary and capricious.

situation, disqualification on that basis would deprive Liberty of fair warning that its application might be disqualified without an opportunity to correct it, contrary to the rule endorsed in *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 607 (D.C. Cir. 2002) ("That the rule did not afford adequate notice reflexive bidding was unlawful is itself sufficient justification for the Commission not to penalize [the bidder].").

In seeking review of *Biltmore Forest*, in its petition for a *writ of certiorari*, plaintiff asserted that the degree of deference typically due administrative determinations should not apply because the FCC was selling licenses and accordingly, was an interested party in the licensing process, particularly when modifying the published terms of the auction would net a higher yield. *Petition for Writ of Certiorari, Biltmore Forest*, 2003 WL 22428481, *13-17 ( 2003) (No. 03-48). The United States Supreme Court denied *certiorari*. *Biltmore Forest,* 540 U.S. 981 (No. 03-48) (2003).

**<u>Defendant's Motion to Dismiss</u>**

For the purposes of a RCFC 12(b)(1) motion to dismiss, the allegations stated in the Complaint are assumed to be true and jurisdiction is decided on the pleadings submitted. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996); *see generally* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2004). As defendant's Rule 12(b) motion questions the court's subject matter jurisdiction, evidence outside the pleadings may be considered. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993). In determining subject matter jurisdiction, the court "'looks to the true nature of the action in determining the existence or not of jurisdiction.'" *Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1372 (Fed. Cir. 2005) (citing *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997)).

In responding to a motion to dismiss for lack of subject matter jurisdiction, plaintiff has the burden to establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Defendant's Motion to Dismiss asserts plaintiff's claims arise under the Communications Act in which Congress vested exclusive jurisdiction over FCC decisions in the District of Columbia Circuit. The Communications Act, 47 U.S.C. § 402 (2000), provides in relevant part:

> (a) Procedure
>
> Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.
>
> (b) Right to appeal
>
> Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:
>
> (1) By any applicant for a construction permit or station license, whose application is denied by the Commission.
>
> . . .
>
> (5) By the holder of any construction permit or station license which has been modified or revoked by the Commission.
>
> (6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

As plaintiff's action here is, at its root, an action by a bidder "whose interests are adversely affected" by the FCC's granting of a license to Liberty and denial of plaintiff's license application, the D.C. Circuit has exclusive jurisdiction under this statutory grant, defendant states.

Plaintiff responds that concurrent jurisdiction in the D.C. Circuit over licensing decisions, and in the Court of Federal Claims over contract claims, is consistent with Supreme Court and Federal Circuit precedent. For example, in *Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738 (D.C. Cir. 2001), the court exercised its jurisdiction over issues related to licensing of hydroelectric dams but, to the extent conditions imposed on that license were so onerous as to rise to a taking, the D.C.

Circuit recognized the Court of Federal Claims also had jurisdiction. *See also Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 690 (D.C. Cir. 2000); *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1444-45 n.1 (D.C. Cir. 1994). *Cf. Northpoint Tech., Ltd. v. FCC*, 414 F.3d 61, 76 (D.C. Cir. 2005) (noting that if the FCC violated an agreement, that would be a Tucker Act matter); *MegaPulse, Inc. v. Lewis*, 672 F.2d 959, 968-69 (D.C. Cir. 1982) (recognizing co-existence of Tucker Act and APA).

That agency decisions may pass administrative muster yet be independently actionable in this court on takings, contract or other grounds, is well-recognized. As plaintiff points out, at its core, *United States v. Winstar Corp.*, 518 U.S. 839 (1996), applied the distinction between regulatory action, which may be appropriate and accordingly enforceable, yet constitute a contractual breach redressable in the Court of Federal Claims. *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604 (2000) recognized that questions concerning the propriety of regulatory actions are independent from considerations of contract, the latter remedied in this court. Similarly, in litigation surrounding the Nuclear Waste Policy Act ("NWPA") and contracts between the Department of Energy ("DOE") and utilities, the D.C. Circuit has construed statutory obligations, deferring contractual remedies to the Court of Federal Claims. *See also Wisc. Elec. Power Co. v. United States*, 211 F.3d 646, 648 (D.C. Cir. 2000) (discussing prior cases of statutory construction and concluding: "[t]he Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes"); *Ind. Mich. Power Co. v. DOE*, 88 F.3d 1272 (D.C. Cir. 1992); *N. States Power Co. v. DOE*, 128 F.3d 754, 759 (D.C. Cir. 1997). *See also Neb. Pub. Power Dist. v. United States*, 73 Fed. Cl. 650 (2006), *appeal granted*, 219 Fed. App'x. 980 (Mar. 1, 2007) (construing the extent of the D.C. Circuit Court's jurisdiction over statutory and regulatory compliance under the NWPA and on related contract matters in the Court of Federal Claims).

Congress assigns jurisdiction to all federal courts except the Supreme Court. *In re United States*, 877 F.2d 1568, 1571 (Fed. Cir. 1989). Congress can withdraw jurisdiction from the Court of Federal Claims and assign it elsewhere. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016-17 (1984). *See also Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1372 (Fed. Cir. 2005) ("Tucker Act review of takings claims is precluded where Congress has provided 'a specific and comprehensive scheme for administrative and judicial review.'"); *Tex. Peanut Farmers v. United States*, 409 F.3d 1370 (Fed. Cir. 2005) (applying statutory grant of exclusive jurisdiction to

district courts of claims against the Federal Crop Insurance Corporation); *Wilson v. United States*, 409 F.3d 1370 (Fed. Cir. 2005) (affirming conclusion that direction of 42 U.S.C. § 405(g) that claims arising under the Medicare Act "shall be brought in the district court of the United States" was a congressional withdrawal of Tucker Act jurisdiction); *Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) ("[A] contract will not fall within the purview of the Tucker Act if Congress has placed jurisdiction over it elsewhere."); *Sw. Marine of S.F., Inc. v. United States*, 896 F.2d 532 (Fed. Cir. 1990) (holding the Federal Court Improvement Act, 28 U.S.C. § 1295, did not carve out a ship repair contract exception to the federal district courts' exclusive jurisdiction over maritime contracts).

Withdrawal of Tucker Act jurisdiction is strictly construed. *Cathedral Candle Co. v. ITC*, 400 F.3d 1352, 1365 (Fed. Cir. 2005) ("'[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'") (citing *Ruckelshaus v. Monsanto* Co., 467 U.S. at 1018). The Tucker Act is a broad grant of jurisdiction to the Court of Federal Claims, and any withdrawal of Tucker Act jurisdiction is tantamount to a partial repeal of that Act. Accordingly, courts will not find the requisite intent to shrink the Court of Federal Claim's jurisdiction "by implication." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017-19 (1984) (explaining that for Tucker Act jurisdiction to be displaced, there must be 'an unambiguous intention to withdraw the Tucker Act remedy.'); *Presault v. ICC*, 494 U.S. 1, 12 (1990) (same); *Qwest Corp. v. United States*, 48 Fed. Cl. 672, 686 (2001) ("'A new statute will not be read as wholly or even partially amending a prior one unless there exists a "positive repugnancy" between the provisions of the new and those of the old that cannot be reconciled .'") (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 133-34 (1974)).

The Federal Circuit recently reiterated and applied these principles in *Acceptance Insurance Cos. v. United States*, 503 F.3d 1328 (Fed. Cir. 2007). An insurance holding company claimed the Department of Agriculture blocked the sale of crop insurance policies held by America Growers, one of its subsidiaries. The Federal Crop Insurance Corporation ("FCIC"), a wholly-owned government corporation within the Department of Agriculture, by statute, regulates private crop insurance and issues reinsurance policies. Also by statute, jurisdiction for all suits by or against the FCIC is in federal district court. Applying its oversight authority over the crop insurance industry, FCIC refused to approve the sale of American

Growers' assets for $21.5 million, finding it would be detrimental to the interests of farmers and taxpayers. The thwarted sale put American Growers in a precarious financial situation and it was ultimately liquidated by the Nebraska Department of Insurance. The Federal Circuit held plaintiff's taking claim could co-exist with the statutory grant of exclusive jurisdiction requiring "all suits" "by or against the [FCIC]" must be brought in district court. Accordingly, "[t]he proper inquiry is whether the statutory language 'all suits by or against the [FCIC]' includes a Fifth Amendment takings claim based on actions of the FCIC." 503 F.3d at 1337. Concluding a taking claim was not against the agency, but against the sovereign, the Federal Circuit held the Court of Federal Claims was not without subject matter jurisdiction.

Defendant counters that the Federal Circuit has applied the Communications Act to preclude jurisdiction in the Court of Federal Claims over an action for breach of implied contract with the FCC. In *Folden v. United States*, 379 F.3d 1344 (Fed. Cir. 2004), the Federal Circuit affirmed the dismissal for lack of subject matter jurisdiction of plaintiff's claimed breach of an implied contract and a taking following the FCC's decision not to award a cellular communication license by lottery. The Federal Circuit held that 47 U.S.C. § 402(b) "reserves judicial review of Commission licensing decisions exclusively for the D.C. Circuit." 379 F.3d at 1353. See also *Minn. Christian Broadcasters, Inc. v. FCC*, 411 F.3d 283 (D.C. Cir. 2005) (deferring to FCC's determination on whether applicant was entitled to new entrant credit).

The Federal Circuit's broad application of the Communications Act and Congressional prerogative in this regard, is binding and dictates the outcome in this case. In *Folden*, the FCC changed the method of awarding licenses, and applicants already in the queue including Folden asserted an implied contract right to have license decisions decided under the rules in effect when they paid their fees.

Previously, the FCC awarded cellular licenses by comparative hearings. In 1981, Congress authorized a system of random selection or lotteries. *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, ch. 2, 1242, 95 Stat. 357, 736-37 (1981) (codified at 47 U.S.C. § 309(i)). As explained in *Folden*, the FCC did not implement a lottery system. 379 F.3d at 1347. Congress reacted by passing a revised lottery statute requiring implementing rules within 180 days. Lottery rules were implemented in 1984. A tentative awardee would be selected randomly with sequentially ranked alternates. The awardee would then undergo qualification-rigor

and if the tentative selectee did not qualify, examination would proceed to the next named alternate, and so on until a qualified applicant was found.

> In 1988, the [FCC] amended [its procedure]. Under the amended regulations, after the tentative selectee was named, each remaining applicant was no longer to be randomly selected and ranked in order of selection. Rather, in accordance with the amended version of 47 C.F.R. § 1.823(a), the Chief of the Common Carrier Bureau and the Managing Director of the Commission were to determine, on a case-by-case basis, the number of remaining applicants to be selected, and thus ranked as alternative selectees, in each lottery.

379 F.3d at 1348 (citation omitted).

In 1988, the *Folden* plaintiffs applied for cellular licenses and paid required filing fees. Subsequent lottery notices stated that if an awardee did not become qualified, another lottery would be held among those remaining. Relotteries were held. None of the plaintiffs were successful. Awardees were successively disqualified and no licenses were granted.

While plaintiffs' applications were still pending, Congress added subsection 309(j) to the Communications Act of 1934 which authorized the FCC to use auctions as the method of selecting licensees among competing applicants. Lotteries could be used with applicants who had filed prior to 1993 which included the *Folden* plaintiffs. Objections were made to the continued use of lotteries among the pre-existing applicants. The lotteries were postponed. Congress then prohibited lotteries in the relevant situations and Folden's applications were dismissed.

Plaintiffs then filed a class action complaint in the Court of Federal Claims, asserting breach of implied-in-fact contracts, takings in violation of the Fifth Amendment and an unconstitutional taking of their contract rights. In dismissing the implied contract claim, the Court of Federal Claims determined that "'the long tradition of Commission authority to change rules effectively precluded the FCC from making a contractual promise to the plaintiffs.'" 379 F.3d at 1353 (citing *Folden v. United States*, 56 Fed. Cl. 43, 55 (2003)). The trial court concluded that 47 U.S.C. § 402(b) assigned exclusive jurisdiction over FCC licensing decisions to the D.C. Circuit Court of Appeals and, that Section 402(b) extends that exclusivity to FCC

decisions that are "'ancillary' to the nine types of licensing decisions expressly enumerated therein." 379 F.3d at 1354 (citing 56 Fed. Cl. at 56-57).

In *Folden*, plaintiffs argued "that because they were seeking money damages, the D.C. Circuit could not have had, and the Court of Federal Claims did have, jurisdiction over their claims." *Id.* Affirming the dismissal of the implied-in-fact contract claims, the trial court found that "plaintiffs' attempt to circumvent established agency and federal court procedures 'conjured a contract theory from the mere chance to obtain a cellular license following submission of their applications' in the absence of any contract negotiations and documents." *Id.* The Federal Circuit rejected the contentions that jurisdiction between the two forums could coexist, and that the D.C. Circuit could not award money damages, as "explicitly rejected in *City of Rochester* [*v. Bond*], 603 F.2d 927 [D.C. Cir. 1979]." 379 F.3d at 1358. Plaintiff's argument that the D.C. Circuit lacks jurisdiction over claims against the United States in excess of $10,000 (citing authorities other than the Federal Circuit) was addressed and rejected in *Folden*.

*Folden* concluded that regardless of the characterization of the grievances stated, they fell within the exclusive jurisdictional grant to the D.C. Circuit. "We think it clear that the D. C. Circuit's jurisdiction over claims that fall within subsection 402(b) is exclusive." 379 F.3d at 1356-57 (citing authorities including *City of Rochester*, 603 F.2d at 932-35 ("'In § 402 of the Communications Act . . . Congress has, we think, prescribed the exclusive mode of judicial review of such controversies as this . . . . '") (alteration in original)). "We have explained that 'when such a "specific and comprehensive scheme for administrative and judicial review" [as is in the Communications Act] is provided by Congress, the Court of Federal Claims' Tucker Act jurisdiction over the subject matter covered by the scheme is preempted.'" *Id.* at 1357 (extensive citations omitted).

Concluding that the D.C. Circuit would have exclusive jurisdiction if the Communications Act applied, the Federal Circuit then addressed that statute, particularly subsection 402(b). The Federal Circuit recognized that the FCC's decision not to hold relotteries was not "strictly speaking" a denial of a licensing application, the statutory term, thus did not fall within the literal language of subsection 402(b)(1) (providing for jurisdiction in the D. C. Circuit of cases by "any applicant . . . whose application is denied"). Nevertheless, *Folden* held the exclusive jurisdiction of the Communications Act extended to "licensing decisions of the

Commission that are 'ancillary' to those set forth in subsections (1)-(9)." *Id.* at 1359. Addressing plaintiff's claim for contractual breach, for which plaintiffs sought an aggregate of $144 million in damages, the fair market value of the licenses, 56 Fed. Cl. at 43, the Federal Circuit instructed: "[w]e have already held, however, that if subsection 402(b) applies in this case, it preempts Tucker Act jurisdiction. In analyzing whether subsection 402(b) applies, we must look to the true nature of plaintiffs' claim, not how plaintiffs characterize it. **At root, plaintiffs' action plainly represents a challenge to the Commission's failure to hold relotteries**. . . It is on those terms that we approach the question whether subsection 402(b) applies to it." 379 F.3d at 1359 n.13 (emphasis supplied).

Review of decisions ancillary to the FCC's licensing decisions and litigation that at its "root" is a grievance against an FCC licensing determination must be brought in the D.C. Circuit, the Federal Circuit stated. "[T]he Senate Report explained in 1951, '[t]he language of this subsection [402(b)], when considered in relation to that of subsection (a), also would make it clear that judicial review of **all cases involving the exercise of the Commission's radio licensing power** is limited to that court [the D.C. Circuit].'" *Id.* at 1360-61 (emphasis and alteration in original) (citation omitted). *See Sprint Commc'n Co. v. FCC*, 274 F.3d 549, 552 (D.C. Cir. 2007) (concluding D.C. Circuit has exclusive jurisdiction); *Sykes v. Jenny Wren Co.*, 78 F.2d 729, 732 (D.C. Cir. 1935) (finding licensee was "aggrieved" and "interests" "adversely affected" by order of the FCC expanding competitor's coverage area; accordingly exclusive jurisdiction was in the D.C. Circuit).

Plaintiff states that if the undersigned finds *Folden* applies, it will seek *en banc* rehearing of that decision by the Federal Circuit. After careful consideration, the court concludes *Folden* is controlling.[11/]

---

[11/] Plaintiff's cited cases are distinguishable. None concern the Communications Act. *United States v. Winstar Corp.*, 518 U.S. 839 (1996) concerned contracts with the Federal Home Loan Bank Board over regulatory accounting. *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604 (2000) involved offshore leases. In *McKay v. Wahlenmaier*, 226 F.2d 35 (D.C. Cir. 1955), the second-highest bidder in an auction by the Secretary of the Interior of oil and gas rights on public land successfully contested the highest bidder's application as defective under the public notice. An Interior Department auction was also the subject of the litigation in *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C. Cir. 1969). Actions by the Federal Energy Regulatory Commission were addressed in *Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738 (D.C. Cir. 2001) and (continued...)

Plaintiff directly contests the FCC's decision to award the license to Liberty and deny plaintiff's mutually exclusive application, thus squarely falling into section 402(b)(6), as an action by a "person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1) [the application denied provision], (2), (3), (4), and (9) of this subsection." In comparison, in *Folden,* the Federal Circuit expanded the statute's enumerated agency acts to "ancillary" decisions. Neither the requested monetary relief, nor the breach of implied contract theory proffered, alter the underlying gravamen of the action. As *Folden* instructs, if the dispute falls within the terms of the statute, exclusive jurisdiction lies in the D. C. Circuit Court of Appeals. Lacking subject matter jurisdiction, this case must be dismissed.

**Motion for Summary Judgment**

In its alternative motion for summary judgment, defendant argues that as the D.C. Circuit rejected plaintiff's assertion that Liberty should have been disqualified as a bidder, this court should likewise reject plaintiff's advancement of the same point, albeit in a contractual context, under *res judicata,* issue preclusion and/or collateral estoppel.

Plaintiff counters that the two cases involve different factual issues, different standards of construction and review, and different jurisdictional statutes. The question in *Biltmore Forest*, it is asserted, was whether the license granted was in the

---

[11/] (...continued)
*Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 670 (D.C. Cir. 2000). In *Bell Atlantic Telephone Cos. v. FCC*, 24 F.3d 1441 (D.C. Cir. 1994), the D.C. Circuit invalidated an FCC order requiring local telephone exchange companies to set aside a portion of their central offices for use by competitive access providers. Agreeing that the FCC did not have authority to require co-location, the court addressed petitioners' alternate argument that such an imposition would constitute a taking. Takings claims were noted as a matter within the exclusive jurisdiction of the Court of Federal Claims. 24 F.3d at 1444, n.1 (citing 28 U.S.C. § 1491(a)(1)). In that context, the *Bell Atlantic* court commented that any taking claim must be brought in the Court of Federal Claims: "the *Tucker Act* remedy is presumed available unless Congress had explicitly foreclosed it by another enactment, and nothing in the Communications Act does so." Finding that the FCC orders were not authorized, the requisite for a taking was not present, the D.C. Circuit's comment is dicta as to a taking claim (and plaintiff here seeks monetary damages for breach) and does not alter the conclusions reached herein.

"public interest, convenience and necessity." 47 U.S.C. § 307(a). The question here is whether the FCC breached the auction terms.

**Any jurisdiction in this court would be as a bid protest and the agency decision subject to review for arbitrariness and capriciousness**

Plaintiff's Complaint asserts this court has jurisdiction under 28 U.S.C. § 1491(a)(1).[12/] The Court of Federal Claims has subject matter jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, **or upon any express or implied contract with the United States."** 28 U.S.C. § 1491(a)(1) (emphasis supplied).

It is concluded, in the alternative, that if the Court of Federal Claims has subject matter jurisdiction, summary dismissal as a matter of law is appropriate. Putting aside the *Folden* decision, plaintiff has pled a garden variety protest to the award of a construction permit to Liberty.[13/] Plaintiff does not seek to invalidate the award, relief which, if granted, could well create a direct conflict with jurisdiction expressly afforded to the D.C. Circuit. While plaintiff invokes Section 1491(a)(1), which grants jurisdiction to the Court of Federal Claims "to render judgment upon any claim against the United States founded . . . upon . . . any express or implied contract with the United States . . . ," Section 1491(b)(1) which grants jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids . . . or the award of a contract," comprises the correct source

---

[12/] Alleged jurisdictional sources also cited are 28 U.S.C. §§ 2071(a) and (c) (general rule-making authority); 2503(b) (proceedings generally); and 2521(1) (subpoena power).

[13/] Government auctions are contractual. *See Barclay v. United States*, 166 Ct. Cl. 421, 435-37, 333 F.2d 847, 856-57 (1964); *Koby v. United States*, 47 Fed. Cl. 99, 102 (2000). *See Swanson Group, Inc. v. United States*, 76 Fed. Cl. 44, 51 (2007) (finding breach of terms of auction contract between government and successful bidder); *Rivera Agredano v. United States*, 70 Fed. Cl. 564, 571-575 (2006) (construing terms of government auction as contract); *Rodriguez v. United States*, 69 Fed. Cl. 487, 491-500 (2006) (same); *Commodities Recovery Corp. v. United States*, 34 Fed. Cl. 282, 290-91 (1995) (cited by the FCC in the case *In re BDPCS, Inc.,* 2000 WL 942977, at *13, n.63 (July 11, 2000) (same); *United States v. Weisbrod*, 202 F.2d 629, 631-32 (7th Cir. 1953) (same).

for any jurisdiction which would exist to grant relief with respect to the claim pleaded.[14/]

Plaintiff is objecting to the auction award to Liberty. Under similar facts, in *Prineville Sawmill Co. v. United States*, 859 F.2d 905 (Fed. Cir. 1988), the Forest Service announced plans to sell salvage timber by auction. Confirming that the government invitation for bids to sell a government commodity carried with it an implied contractual obligation to fairly and honestly consider all bids, for breach of duty, the Federal Circuit, applied bid protest standards under then Section 1491(a)(3), measuring government action under the arbitrary and capricious standard. 859 F.2d at 909-15.

Under the Tucker Act, protests must be brought by "interested parties." 28 U.S.C. § 1491(b)(1). Standing, construed in accordance with the Competition in Contracting Act, is limited to "'an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'" *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)). Accordingly, plaintiff must establish that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

To establish that it has a "direct economic interest," plaintiff must show that it had a "substantial chance" of receiving the contract. *Id.* at 1307. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001)). Plaintiff bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Additionally, a protestor must also show that any alleged errors caused prejudice. *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[T]o prevail in a protest the protester must show not only a significant error in the

---

[14/] *Folden* does not address any source of subject matter jurisdiction absent the Communications Act. Plaintiffs in *Folden* alleged subject matter jurisdiction under Section 1491(a)(1). 379 F.3d at 1354. Neither the trial court nor the Federal Circuit ruled on that reliance. Also, in *Folden,* the FCC conducted lotteries, not auctions.

procurement process, but also that the error prejudiced it." (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 283 (2006) ("[A] successful protestor must also establish that the errors complained of caused prejudice."). Therefore, "prejudice (or injury) is a necessary element of standing." *Myers*, 275 F.3d at 1370.

Plaintiff satisfies the "interested party" requirement under section 1491(b)(1). First, it is undisputed that plaintiff was an actual (the second-highest) bidder. *Rex Serv.*, 448 F.3d at 1307. Secondly, the FCC's decision to declare Liberty the winner and licensee, and deny plaintiff's application, directly affects plaintiff's economic interests as alleged in this Complaint. *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 94 (2006). Plaintiff would "no doubt benefit from receiving the award." *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 515 (2007). Therefore, plaintiff has stated sufficient economic interest for standing. *Rex Serv.*, 448 F.3d at 1307.

Plaintiff is an unsuccessful bidder. Prior to 1970, an unsuccessful bidder generally did not have standing to challenge an award of a government contract. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940); *Edelman v. Federal Housing Admin.*, 382 F.2d 594, 597 (2nd Cir.1967). The reasoning was that the statutes and regulations governing the contract awards were intended to protect only the government, not bidders. *Id.*

In *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970), the court held that under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1982), a disappointed bidder had standing to challenge the award of a government contract. The court stated that unsuccessful bidders "are the people who will really have the incentive to bring suit" to compel "agencies [to] follow the regulations which control government contracting" and that "[t]he public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity . . . ." *Id.* at 864.

The jurisdiction first asserted by the Court of Claims over suits challenging a contract award for alleged impropriety in the contracting process, rested upon the Tucker Act grant of jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. §

1491(a) (1982). Improprieties may violate "an implied contract to have the involved bids fairly and honestly considered." *United States v. John C. Grimberg Co*., 702 F.2d 1362, 1367 (Fed. Cir. 1983). In *Grimberg,* the Federal Circuit referred to *Keco Industries, Inc. v. United States*, 192 Ct. Cl. 773, 428 F.2d 1233 (1970), which recognized an unsuccessful bidder's standing.

*Keco* explained that "as a result of *Scanwell,* a party, who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation, does have standing to sue . . . . [E]very bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, then the injured party has the right to come into court to try and prove his cause of action." *Keco*, 192 Ct. Cl. at 779-80. "[B]y the solicitation for bids, the Government impliedly promised that it would give honest and fair consideration to all bids received and would not reject any of them arbitrarily or capriciously, but would award the contract to that bidder whose bid in its honest judgment was most advantageous to the Government." *Heyer Products Co. v. United States*, 147 Ct. Cl. 256, 258, 177 F. Supp. 251, 252 (1959); *see also B.K. Instrument, Inc. v. United States*, 715 F.2d 713 (2d Cir. 1983); *Heyer Products Co. v. United States*, 135 Ct. Cl. 63, 71, 140 F. Supp. 409, 413-14 (1956).

In Section 133(a) of the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, 39-40 (1982), Congress amended the Tucker Act to give the Claims Court authority to grant injunctive relief:

> (3) To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.

The legislative history of this provision shows that Congress intended the Claims Court to have the same authority over pre-award bid protests, *Grimberg*, 702 F.2d at 1369, that the district courts had under *Scanwell*. The Senate Committee Report explained:

> By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this

> area. Specifically, the *Scanwell* doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic]. *See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970).

S. Rep. No. 97-275, 1st Sess., at 23, *as reprinted in* 1982 U.S.C.C.A.N. 11, 33.

Similarly, the House Committee Report stated: "[i]t is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action. *See, e.g., Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970)." H.R. Rep. No. 97-312, 1st Sess., at 43 (1981).

The essence of "the *Scanwell* doctrine," which Congress intended 28 U.S.C. § 1491(a)(3) to make applicable to the Claims Court, is that an unsuccessful bidder has standing to challenge a proposed contract award on the ground that in awarding the contract the government violated statutory and procedural requirements. *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1572-74 (Fed Cir. 1983).

While jurisdiction over protests by unsuccessful bidders was established, damages were limited to bid preparation costs. *Heyer Products* acknowledged that unsuccessful bidders could not recover lost profits, but could recover bid preparation costs. "It was an implied condition of the request for offers that each of them would be honestly considered . . . . This implied contract has been broken, and plaintiff may maintain an action for damages for its breach." 135 Ct. Cl. at 69-70, 140 F. Supp. at 412-13. However, " [a]n unsuccessful bidder cannot recover the profit he would have made out of the contract." 135 Ct. Cl. at 69, 140 F. Supp. at 412.

The enactment of the Administrative Dispute Resolution Act of 1966, Pub. L. No. 104-320, 110 Stat. 3870 (1996) ("ADRA"), further amended the Tucker Act, enlarging the Court of Federal Claims' jurisdiction over bid protests to post-award matters, and extending the court's equitable powers. *See* 28 U.S.C. § 1491(b). The limitation of any monetary relief to "bid preparation and proposal costs" was maintained. Section 1491(b)(2). Federal district court jurisdiction over bid protests was terminated as of January 1, 2001. *See* Pub. L. No. 104-320 § 12(d), 110 Stat. at 3875; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001). Accordingly, after January 1, 2001, the Court of Federal Claims provides the sole judicial forum for bid protest litigation.

With the enactment of ADRA, it was no longer necessary for an unsuccessful bidder to base the court's protest jurisdiction on a breach of an implied contract to consider bids fairly, but the statute enables a protestor to challenge arbitrary and capricious conduct in the context of a contract award – the same cause of action previously considered under the rubric of a breach of an implied contract. *See L-3 Commc'ns Integrated Sys. v. United States*, 79 Fed. Cl. 453 (2007). *L-3 Communications* was brought by an unsuccessful bidder alleging the Air Force breached its contractual obligation to fairly consider its offer because the selection process was manipulated and tainted by misdeeds of a high-ranking government official. Allegations included bad faith, favoritism and bias. As the court explained:

> Before enactment of the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 (1996) (ADRA), the Court of Federal Claims' jurisdiction over a bid protest was predicated on the implied contract between the Government and prospective bidders to treat the bidder's proposal fairly, equally, and consistently with the agency's solicitation of bids . . . . Although ADRA obviated the need to base the COFC's protest *jurisdiction* on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing. Section 1491(b) expressly provides that this Court has jurisdiction over 'an action by an interested party objecting . . . to the award of a contract.' The statute does not limit the legal theories on which such an 'objection' to a contract award might be based. Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.

79 Fed. Cl. at 461-62 (extensive citations omitted).[15/]

---

[15/] As noted in *L-3 Communications*, "[t]he Federal Circuit has not had occasion to address whether the implied contract theory survives the Administrative Dispute Resolution Act." 79 Fed. Cl. at 461 n.16. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1083 n.9 (Fed. Cir. 2001) ("Similar to the *Impresa* court, 238 F.3d at 1332 n.6, we decline to address whether implied contract theory survives the ADRA."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.6 (Fed. Cir. 2001) (noting that "we need not decide" whether (continued...)

**<u>The D.C. Circuit determined the FCC did not act arbitrarily or capriciously</u>**

The FCC's decisions challenged here have already been adjudicated in *Biltmore Forest* as not arbitrary or capricious, the applicable standard. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 909 (Fed. Cir. 1988) (stating the review of an agency's bid solicitation decisions is narrowly construed and the standard is arbitrary and capricious action). The D.C. Circuit's finding that the FCC's actions were not arbitrary or capricious, followed extensive venting, including arguments concerning Liberty's failure to file its family media certification. Those findings bind this court. The parties are identical or in privity; the first suit proceeded to a final judgment on the merits; and thirdly, the second claim (the instant litigation) is based on the same set of transactional facts as the first. *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003). The D.C. Circuit concluded the FCC did not act arbitrarily or capriciously in concluding Liberty could file a family media certification after the deadline, and granting Liberty's application while denying plaintiff's competing one. Assuming jurisdiction here, the same question would be asked and the response would be the same.

In *Nevada v. United States*, the Supreme Court summarized *res judicata*:

> Simply put, the doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, '[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' The final 'judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever.'

463 U.S. 110, 129-30 (1983) (alteration in original) (citations omitted).

The Federal Circuit has defined "claim preclusion" (a term that, along with " issue preclusion") is used interchangeably with *res judicata:* "[W]hen a judgment is

---

[15] (...continued)
the implied contract theory survived the 1996 amendments to the Tucker Act).

rendered in favor of a party to litigation, the plaintiff may not thereafter maintain another action on the same 'claim,' and defenses that were raised or *could have been* raised by the defendant in that action are extinguished.'" *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478 (Fed. Cir. 1991).

As the Federal Circuit explained, "[t]he doctrine of *res judicata*, in its claim preclusion form, provides that final judgment on a claim extinguishes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Hornback v. United States*, 405 F.3d 999, 1001 (Fed. Cir. 2005) (citations and internal quotation marks omitted).

Issue preclusion, or collateral estoppel. "bars litigation of an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented." *Simmons v. Small Business Admin.*, 475 F.3d 1372, 1374 (Fed. Cir. 2007), *cert. denied,* 128 S. Ct. 361 (2007).

That an issue be "actually litigated" is "generally satisfied if the parties to the original action disputed the issue and the trier of fact decided it." *In re Freeman*, 30 F.3d 1459, 1466 (Fed. Cir. 1994). The requirement that the party had a "full and fair opportunity to litigate," 30 F.3d at 1465, is satisfied if there is no reason to "doubt the quality, extensiveness, or fairness of procedures followed in the prior litigation." 30 F.3d at 1467 (citing *Montana v. United States*, 440 U.S. 147, 164 & n.11 (1979)).

In *Biltmore Forest*, Biltmore argued that the FCC should have disqualified Liberty, awarded the license to Biltmore and not dismissed Biltmore's application, for several reasons, including the untimely filing of the family media certification. In response, the D.C. Circuit held that "the family [media] certification [was] not among those required pursuant to [47 C.F.R.] § 1.2105, the omission of which incurably disqualifies the applicant as specified in § 1.2105(b)(1)." 321 F.3d at 160-61. The D.C. Circuit further held that it was not unreasonable for the FCC to extend to Liberty the opportunity to correct its filing defect pursuant to Section 1.2105(b)(2). Accordingly, the D.C. Circuit affirmed the FCC's decision to award the license to Liberty.

That the first action was a review of the FCC's licensing decisions and this subsequent suit for breach of contract is of no moment. The underlying facts, particularly the family media certificate requirements in the Public Notice, are the same. Plaintiff repeats the same argument, that the FCC breached an implied-in-fact contract when it did not disqualify Liberty for failure to file its family media certification. This issue was actually litigated and decided by the D.C. Circuit; substantive resolution of that issue was part of the D.C. Circuit's decision to affirm the FCC's determination. 321 F.3d at 155. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. " *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

In *Aulston v. United States*, 823 F.2d 510 (Fed. Cir. 1987), the Interior Board of Land Appeals determined that the plaintiff had no ownership rights in the property. As the title question was decided against plaintiff in an adjudicative administrative procedure, that finding was binding on the Court of Federal Claims in a subsequent takings case. Confirming this court has jurisdiction over the taking claim, the administrative findings on lack of title could not be ignored. "'[T]he Claims Court does not acquire authority to review an agency action otherwise reviewable only in district court merely because plaintiff's effort to obtain review is couched in terms of a taking claim.'" 823 F.2d at 514.

Accordingly, if this court has jurisdiction over plaintiff's pleaded claim, defendant's alternative motion for summary judgment presents a valid argument because, as a matter of law, plaintiff's claims are barred by *res judicata*, collateral estoppel and issue preclusion.

Finally, if this court has subject matter jurisdiction over plaintiff's claims, and if the issues sought to be raised here were not barred by *res judicata*, issue preclusion or collateral estoppel, any monetary recovery would be limited to bid preparation and proposal costs, not the lost profits specifically plead. 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.").

Accordingly, it is **ORDERED** that:

1. Defendant's Motion to Dismiss Plaintiff's Complaint, or in the Alternative, Motion for Summary Judgment, is **GRANTED**.

2. The Clerk is directed to enter final judgment dismissing plaintiff's Complaint with no costs assessed.

s/ James F. Merow
James F. Merow
Senior Judge